UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NOVEL COMMODITIES S.A.,

                Plaintiff,

      v.

QBE INSURANCE CORPORATION,

                Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 30, 2013

**ORDER**

11 Civ. 6339 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

      This case concerns an insurance coverage dispute. In 2009 and 2010, Plaintiff Novel Commodities S.A. ("Novel") sold large quantities of rice to CIA. Arrocera Covadonga ("Covadonga"), a large Mexican agribusiness, on credit. Because of the credit risk associated with doing business with Covadonga, Novel obtained a trade credit insurance policy (the "Policy") from Defendant QBE Insurance Corporation (the "Insurer"). The term of the Policy was from October 1, 2009 to September 30, 2010. The Policy was subject to an "Endorsed Credit Limit" of $15 million. (Pltf. R. 56.1 Stmt. ¶ 15)[1] After the deductible and other limitations on coverage are applied, the Policy provided Novel with coverage up to $13.5 million in the event that Covadonga did not pay invoices for rice Novel had shipped.[2]

      After Covadonga defaulted on its payment obligations, Novel made a claim under the Policy, seeking coverage for 32 invoices issued between April 19, 2010, and September 23, 2010, for rice shipped to Covadonga. (Pltf. R. 56.1 Stmt. ¶ 35) The invoice value of the rice

---

[1] To the extent that this Court relies on facts drawn from Local Rule 56.1 statements, it does so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." (citations omitted)).

[2] The Policy is subject to a $500,000 deductible and provides for a recovery of only 95% of a "Insured Loss" (the "Insured Percentage"). (Pltf. R. 56.1 Stmt. ¶¶ 16-17)

was $12,285,001.12, and Novel sought recovery in that amount.  (Id.)  The Insurer denied coverage for many of the invoices because they were issued, and rice was shipped, at a time when Covadonga's outstanding debt to Novel was greater than $15 million.  The Insurer asserted that these sales and shipments represented extensions of credit that exceeded the $15 million limit, and therefore were not covered under the Policy.

The parties have filed cross-motions for summary judgment.  Although they offer conflicting interpretations of the key Policy language, both Novel and the Insurer assert that the relevant Policy terms are unambiguous, and ask the Court to interpret these terms as a matter of law.

Novel contends that the Policy provides coverage for all invoices not paid by Covadonga, as long as the credit was provided during the policy period and before Covadonga had committed any default, up to $15 million, minus the deductible and the Insured Percentage.  (Novel Br. 1-2)  The Insurer contends that any invoices issued at a time when Covadonga owed Novel $15 million or more are excluded from coverage.  (QBE Br.12)

Because the relevant Policy terms are not unambiguous, and because the extrinsic evidence offered by the parties is not conclusive, the parties' cross-motions for summary judgment will be denied.

## BACKGROUND

### I.  THE POLICY

The Policy terms most relevant to the parties' coverage dispute are set forth below:

The "Insuring Clause" of the Policy reads as follows:

> In consideration of the payment of all **Premium** and other charges when due and subject to the terms and conditions of this **Policy**, we agree to cover you in respect

of goods sold and **Dispatched**[3] . . . within the **Policy Period** up to the **Insured Percentage** of the **Insured Loss** in the event of the **Buyer** failing, due to **Insolvency** or **Protracted Default**, to pay you an **Insured Debt** up to the **Policy Amount**. Any **Endorsed Credit Limit**, **Policy Amount** or other limits of liability under this **Policy** and under any preceding or future **Policy** issued by us to you are non-cumulative.

(Knoerzer Decl., Exh. 12 (Policy), Art. II)

An "Insured Debt" is defined in the Policy as the invoice value of goods sold that does not exceed the "Endorsed Credit Limit":

**"Insured debt"** means the invoice value of such goods sold and **Dispatched** . . . by you arising out of the trade specified in the **Declaration** that:  a. is owed to you by the **Buyer**; and b. does not exceed the **Endorsed Credit Limit** for the **Buyer**; and c. is in respect of the invoice value of goods . . . both sold by you to the **Buyer** and **Dispatched** to the **Buyer** within the **Policy Period** pursuant to a contract of sale providing for repayment of the debt within the terms of payment specified in the **Declaration** . . . .

(Id., Art. V)

The Policy defines "Endorsed Credit Limit" as "the maximum amount of credit that you are covered for under this **Policy** and shall not include any sales tax, value added tax, or any other taxes." (Id.)

The Policy also contains a "Co-Insurance" clause, which states:

You shall retain for your own account:  (1) the amount of **Insured Loss** that exceeds the **Insured Percentage**; and (2) any indebtedness of the **Buyer** to you that exceeds the **Endorsed Credit Limit**; and (3) the **Deductible** amount (if any); and (4) any loss that exceeds the **Policy Amount**.

---

[3] Under the Policy "**Dispatched**" means:

when such goods: . . . b. in the case where the **Buyer** is located in a different country the time period at which the goods have been passed to the first carrier (which must be within the **Policy Period**) in the process of being carried to the place where the **Buyer** is required to accept them.

(Policy, Art. V)

3

(Id., Art. III.6.a)

As discussed in more detail below, the parties' coverage dispute turns on application of the "Endorsed Credit Limit" provision, and what point in time the buyer's outstanding debt is calculated. The Insurer argues that for every invoice Novel issued to Covadonga that was not paid, it is necessary to do an analysis of the amount of credit that Novel then had outstanding to Covadonga. As noted above, Novel's position is that no such invoice-specific analysis is required under the Policy, and that coverage turns simply on whether the unpaid invoices were issued within the Policy period and amount to less than the $15 million limit.

## II.     NOVEL'S SALES TO COVADONGA AND COVADONGA'S DEFAULT

At some point after October 16, 2009, Novel began selling large quantities of rice to Covadonga on credit. (Hollebeke Decl. ¶ 4; Ex. C) Under the terms of the invoices, Covadonga was required to pay the invoices within 150 days of their issuance. From October 2009 until early September 2010, Covadonga timely paid all of Novel's invoices. (Id. ¶ 10)

On September 16, 2010, Invoice No. 1910, in the amount of $1,374,647.02, became due for payment. (Pltf. R. 56.1 Stmt. ¶ 21) This invoice was issued on April 19, 2010, i.e., 150 days prior to the payment due date. Covadonga did not pay this invoice, an act that constitutes a "Notifiable Event" under the Policy. (Pltf. R. 56.1 Stmt. ¶¶ 22-23) Novel notified the Insurer of Covadonga's default on September 27, 2010.[4] (Pltf. R. 56.1 Stmt. ¶ 24)

In January 2011, Novel commenced an insolvency proceeding against Covadonga in Mexico. (Pltf. R. 56.1 Stmt. ¶ 30)

---

[4] Under the Policy, after a "Notifiable Event," Novel is not covered for any additional sales to Covadonga. (Knoerzer Decl., Exh. 12 (Policy), Art. III.2.c) (the "Endorsed Credit Limit on the Buyer is automatically cancelled and [a]ny subsequent goods Dispatched . . . following the occurrence of a Notifiable Event are not insured. . . .").

### III. NOVEL'S CLAIM

On February 3, 2011, Novel submitted a notice of claim under the Policy concerning Covadonga's unpaid invoices. (Pltf. R. 56.1 Stmt. ¶¶ 33-34) Novel sought to recover on 32 invoices[5] issued between April 19, 2010, and September 28, 2010, for a total invoiced amount of $12,285,001.12. (Pltf. R. 56.1 Stmt. ¶ 35) Novel's claim was cumulative, in that it included all of the unpaid invoices that were issued during the one-year period that the Policy was in effect, less the deductible and Insured Percentage. Because the total amount of unpaid invoices is less than $15 million, Novel claimed then, and claims now, that it has coverage for all its losses, less the deductible and the Insured Percentage.

On April 27, 2011, the Insurer rejected 20 invoices that were part of Novel's claim. The Insurer argued that Covadonga's outstanding debt was above $15 million when each of these 20 invoices was issued, and that, as a result, none were covered under the Policy. (Pltf. R. 56.1 Stmt. ¶ 39)

On July 26, 2011, the Insurer issued a payment to Novel in the amount of $1,160,927.59. (Pltf. R. 56.1 Stmt. ¶ 54) This amount represents the partial or total gross invoice value of ten invoices that were issued when Covadonga's debt was less than $15 million, less the deductible and the Insured Percentage. (Pltf. R. 56.1 Stmt. ¶ 54) Novel accepted the Insurer's payment without prejudice to its right to seek additional coverage under the Policy. (Pltf. R. 56.1 Stmt. ¶ 56)

The Parties agree that New York law governs the "construction, performance, and validity" of the Policy. (Pltf. R. 56.1 Stmt. ¶ 20)

---

[5] In this action, Novel seeks recovery on only 30 unpaid invoices, totaling $9,804,810.72. (Novel Br. 2) The two remaining invoices were issued after Covadonga's first default – the "Notifiable Event" – on September 27, 2010. (Id. at 2 n.3)

5

**DISCUSSION**

I.   **LEGAL STANDARD FOR SUMMARY JUDGMENT**

The parties have crossed-moved for summary judgment. Under Federal Rule of Civil Procedure 56(a), summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).

In deciding a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001). However, "a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotations and citations omitted). Instead, the non-moving party must "offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998).

"The same standard applies where, as here, the parties filed cross-motions for summary judgment. . . ." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion

must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. (internal citation omitted).

## II.     INTERPRETATION OF INSURANCE CONTRACTS UNDER NEW YORK LAW

### A.     Applicable Law

Under New York law, "'an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract.'" Morgan Stanley Group Inc. v. New England Ins. Co., 225 F.3d 270, 275 (2d Cir. 2000) (quoting Village of Sylvan Beach v. Travelers Indem. Co., 55 F.3d 114, 115 (2d Cir. 1995)). When the provisions of a policy are unambiguous and understandable, courts are to enforce them as written. See Goldberger v. Paul Revere Life Ins. Co., 165 F.3d 180, 182 (2d Cir. 1999).

Whether a contract is ambiguous is a "threshold question of law to be determined by the court." Duane Reade Inc. v. St. Paul Fire and Marine Ins. Co., 411 F.3d 384, 390 (2d Cir. 2005); see also Morgan Stanley Group, Inc., 225 F.3d at 275 ("Part of this threshold interpretation is the question of whether the terms of the insurance contract are ambiguous." (citing Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, 136 F.3d 82, 86 (2d Cir. 1998))). "An ambiguity exists where the terms of an insurance contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" Morgan Stanley Group Inc., 225 F.3d at 275 (quoting Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir. 1997)).

No ambiguity exists when contract language has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning

7

which there is no reasonable basis for a difference of opinion." <u>Breed v. Insurance Co. of North America</u>, 46 N.Y.2d 351, 355 (1978).

    B.    <u>Analysis</u>

        1.    **<u>Plain Language</u>**

The Insurer argues that the Policy provides no coverage to Novel for unpaid invoices and rice shipments that Novel issued to Covadonga at a time when Covadonga had an outstanding debt to Novel of greater than $15 million. According to the Insurer, the determination of whether the $15 million threshold has been reached is conducted on a day-to-day, invoice-by-invoice basis, looking at Covadonga's shifting balance of debt, as it made payment on some invoices and was invoiced for new shipments of rice. (QBE Br.15-16) If Covadonga had an outstanding balance of less than $15 million at the time an invoice was issued, and Covadonga later defaulted on that invoice, Novel is covered. If Covadonga had an outstanding balance of greater than $15 million at the time an invoice was issued, and Covadonga later failed to make payment on that invoice, Novel is not covered.

The key provisions of the Policy, particularly the definitions of "Insured Debt" and "Endorsed Credit Limit," do not unambiguously provide for the non-cumulative, day-to-day, invoice-by-invoice approach advocated by the Insurer. While the definition of "Insured Debt" speaks to the "invoice value of such goods sold," no Policy provision unambiguously states that the "Endorsed Credit Limit" determination is made on the basis of the debt outstanding at the time that an unpaid invoice was issued. Accordingly, the Insurer is not entitled to summary judgment based on the plain language of the Policy.

The plain language of the Policy likewise does not permit the Court to enter summary judgment for Novel. Novel has not cited any language in the Policy demonstrating that

the "Endorsed Credit Limit" analysis is conducted at the end of the Policy term, as opposed to when an unpaid invoice was issued, when the buyer first defaults, at the time of each subsequent default, when the claim is made, or at some other point. In short, Novel has not shown that the Policy unambiguously covers all of Covadonga's unpaid invoices, issued at any time during the Policy period, up to $15 million, less the deductible and Insured Percentage.

Because the Policy language is ambiguous on this issue, neither side is entitled to summary judgment based on the plain language of the Policy

### 2.     **Extrinsic Evidence**

"Once a court concludes that an insurance provision is ambiguous, 'the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.'" Morgan Stanley Group Inc., 225 F.3d at 275-76 (quoting Alexander & Alexander, 136 F.3d at 86; see also Seiden Assocs. v. ANC Holdings, Inc., 959 F.2d 425, 428-29 (2d Cir. 1992)).

Novel has not offered any extrinsic evidence.

The Insurer has offered two emails of Novel employees to demonstrate that Novel contemporaneously acknowledged that extensions of credit over the $15 million limit were at Novel's own risk. The first email (Knoerzer Decl., Ex. 9 at Novel 0339) is of no value, because it involves different parties, and there is nothing in the record demonstrating that the policy at issue there had the same terms as the policy at issue here. However, in the second email – dated September 2, 2010 – a Novel employee states: "This puts us almost square on [the Insurer's] limit which we have overdrawn by about 2.5 mi[lli]on to help Covadonga obtain[] more goods at our own risk." (Knoerzer Decl., Ex. 10 at Novel 0475)  This email tends to suggest that Novel

understood that when it extended more than $15 million in credit to Covadonga, it would bear the loss if Covadonga did not pay on that invoice.

The Insurer has also offered evidence that Novel made "constant requests for increases in the [$15 million Endorsed Credit Limit.]"  (See QBE Br. 21)  The Insurer argues that these requests "demonstrate[] that Novel's understanding of the Policy at the time was the same as [the Insurer's] – extension of credit below the [$15 million] ECL were Insured Debt, but if the [$15 million limit] was exceeded, further transactions would not be insured. . . ."  (Id. at 22)  While Novel's requests to increase the Endorsed Credit Limit indicate that Novel wanted more coverage, those requests do not establish that Novel believed that the Endorsed Credit Limit analysis under the Policy was to be conducted on an invoice-by-invoice basis.

In sum, the very limited extrinsic evidence offered at summary judgment does not yield a conclusive answer as to the parties' intent regarding application of the Endorsed Credit Limit provision.

### 3. The Rule of Contra Proferentem Does Not Require that Novel's Summary Judgment Motion be Granted

Novel argues that "as a last resort, [this Court] should apply the rule of contra profenterem and resolve any ambiguities in favor of Novel."  (Novel Opp. Br. 11)

"'If the extrinsic evidence does not yield a conclusive answer as to the parties' intent,' a court may apply other rules of contract construction, including the rule of contra proferentem, which generally provides that where an insurer drafts a policy 'any ambiguity in [the] . . . policy should be resolved in favor of the insured.'"  Morgan Stanley Group Inc., 225 F.3d at 276 (quoting McCostis v. Home Ins. Co., 31 F.3d 110, 113 (2d Cir. 1994)).  "The rule of contra proferentem is 'that when one party is responsible for the drafting of an instrument, absent evidence indicating the intention of the parties, any ambiguity will be resolved against the

drafter.'" Pagan v NYNEX Pension Plan, 52 F.3d 438, 443 (2d Cir. 1995) (quoting O'Neil v. Retirement Plan For Salaried Employees of RKO General, Inc., 37 F.3d 55, 61 (2d Cir. 1994). The Second Circuit has emphasized that "contra proferentem is used only as a matter of last resort, after all aids to construction have been employed but have failed to resolve the ambiguities in the written instrument." Schering Corp. v. Home Ins. Co., 712 F.2d 4, 10 n.2 (2d Cir. 1983).

   Here, the record is clear that none of the Policy terms at issue were negotiated by the parties. They were, instead, drawn from the Insurer's "Specific Account Policy," a standard form available on the Insurer's website. (See Sullivan Supp. Decl. ¶4; Ex. G.) Nonetheless, it is not appropriate to resolve this case, against the Insurer, on the basis of the contra proferentem rule.

   The Court has concluded that the plain language of the Policy is ambiguous. Novel chose not to offer any extrinsic evidence to support its interpretation of the Policy. The Insurer offered very little extrinsic evidence, but part of what it did offer supports the Insurer's interpretation of the Policy. "'[W]here the relevant extrinsic evidence offered "raises a question of credibility or presents a choice among reasonable inferences" the construction of the ambiguous terms of the contract is a question of fact which precludes the application of the contra proferentem rule [at summary judgment].'" Core-Mark Intern. Corp. v. Commonwealth Ins. Co., No. 05 Civ. 0183(WHP), 2006 WL 2501884, at *7 (S.D.N.Y. Aug. 30, 2006) (quoting Morgan Stanley Group, Inc. v. New Eng. Ins. Co., 36 F. Supp. 2d 605, 609 (S.D.N.Y. 1999) (quoting Alfin, Inc. v. Pac. Ins. Co., 735 F. Supp. 115, 119 (S.D.N.Y. 1990))); see also Alfin, Inc., 735 F. Supp. at 121 n.5 (where "there is extrinsic evidence which is subject to [multiple] reasonable interpretations" "it would be improper" to apply the rule "on summary judgment"; the

11

propriety of applying the rule will be determined by the ultimate "factfinder, [who] after hearing all the evidence, [might] be able to resolve the dispute without need to employ this doctrine of construction, which is only to be used as a last resort").

The Second Circuit has also indicated that the contra proferentem rule must be applied with caution, and only after all other aids to construction have failed to resolve ambiguity. "To conclude otherwise would require every ambiguously drafted policy to be automatically construed against the insurer." Schering Corp., 712 F.2d at 10 n.2. Given the very limited extrinsic evidence offered by the parties, and the fact that no evidence whatsoever was introduced concerning, for example, the custom in the industry, it is premature to conclude that there are no other aids to construction that might resolve the ambiguity in the Policy.

## CONCLUSION

For the reasons stated above, Novel and QBE's cross-motions for summary judgment are denied. The Clerk of the Court is directed to terminate the motions. (Dkt. Nos. 21, 26)

The parties are directed to comply with this Court's Individual Rules concerning the preparation of a pre-trial order. The joint pre-trial order will be filed on April 30, 2013. Motions in limine, voir dire requests, and requests to charge are due on April 30, 2013. Responsive papers, if any, are due on May 14, 2013. Trial will commence on May 20, 2013, at 9:00 a.m., in Courtroom 705, 40 Foley Square, New York, New York.

Dated: New York, New York
March 30, 2013

SO ORDERED.

_Paul Gardephe_
Paul G. Gardephe
United States District Judge