UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
NOVEL COMMODITIES S.A.,

                Plaintiff,          No. 11-cv-6339 (PGG)
                                                  ECF CASE

     v.

QBE INSURANCE CORPORATION,

                Defendant.
-----------------------------------------------------------X

## QBE INSURANCE CORPORATION'S
## TRIAL MEMORANDUM OF LAW

 

CLYDE & CO US LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174

*Attorneys for Defendant*
*QBE Insurance Corporation*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ........................................................................................................ 1

ISSUES OF LAW ..................................................................................................................... 8

    A. Burden of Proof.............................................................................................................. 8

    B. Novel's Proposed Requests to Charge and Verdict Sheet Are Contrary to New York Law in that They Seek to Shift the Burden of Proof to QBE ......................... 9

    C. Novel's Proposed Requests to Charge and Verdict Sheet Are Contrary to New York Law to the Extent that They Ask the Jury, Rather than the Court, to Determine Whether Language in the Policy Constitutes an Exclusion, and Seek to Shift the Burden of Proof from Novel to QBE ...................................................... 12

CONCLUSION ....................................................................................................................... 15

1

# TABLE OF AUTHORITIES

**Cases**

*Consolidated Edison Co. v. Allstate Insurance Co.*, 98 N.Y.2d 208 (2002)................13

*Hartford Accident & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169 (N.Y. 1973)........... 10, 13

*MBIA Inc. v. Fed. Ins. Co.*, 652 F.3d 152 (2d Cir. 2011) .............................. 8, 12

*Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178 (2d Cir. 1995).......... 13

*Uniroyal v. The Home Ins. Co.*, 707 F. Supp. 1368 (E.D.N.Y. 1988).............................. 10

**Treatises**

N.Y. PJI 1:23............................................................................................................ 8

## PRELIMINARY STATEMENT

Pursuant to Rule 10(B) of the Court's Individual Practices and the Court's Order dated March 30, 2013, Defendant-counterclaimant QBE Insurance Corporation ("QBE") respectfully submits its trial memorandum of law.

This litigation relates to a trade credit insurance policy (the "Policy") that was issued by QBE to Plaintiff Novel Commodities S.A. ("Novel") with respect to invoices issued by Novel to CIA. Arrocera Covadonga ("Covadonga"). The issue to be resolved at trial is whether the parties intended for there to be insurance coverage as respects invoices issued by Novel to Covadonga at times where Covadonga's debt to Novel exceeded the $15 million Endorsed Credit Limit (the "ECL").

QBE shall contend at trial that, consistent with the terms of the Policy, Novel's invoices to Covadonga for amounts over the $15 million ECL are not Insured Debt covered under the Policy and that this was consistent with Novel's intent and understanding, as established in various Novel-generated documents. QBE seeks judgment: (1) dismissing with prejudice all of Novel's claims in this matter; (2) declaring that QBE's obligations with respect to Access Global's claim were met in full by QBE's July 26, 2011 payment to Novel in the amount of $1,160,927.59; and (3) for such other and further relief as may seem appropriate to the Court.

## STATEMENT OF FACTS

Until its recent financial distress, Novel conducted business as commodities traders with its principal place of business in Switzerland. One of Novel's lines of business was to sell rice on credit to Covadonga which, until its own financial demise,

1

was a Mexican-based company that bought various commodities on credit and resold them in Mexico to retail establishments.

To conduct business in the United States, Novel retained the services of Access Global Capital LLC ("Access Global"). Access Global's principal is James Besch, who will testify at the trial. One of the tasks performed by Access Global for Novel was to negotiate the purchase of trade credit insurance. Novel admits that, from its side, only Mr. Besch and Novel's broker, John Hertzer of Aon Trade Credit, was involved in and had personal knowledge of the negotiations involving the Policy.

QBE is an insurance company that markets and sells various insurance products, including trade credit insurance policies. Subject to the terms and limits of the policy, trade credit insurance provides coverage for sales of commodities on credit in cross-border transactions.

The parties' dealings with one another prior to issuance of the Policy in dispute are relevant. QBE insured Novel's risks to Covadonga at times before the Policy at issue was effective. At first, QBE to Novel issued excess policy coverage on a different form from the Policy at issue. Subsequently, for the period February 1, 2009 through June 30, 2009, QBE provided coverage on a primary basis, up to a $10 million Endorsed Credit Limit, on a QBE form known as the Specific Account Policy form QBTC-003 (10-05).

The evidence at trial will be that this prior primary policy contained the same terms and conditions as the Policy at issue. It was about this policy form that on June 26, 2009, Mr. James Besch inquired of QBE's underwriter Wayne Bayer:

> We have a request from our banks.
>
> Please find attached the current Novel Aging on Covadonga Mexico. We have used the 10 million capacity in our 2009 Policy. Additionally note as

2

> you will see from the attached spread sheet we have 1.2 million in sales over our limit of 10 million.
>
> Having said the above Covadonga has already "paid down" invoices during our 2009 policy period, therefore freeing up capacity under the policy, or "rolling over coverage as payments are made against invoices during the policy period as long as the new invoice also fall under the terms of the policy period".
>
> The banks are requesting confirmation from your office indicating that as payments are made against invoices during the policy period that indeed creates capacity for addition invoices if those invoices are also during said policy period, and do not exceed the policy value of 10 million dollars. Therefore could you forward a email or note on your letter head confirming this request.
>
> Please feel free to give me a call on my mobile phone should you have any questions.

QBE's Wayne Bayer responded:

> The policy provides for a maximum credit limit of $10 million in a revolving basis. As long as the shipments occur before the end of the policy period and the shipments and invoices meet the policy terms and conditions, invoices up to $10 million would be covered under the policy.

Mr. Besch sent Mr. Bayer's response to Frank Gouverne, a Novel commodities trader.

From this, the jury will see that – prior to issuance of the Policy at issue in this case – Novel understood that QBE's Specific Account Policy Form QBTC-003 (10-05) covered only those invoices issued when Covadonga's debt was less than the ECL.

The Policy QBE issued to Novel that is at issue in this case covered the period of October 1, 2009 through September 30, 2010, and was also issued on Specific Account Policy form QBTC-003 (10-05). The "Insuring Clause" of the Policy provides that, in the event that Covadonga did not repay an invoice, QBE shall pay Novel for "an Insured Debt":

3

> In consideration of the payment of all Premium and other charges when due and subject to the terms and conditions of this Policy, we agree to cover you in respect of goods sold and Dispatched and Services Provided within the Policy Period up to the Insured Percentage of the Insured Loss in the event of the Buyer failing, due to Insolvency or Protracted Default, <u>to pay you an Insured Debt</u> up to the Policy Amount. Any Endorsed Credit Limit, Policy Amount or other limits of liability under this Policy and under any preceding or future Policy issued by us to you are noncumulative.

(Policy at II) (emphasis added).

"Insured Debt" is defined in the Policy to mean the "invoice value" of all goods sold to Covadonga, to the extent that such indebtedness does not exceed the ECL:

> Insured Debt means the invoice value of such goods sold and Dispatched or Services Provided by you arising out of the trade specified in the Declaration that:
>
> a. is owed to you by the Buyer; and
>
> b. does not exceed the Endorsed Credit Limit for the Buyer...

*Id.* at V.

The ECL is defined as "the maximum amount of **credit** that you are covered for under this Policy..." *Id.* (emphasis added). Notably, the definition of ECL describes the limit as the amount of *credit*, rather than the amount of *loss*, for which Novel is covered. The Court has determined that the ECL is ambiguous.

Section III(6)(a)(2) of the Policy (entitled "Co-Insurance") provides that, among other things, Novel retains the risk of transactions with Covadonga that exceeded the $15 million ECL: "You shall retain for your own account ... any **indebtedness** of the Buyer to you that exceeds the Endorsed Credit Limit...." *Id.* (emphasis added). Notably, this provision limits coverage to <u>indebtedness</u> of the Buyer below the ECL.

When the Policy was first issued to Novel, it had an ECL of only $10 million. This ECL represented a much lower level of coverage than the amount of coverage that

4

had been available to Novel prior to the credit crisis in 2008. As the evidence at trial will prove, Novel understood that, for invoices issued at times when Covadonga's debt was above the ECL, there was no insurance for such invoices. Novel chafed at this reduction of its ECL after the financial crisis, because this reduction had the practical effect of reducing the amount of credit that Novel could issue to Covadonga (and thereby the amount of rice Novel could sell Covadonga).

Acting on behalf of Novel, Access Global's James Besch made frequent offers of more premium to QBE in return for QBE's agreement to increase the ECL. QBE granted only one such request to Novel, increasing the ECL from $10 million to $15 million. This $15 million level proved inadequate to Novel's desire to sell more rice to Covadonga, and Mr. Besch made numerous further requests to QBE to increase the ECL, with offers of yet more premium. QBE's underwriter, Wayne Bayer, will testify at the trial that he declined all of these further requests for an increase in the ECL, despite the promise of more premium, because $15 million was the maximum amount of credit to Covadonga that QBE thought prudent to cover under the Policy.

The evidence will show that Novel closely tracked its sales to Covadonga, monitoring the level of credit extended to Covadonga against the $15 million ECL. Documents kept in the ordinary course by Novel (and later provided to QBE) show that Novel considered any transactions resulting in an extension of credit to Covadonga above $15 million to be uninsured. The evidence at trial will also include a number of communications, either internal to Novel or with QBE, that show that both Novel employees and Mr. Besch understood that extensions of credit to Covadonga at times that

5

Covadonga's indebtedness to Novel was above $15 million, were not covered under the Policy.

In September 2010, Novel informed QBE of a "slow pay" by Covadonga of several invoices. Even then, Novel kept selling rice to Covadonga on credit. After Covadonga failed to pay Novel, Novel made a claim to QBE on February 3, 2011 in the amount of $12,285,001.12. After consideration of the claim, QBE determined that there was coverage of only those invoices issued when Covadonga's total indebtedness did not exceed $15 million. After applying the $500,000 deductible and the 95% insured percentage, QBE allowed Novel's claim in the amount of $1,160,927,58 and made payment in that amount to Novel.

However, as respects the other invoices issued by Novel to Covadonga at a time when Covadonga's indebtedness was above $15 million, QBE determined that there was no coverage. It is QBE's position that its obligation under the Policy is to indemnify Novel for an "Insured Debt." (Policy at II). As noted, "Insured Debt" is defined in relevant part as follows:

> Insured Debt means the invoice value of such goods sold and Dispatched or Services Provided by you arising out of the trade specified in the Declaration that:
>
> a. is owed to you by the Buyer; and
> b. does not exceed the Endorsed Credit Limit for the Buyer…

*Id.* at V.

Thus, to be insured, all invoices issued to Covadonga had to be less than the $15 million ECL. If any invoice was issued in excess of the ECL, it did not represent Insured Debt and was therefore not covered under the Policy. Although Novel was free to extend as much credit to Covadonga as it liked, if Novel extended credit to Covadonga such that

6

the "invoice value" exceeded $15 million, then it was not Insured Debt. This interpretation is supported further by the Co-Insurance provision of the Policy, which provides that "[Novel] shall retain for your own account ... any indebtedness of the Buyer to you that exceeds the Endorsed Credit Limit...."

The parties have stipulated to a chart showing the agreed and paid invoices (not highlighted), disputed invoices (highlighted in yellow), and invoices originally claimed but since withdrawn by Novel (in red):

|    | INVOICE NO. | INVOICE DATE | COVADONGA DEBT (QBE'S CALCULATION) | PAYMENT DUE DATE | GROSS INVOICE VALUE | NOVEL CLAIMED LOSS | QBE ADMITTED LOSS |
|----|-------------|--------------|------------------------------------|------------------|---------------------|--------------------|-------------------|
| 1  | 1910        | 4/19/2010    | 22,091,404.87                      | 9/16/2010        | 1,374,647.02        | 1,198,356.39       | 0.00              |
| 2  | 1913        | 4/27/2010    | 18,644,597.04                      | 9/24/2010        | 1,329,804.05        | 1,329,804.05       | 0.00              |
| 3  | 1928        | 4/29/2010    | 13,986,708.88                      | 9/26/2010        | 79,419.85           | 0.00               | 79,419.85         |
| 4  | 1928-A      | 5/4/2010     | 14,281,747.87                      | 10/1/2010        | 295,038.99          | 0.00               | 295,038.99        |
| 5  | 1919-E      | 5/5/2010     | 14,404,158.10                      | 10/2/2010        | 122,410.23          | 0.00               | 122,410.23        |
| 6  | 1928-B      | 5/6/2010     | 14,674,512.46                      | 10/3/2010        | 270,354.36          | 0.00               | 270,354.36        |
| 7  | 1914        | 5/7/2010     | 15,850,669.16                      | 10/4/2010        | 1,176,156.70        | 1,176,156.70       | 325,487.54        |
| 8  | 1928-G      | 5/28/2010    | 17,031,585.69                      | 10/25/2010       | 269,003.60          | 269,003.60         | 0.00              |
| 9  | 1928-H      | 6/2/2010     | 17,148,141.99                      | 10/30/2010       | 116,556.30          | 116,556.30         | 0.00              |
| 10 | 1928-I      | 6/4/2010     | 17,193,274.35                      | 11/1/2010        | 45,132.36           | 45,132.36          | 0.00              |
| 11 | 1928-J      | 6/8/2010     | 17,249,950.65                      | 11/5/2010        | 56,676.30           | 56,676.30          | 0.00              |
| 12 | 1928-K      | 6/16/2010    | 17,278,140.85                      | 11/13/2010       | 28,190.20           | 28,190.20          | 0.00              |
| 13 | 1928-M      | 6/22/2010    | 17,368,592.50                      | 11/19/2010       | 90,451.65           | 90,451.65          | 0.00              |
| 14 | 1928-L      | 6/25/2010    | 17,550,929.40                      | 11/25/2010       | 182,336.90          | 182,336.90         | 0.00              |
| 15 | 1947        | 7/17/2010    | 17,780,830.63                      | 12/14/2010       | 229,901.23          | 229,901.23         | 0.00              |
| 16 | 1947-A      | 7/19/2010    | 17,802,007.47                      | 12/16/2010       | 21,176.84           | 21,176.84          | 0.00              |
| 17 | 1947-B      | 7/23/2010    | 18,019,160.27                      | 12/19/2010       | 217,152.80          | 217,152.80         | 0.00              |
| 18 | 1947-C      | 7/26/2010    | 18,148,939.21                      | 12/20/2010       | 129,778.94          | 129,778.94         | 0.00              |
| 19 | 1947-D      | 7/27/2010    | 18,394,864.79                      | 12/24/2010       | 245,925.58          | 245,925.58         | 0.00              |
| 20 | 1947-E      | 7/29/2010    | 18,649,929.89                      | 12/26/2010       | 255,065.10          | 255,065.10         | 0.00              |
| 21 | 1947-F      | 7/31/2010    | 18,566,609.99                      | 12/28/2010       | 264,366.25          | 264,366.25         | 0.00              |
| 22 | 1947-G      | 8/3/2010     | 18,835,882.09                      | 12/31/2010       | 269,272.10          | 269,272.10         | 0.00              |
| 23 | 1947-H      | 8/6/2010     | 18,861,065.92                      | 1/3/2011         | 25,183.83           | 25,183.83          | 0.00              |
| 24 | 1955        | 8/11/2010    | 22,746,277.62                      | 1/8/2011         | 5,110,644.07        | 5,110,644.07       | 0.00              |
| 25 | 1947-I      | 8/12/2010    | 22,898,710.79                      | 1/9/2011         | 152,433.17          | 152,433.17         | 0.00              |

7

|    | INVOICE NO. | INVOICE DATE | COVADONGA DEBT (QBE'S CALCULATION) | PAYMENT DUE DATE | GROSS INVOICE VALUE | NOVEL CLAIMED LOSS | QBE ADMITTED LOSS |
|----|---------|-----------|---------------|-----------|------------|------------|------------|
| 26 | 1962    | 9/10/2010 | 11,437,564.73 | 2/7/2011  | 24,000.37  | 24,000.37  | 24,000.37  |
| 27 | 1962-A  | 9/17/2010 | 11,460,449.20 | 2/14/2011 | 22,884.47  | 22,884.47  | 22,884.47  |
| 28 | 1962-B  | 9/17/2010 | 11,597,626.13 | 2/14/2011 | 137,176.93 | 137,176.93 | 137,176.93 |
| 29 | 1962-C  | 9/17/2010 | 11,697,192.62 | 2/14/2011 | 99,566.49  | 99,566.49  | 99,566.49  |
| 30 | 1962-D  | 9/18/2010 | 11,816,866.77 | 2/15/2011 | 119,674.15 | 119,674.15 | 119,674.15 |
| 31 | 1962-E  | 9/20/2010 | 11,863,608.95 | 2/17/2011 | 46,742.18  | 46,742.18  | 46,742.18  |
| 32 | 1962-F  | 9/20/2010 | 11,980,609.65 | 2/17/2011 | 117,000.70 | 117,000.70 | 117,000.70 |
| 34 | 1962-G  | 9/22/2010 | 12,000,983.19 | 2/19/2011 | 20,373.54  | 20,373.54  | 20,373.54  |
| 35 | 1962-H  | 9/27/2010 | 12,086,432.02 | 2/21/2011 | 43,549.59  | 43,549.59  | 0.00       |
| 36 | 1962-I  | 9/23/2010 | 12,042,882.43 | 2/20/2011 | 41,899.24  | 41,899.24  | 41,899.24  |
| 37 | 1962-J  | 9/28/2010 | 12,108,710.49 | 2/25/2011 | 22,278.47  | 22,278.47  | 0.00       |

## ISSUES OF LAW

The court has declared the ECL to be ambiguous but concluded that QBE has adduced enough extrinsic evidence to merit a jury's consideration of extrinsic evidence to determine the parties' intent. *See* March 30, 2013 Order. Pre-trial exchanges between the parties establish that a few legal issues will need to be preliminarily addressed by the Court.

### A.    Burden of Proof

Novel has the burden of proving by a preponderance of the evidence that the Policy provides coverage for the claimed loss. *MBIA Inc. v. Fed. Ins. Co.*, 652 F.3d 152, 158 (2d Cir. 2011). If Novel cannot meet this burden, or if the jury concludes that the weight of evidence is so balanced that there is no showing of a preponderance of evidence in Novel's favor, then the jury must find for QBE. *See* N.Y. PJI 1:23.

8

**B.    Novel's Proposed Requests to Charge and Verdict Sheet Are Contrary to New York Law in that They Seek to Shift the Burden of Proof to QBE**

The parties have failed to reach an agreement with respect to a proposed verdict sheet and several proposed requests to charge. The parties will each submit a verdict sheet for the Court's consideration. With respect to the requests to charge, the parties are in agreement with respect to Charges 1-10, but submit their own Requests to Charges 12-16. For the reasons that follow, the Court should adopt QBE's Proposed Verdict Sheet and Requests to Charge.

As respects Proposed Request to Charge Number 13, the parties are in general agreement except that QBE believes that the Court should identify the party with the burden of proof.

In its Novel's Proposed Request to Charge Number 12, Novel proposes the following instruction to the jury:

> *Similarly, if you cannot determine—by a preponderance of the evidence—the parties' intent at the time the Policy issued, then you should answer the appropriate question on the verdict form.*
>
> *I remind you that you are not required to find that the extrinsic evidence presented by the parties has proven what the parties' intentions were. You will have fulfilled your duty if you determine that the evidence is inconclusive.*

*See also* Novel's Proposed Request to Charge Number 14 ("*If, upon review of all of the evidence, you are not able to determine the meaning of the disputed language of the*

9

*Policy, then I instruct you as a matter of law that you must interpret the language of the Policy in favor of Novel against QBE.")*

By these proposed charges, Novel invites the jury to conclude that the extrinsic evidence is insufficient for the jury to decide the matter. This invitation is contrary to New York law and the Court's Order of March 30, 2013. It would put the jury in the position of superseding the role of the Court and making its own determination as to whether there is sufficient extrinsic evidence.

In a passage previously cited by Novel on its motions for summary judgment, Judge Weinstein, writing in *Uniroyal v. The Home Insurance Co.,* 707 F. Supp. 1368 (E.D.N.Y. 1988), summarized New York concerning the treatment of ambiguous insurance policies:

> Where the terms of the policy admit of ambiguity, the court should afford the parties an opportunity to adduce extrinsic evidence as to their intent. This invitation might result in three outcomes relevant under New York law: extrinsic evidence offered that raises a question of credibility or presents a choice among reasonable inferences; extrinsic evidence offered that fails to raise credibility or present such a choice; or no extrinsic evidence offered. New York law requires a submission to the factfinder in the first situation, but a construction by the court as a matter of law in the second and third situations.

*Id.* at 1374 (internal citation omitted). The Court's March 30, 2013 Order makes clear that it is the first outcome that is of concern to us here. In that order, the Court has concluded that there is sufficient extrinsic evidence to warrant submission to a fact finder – the jury. This is consistent with the law set out by the New York Court of Appeals in *Hartford Accident & Indemnity Co. v. Wesolowski,* 33 N.Y.2d 169, 172 (N.Y. 1973) ("If there is ambiguity in the terminology . . . and determination of the intent of the parties depends on the credibility of extrinsic evidence or on a choice among reasonable

10

inferences to be drawn from extrinsic evidence, then such determination is to be made by the jury.").

Contrary to Novel's approach, it is a threshold question for the Court, and never for the jury, to determine whether the extrinsic evidence raises a question of credibility or presents a choice among reasonable inferences. "The appraisal of the value or existence of extrinsic evidence is for the court as a matter of substantive law." *Uniroyal*, 707 F. Supp. at 1375. "Thus the court must determine the nature of any ambiguity present after any extrinsic evidence has been adduced." *Id.*

If the Court concludes that QBE has presented extrinsic evidence at trial that raises a question of credibility or present a choice among reasonable inferences, then the matter is referred to the jury for disposition as the factfinder. *Uniroyal*, 707 F. Supp. at 1374 ("New York law requires a submission to the factfinder" where the extrinsic evidence creates a question of credibility or presents a choice among reasonable inferences.).

According to the aforementioned authorities, however, after the Court has appraised the value of the extrinsic evidence and determined that the extrinsic evidence is sufficient to allow the question of coverage to go to the jury, it is not for the jury to overturn the Court's decision and to determine that the extrinsic evidence is insufficient and therefore decline to render a verdict on that basis.

Novel's Proposed Requests to Charge 12 and 14 not only violate these principles of New York law, but if they were upheld, they would have the effect of overturning Novel's burden of proving its claim by a preponderance of evidence, and instead resulting in Novel prevailing if the jury concludes there is not a preponderance of evidence in

11

either party's favor. Novel, as the insured, has the burden to prove by a preponderance of the evidence that the parties intended there would be coverage for the disputed invoices issued to Covadonga at a time when Covadonga owed Novel at least $15 million. *See MBIA Inc. v. Federal Ins. Co.*, 652 F.3d 152, 158 (2d Cir. 2011). A finding by the jury in favor of Novel is required if the evidence favoring its claims for coverage outweighs the evidence opposed to those claims. *See* N.Y. PJI 1:23. Contrary to Novel's position here, if the evidence Novel adduces at trial does not outweigh the evidence offered by QBE, or if the competing evidence weighs evenly so that the jury cannot find for either party, then the jury must decide the question of the parties' intent in favor of QBE. *See id.*

Therefore, Novel's Proposed Requests to Charge 12 and 14 and, and its verdict sheet, questions 2 and 3, must be stricken.

### C. Novel's Proposed Requests to Charge and Verdict Sheet Are Contrary to New York Law to the Extent that They Ask the Jury, Rather than the Court, to Determine Whether Language in the Policy Constitutes an Exclusion, and Seek to Shift the Burden of Proof from Novel to QBE

Novel's Proposed Requests to Charge Number 15 and 16 and its question number 4 in its Proposed Verdict Sheet improperly seek to refer to the jury the legal question of whether language in the Policy is an exclusion. Novel's Proposed Request to Charges Number 15 and 16 and questions Number 4 and 5 in its Proposed Verdict Sheet also wrongly seek to shift to QBE the burden of proving that Novel's claims are excluded under the Policy.

It is well-settled that contract interpretation is a matter for the Court and not the jury. *Hartford Accident & Indem. Co. v. Wesolowski*, 33 N.Y.2d at 172. The question of

12

whether a particular provision of an insurance policy constitutes an exclusion is a matter of contract interpretation reserved for the Court.

Novel has argued that the Co-Insurance and ECL provisions of the Policy are exclusions and that, as such, QBE should bear the burden of proving that those provisions apply. Novel is incorrect to characterize these provisions as exclusions, or to assert that QBE has the burden of proof.

The case relied upon by Novel in support of its arguments that these provisions are exclusions, *Stonewall Insurance Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178 (2d Cir. 1995), declared that policy language limiting coverage should be read as an exclusion. *Id.* at 1205. *Stonewall* has been characterized by the New York Court of Appeals as not reflecting New York law.

In *Consolidated Edison Co. v. Allstate Insurance Co.*, 98 N.Y.2d 208 (2002), the New York Court of Appeals declared the reasoning of *Stonewall* "unpersuasive" and noted that "*Any* language providing coverage for certain events of necessity implicitly excludes other events. Indeed, virtually all of the language in the policies following the initial grant of coverage has the effect of limiting the scope of coverage in one way or another." *Id.* at 219 (emphasis original). Therefore, the New York Court of Appeals declared that the fact that a policy term limits coverage does not make that policy provision into an exclusion.

The "Co-Insurance" clause of the Policy provides that:

You shall retain for your own account . . . (2) any indebtedness of
the Buyer to you that exceeds the Endorsed Credit Limit...

13

(Policy at III(6)(a)(2)). This provision is merely an expression of the limit of coverage, beyond which Novel was not covered. The definition of Endorsed Credit Limit – "the maximum amount of credit that you are covered for under this Policy..." – likewise is merely an expression of the limit of coverage. Novel has not cited any authority, and QBE is aware of none, that stands for the proposition that a policy limit is equivalent to an exclusion. QBE contends Novel's attempt to shift the burden of proof and to narrowly construe these policy provisions as exclusions is legally unfounded.

In light of the above, Novel's Proposed Request to Charge Number 15 and 16 and Question Number 4 and 5 in its Proposed Verdict Sheet should be rejected.[1]

## **CONCLUSION**

For the foregoing reasons, QBE seeks an order as follows:

1. Striking Novel's Proposed Requests to Charge Number 12-16;

2. Striking Novel's Proposed Verdict Sheet in its entirety; and

3. Charging the jury as per QBE's Proposed Requests to Charge and Verdict Sheet.

At the conclusion of trial, QBE seeks a judgment dismissing Novel's claims with prejudice and for such other relief as the Court deems appropriate.

Dated: New York, New York
       April 30, 2013

                              CLYDE & CO US LLP

                              By: _____
                              Michael A. Knoerzer
                              Stephen M. Kennedy
                              Victoria L. Melcher
                              The Chrysler Building
                              405 Lexington Avenue,
                              16th Floor
                              New York, New York 10174
                              (212) 710-3900

                              *Attorneys for Defendant*
                              *QBE Insurance Corporation*

---

[1] Question Number 1 of Novel's Proposed Verdict Sheet should also be stricken as it contains an improper reference to an exclusion where no exclusion exists.

15