UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------- X
:
NOVEL COMMODITIES S.A.,                     :
                                            :           No. 11-cv-6339 (PGG)
                Plaintiff,                  :
                                            :           ECF CASE
                                            :
       - v -                                :
                                            :
QBE INSURANCE CORPORATION,                  :
                                            :
                Defendant.                  :
                                            :
------------------------------------------- X

**PLAINTIFF NOVEL COMMODITIES S.A.'S TRIAL MEMORANDUM OF LAW**

SULLIVAN & WORCESTER LLP
Michael T. Sullivan
Andrew T. Solomon
Karen E. Abravanel
1633 Broadway, 32nd Floor
New York, New York 10019
Telephone: (212) 660-3000
Facsimile: (212) 660-3001

*Attorneys for Plaintiff*
*Novel Commodities S.A.*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... ii
INTRODUCTION ...........................................................................................................................1
SUMMARY OF THE EVIDENCE ................................................................................................3
    I.    Background ...............................................................................................3
    II.    The Relevant Terms of the Policy ............................................................4
    III.    The Negotiation of the Policy ..................................................................5
    IV.    Novel's Sales To Covadonga And Covadonga's Default .........................6
    V.    Novel's Claim Under The Policy .............................................................6
    VI.    QBE Denies Complete Coverage For Novel's Claim ..............................6
    VII.    Novel's Litigation Claim ...........................................................................8
    VIII.    Anticipated Testimony .............................................................................9
OVERVIEW OF LEGAL ISSUES ..................................................................................................9
    I.    NOVEL'S CLAIM FOR BREACH OF CONTRACT .............................9
    II.    QBE'S COUNTERCLAIM FOR DECLARATORY JUDGMENT ......10
    III.    THE EVIDENCE PRESENTED AT TRIAL WILL RESOLVE ANY AMBIGUITY IN NOVEL'S FAVOR ........................................................10
    IV.    IN THE ALTERNATIVE, THE APPLICATION OF THE ENDORSED CREDIT LIMIT PROVISION IS AN EXCLUSION, WHICH SHOULD BE STRICTLY CONSTRUED AGAINST QBE ........................................11
    V.    THE PARTIES' PROPOSED REQUESTS TO CHARGE ...................12
        A.    # 12: "Burden of Proof" ...............................................................12
        B.    # 13: Preponderance of the Evidence ..........................................13
        C.    # 14: Breach of Contract—Ambiguous Coverage Term ............13
        D.    # 15: Coverage or Exclusion? ......................................................14
        E.    # 16 : Breach of Contract—Ambiguous Contractual Term .........14
    VI.    THE PARTIES' PROPOSED VERDICT SHEETS .............................15
CONCLUSION ..............................................................................................................................15

# **TABLE OF AUTHORITIES**

**Cases**

*Ace Wire & Cable., Inc. v. Aetna Causlty & Surety Co.*, 60 N.Y.2d 390 (1983) ............................ 13

*Brice v. State Farm Fire and Cas. Co.*, 761 F. Supp. 2d 96 (S.D.N.Y. 2010) ..................... 3, 10, 11

*Parks Real Estate Purchasing Group v. St. Paul Fire and Marine Ins. Co.*, 472 F.3d 33 (2d Cir. 2006) ................................................................................................................. 10

*Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304, 476 N.E.2d 272 (1984) ................................... 10

*Stonewall Ins. Co. v Asbestos Claim Mgmt. Corp.*, 73 F.3d 1178 (2d Cir. 1995) ......................... 12

*Utica Mut. Ins. Co. v. Prudential Prop. & Cas. Ins Co.*, 103 A.D.2d 60, 477 N.Y.S.2d 657 (2d Dep't 1984) ........................................................................................................ 11

*VAM Check Cashing Corp. v. Fed. Ins. Co.*, 699 F.3d 727 (2d Cir. 2012) .................................... 11

Pursuant to Paragraph 10(B)(1)(b) of the Court's Individual Practices, Plaintiff Novel Commodities S.A. ("Novel") respectfully submits this trial memorandum of law in support of its claim for breach of contract against Defendant QBE Insurance Corporation ("QBE").

## INTRODUCTION

This action concerns a Trade Credit Insurance Policy ("Policy") that QBE issued and sold to Novel,[1] on or about October 16, 2009. The Policy purports to indemnify Novel for unpaid debt—"invoice value"—arising from Novel's anticipated sales of "rice, beans, and food products" to CIA. Arrocera Covadonga ("Covadonga"). The Policy provided an Endorsed Credit limit of $10,000,000, later increased to $15,000,000.

The Court earlier succinctly summarized the parties' dispute:

> Novel contends that the Policy provides coverage for all invoices not paid by Covadonga, as long as the credit was provided during the policy period and before Covadonga had committed any default, up to $115 million, minus the deductible and the Insured Percentage. . . . The Insurer contends that any invoices issued at a time when Covadonga owed Novel $15 million or more are excluded from coverage."

*See* Order dated March 30, 2013 at 2 (dkt. no. 39) ("SJ Order"). The Court continued:

> [T]he parties' coverage dispute turns on application of the "Endorsed Credit Limit" provision and what point in time the buyer's outstanding debt is calculated. The Insurer argues that for every invoice Novel issued to Covadonga that was not paid, it is necessary to do an analysis of the amount of credit that Novel then had outstanding to Covadonga. As noted above, Novel's position is that no such invoice-specific analysis is required under the Policy, and that coverage turns simply on whether the unpaid invoices were issued within the Policy period and amount to less than the $15 million limit.

*Id.* at 4.

---

[1] The Policy identifies the insured as "Access Global Capital LLC *for the account of Novel Commodities S.A.*" *See* Novel's Trial Ex. 8 (Policy). It is common ground that Access Global acted for Novel.

The parties' dispute concerns 21 invoices issued by Novel to Covadonga. Because these 21 invoices were created at time when Covadonga already owed Novel the amount of the Endorsed Credit Limit, QBE claims that those transactions are excluded—forever. The fact that Covadonga's debt to Novel was less the Endorsed Credit Limit when Novel suffered an insured loss, experienced a "notifiable event" or filed its claim, is, according to QBE, meaningless.

Both sides moved for summary judgment based on the plain text of the Policy, which QBE drafted. QBE alternatively sought summary judgment based on proffered "extrinsic evidence," which the Court found lacking. SJ Order at 10. The Court found the relevant Policy text to be ambiguous and QBE's extrinsic evidence to be unpersuasive. The Court determined that a trial is required to determine a single issue: does extrinsic evidence resolve the ambiguity that the Court identified? *See id.* at 12.[2] In other words: will extrinsic evidence establish the parties' intent at the time of Policy issuance with respect to invoices such as the 21 invoices in dispute?

Unless extrinsic evidence resolves the question in QBE's favor, Novel is entitled to judgment. The Court has already determined that "the record is clear that none of the Policy terms in dispute were negotiated by the parties. They were, instead, drawn from the Insurer's "Specific Account Policy," a standard from available on the Insurer's website." SJ Order at 11. Accordingly, unless the jury is able to resolve the ambiguities in QBE's favor, Novel is entitled to judgment: either the jury interprets the Policy as does Novel; or the Policy will remain ambiguous and will be construed against QBE pursuant to the rule of *contra profenterem*.

---

[2] Novel has moved for reconsideration of the S.J. Order, primarily on the grounds that the Court failed to address Novel's argument that the application of the Endorsed Credit Limit provision constitutes a Policy exclusion that is to be strictly construed against QBE. As of this writing, that motion is fully briefed but remains pending before this Court. *See* Memorandum of Law in Support of Plaintiff's Motion for Reconsideration of the Court's March 30, 2013 Order (dkt. no. 42) and accompanying Reply Memorandum (dkt. no. 45).

2

As the Court is aware, QBE face as "heavy burden." To prove that the 21 disputed invoices are excluded from coverage, QBE must point to clear and unmistakable Policy language, which is not subject to any other reasonable interpretation. This Court has previously described QBE's burden of proof as follows:

> '[W]henever an insurer wishes to exclude certain coverage from its policy obligations, it must do so in clear and unmistakable language. Any such exclusions or exceptions from policy coverage must be specific and clear in order to be enforced. They are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction. Indeed, before an insurance company is permitted to avoid policy coverage, it must satisfy the burden which it bears of establishing that the exclusions or exemptions apply in the particular case, and that they are subject to no other reasonable interpretation'....

*Brice v. State Farm Fire and Cas. Co.*, 761 F. Supp. 2d 96, 99 (S.D.N.Y. 2010) (Gardephe, J.) (quoting *Pioneer Tower Owners Ass'n v. State Farm Fire & Cas. Co.*, 12 N.Y.3d 302, 307, 880 N.Y.S.2d 885, 908 N.E. 2d 875 (2009)).

## SUMMARY OF THE EVIDENCE

This Court is already well-versed in the facts of this case, having already considered the parties' cross-motions for summary judgment and having issued a detailed ruling resolving those cross-motions. Further, the parties have entered a stipulation concerning many of the facts underlying this litigation, from the amounts that remain unpaid, to the fact that the parties never negotiated the relevant terms of the Policy, to the calculation of Novel's litigation claim. *See* Joint Pretrial Order (dkt. no. 54), Ex. A ("Stip."). As such, Novel provides here only a brief summary of the evidence it expects to present at trial, to provide context for its legal arguments.

### I.   Background

Novel is a Swiss corporation engaged in the business of selling agricultural commodities, including rice. Stip. ¶ 1. QBE is a Pennsylvania insurance company with its principal place of business in New York . *Id.* ¶ 2. Covadonga is a Mexican corporation, now insolvent, that

specialized in agribusiness, including the purchase and sale of rice. *Id.* ¶ 4. Before failing, Covadonga was a significant customer of Novel: in 2010, Novel's sales to Covadonga amounted to approximately $40 million. *Id.* ¶¶ 5-6.

The basic structure of Novel's sales to Covadonga at issue in this litigation is as follows: (a) Novel bought rice from various sources; (b) Novel sold rice to Covadonga on credit; (c) Covadonga in turn sold the rice to third parties; and (d) after receiving payment from the third parties, Covadonga repaid Novel. *Id.* ¶ 7. Novel purchased primary and excess trade credit insurance in order to minimize the consequences it might suffer if Covadonga failed to pay. *Id.* ¶ 8. Insurance coverage for the year 2007-2008 was provided by another company, Euler Hermes, as the primary insurer (providing coverage with a face amount of $18 million) and QBE as an excess insurer (providing $18 million above the coverage provided by the primary insurer) for three terms spanning from September 1, 2007 to December 31, 2007; from May 1, 2008 to August 31, 2008; and from September 1, 2008 to December 31, 2008. *Id.* ¶ 9. Beginning with the February 1, 2009 through June 30, 2009 coverage period, however, Euler Hermes ceased to provide Novel with trade credit insurance coverage for Novel's sales to Covadonga, and QBE became Novel's primary insurer for Covadonga exposure. *Id.* ¶¶ 10-11.

## II.     The Relevant Terms of the Policy

In October 2009, Novel bought the Policy from QBE. Stip. ¶ 13. The purpose of the Policy was to protect Novel against the risk of Covadonga's failure to pay for goods purchased any time during the 12-month period ending September 30, 2010. *Id.* ¶¶ 16-17. The provisions of the Policy most relevant to the parties' coverage dispute each concern the application of the Policy's "Endorsed Credit Limit" provision. The Policy defines "Endorsed Credit Limit" as "the maximum amount of credit that you are covered for under this **Policy** . . . ." Novel's Trial Ex. 8 (Policy), Art. V. The three key provisions of the Policy in this dispute are the following:

4

1. The "Insuring Clause" of the Policy provides:

   In consideration of the payment of all **Premium** and other charges when due and subject to the terms and conditions of this **Policy**, we agree to cover you in respect of goods sold and **Dispatched** . . . within the **Policy Period** up to the **Insured Percentage** of the **Insured Loss** in the event of the **Buyer** failing, due to **Insolvency** or **Protracted Default**, to pay you an **Insured Debt** up to the **Policy Amount**. Any **Endorsed Credit Limit**, **Policy Amount** or other limits of liability under this **Policy** and under any preceding or future **Policy** issued by us to you are non-cumulative.

   Novel's Trial Ex. 8 (Policy), Art. II.

2. The Policy defines an "Insured Debt" as follows:

   "**Insured Debt**" means the invoice value of such goods sold and **Dispatched** . . . by you arising out of the trade specified in the **Declaration** that: a. is owed to you by the **Buyer**; and b. does not exceed the **Endorsed Credit Limit** for the **Buyer**; and c. is in respect of the invoice value of goods . . . both sold by you to the **Buyer** and **Dispatched** to the **Buyer** within the **Policy Period** pursuant to a contract of sale providing for repayment of the debt within the terms of payment specified in the **Declaration** . . . .

   *Id.*, Art. V.

3. The Policy also contains a "Co-Insurance" clause, which provides, in relevant part:

   You shall retain for your own account: . . . (2) any indebtedness of the **Buyer** to you that exceeds the **Endorsed Credit Limit** . . . .

   *Id.*, Art. III.6(a).

## III. The Negotiation of the Policy

The disputed terms were not negotiated. Rather, they came from QBE's stock policy. SJ Order at 11. Novel was otherwise represented primarily by James Besch in its purchase of the Policy. Mr. Besch is the principal of Access Global Capital LLC ("Access Global"). QBE was represented by its employee, Wayne Bayer. *Id.* ¶ 24.

5

### IV. Novel's Sales To Covadonga And Covadonga's Default

On September 16, 2010, Covadonga defaulted on its obligations to Novel, by failing to pay invoice No. 1910, in the amount of $1,374,647.02. Stip. ¶¶ 32-33. This default constituted a "Notifiable Event" under the Policy. *Id.* ¶ 34. Novel notified QBE of Covadonga's payment default on September 27, 2010. *Id.* ¶ 35. QBE acknowledged this notification. *See* Novel's Trial Ex. 24. Subsequently, Novel complied with QBE's requests for additional information in support of this notice of a Notifiable Event. Stip. ¶ 36.

Following this initial payment default, Covadonga failed to make timely payment on several additional invoices. *Id.* ¶ 38. Novel worked with Covadonga to obtain payment for the outstanding debt and regularly informed QBE about this effort. *Id.* ¶ 37. In early 2011, Novel and another creditor commenced insolvency proceedings as against Covadonga in Mexico. *Id.* ¶ 40. Those insolvency proceedings are continuing as of this writing. *Id.* ¶ 41.

### V. Novel's Claim Under The Policy

On February 3, 2011, Novel timely submitted a claim ("Claim") under the Policy for $12,285,001.12 ("Original Claimed Amount"). Stip. ¶ 44. The Claim included copies of the 32 invoices from which the insured "invoice value" was obtained, as well as all other documentation required by the Policy. *See* Novel's Trial Ex. 29; *see also* Stip. ¶ 43.

### VI. QBE Denies Complete Coverage For Novel's Claim

As part of its investigation of Novel's claim under the Policy, QBE calculated the amount of the total of unpaid invoices issued by Novel to Covadonga ("Covadonga Debt"), as of the date of: (i) Novel's individual sales to Covadonga; or (ii) Covadonga's payment to Novel. Stip. ¶ 48. On several dates during the Policy Period, the Covadonga Debt, as calculated by QBE, exceeded $15,000,000. *Id.* ¶¶ 27-28. By not later than September 16, 2010, however, the Covadonga

Debt was (and thereafter remained) less than $15,000,000. *Id.* ¶¶ 45-47. In other words, at the time of Covadonga's default, the Covadonga Debt was less than the Endorsed Credit Limit.

In letters dated April 27, 2011 and May 25, 2011, QBE rejected liability for most the Claim, eventually admitting liability for only $1,722,029.04 ("QBE Admitted Loss"). *Id.* ¶ 50. On July 26, 2011, QBE paid $1,160,927.59 (the "QBE Payment") to Access Global, on behalf of Novel. *Id.* ¶ 52. The QBE Payment represented the QBE Admitted Loss, less the Deductible, and subject to the Insured Percentage.[3] *Id.* ¶ 53.

QBE refused to indemnify Novel for the remainder of Novel's claimed loss, asserting that it was not liable for any sales made to Covadonga at a time when the Covadonga Debt exceeded $15,000,000. *Id.* ¶ 48. According to QBE: "any extensions of credit that were made when the total exposure to the Buyer was greater than $15,000,000 are not, and never were, subject to coverage under the Policy." *See* Novel's Trial Ex. 32 ¶ 7. In its correspondence, QBE made clear that it relied on language in Article III.6.a(2) of the Policy to support the exclusion of coverage for the disputed 21 invoices. QBE now relies on this same Policy provision in its Counterclaim, which seeks to disclaim coverage for the Novel Claimed Loss of $12,042,882.43. *See* Novel's Trial Ex. 39 ¶¶ 8-11.

---

[3]  QBE's payment was calculated as follows:

| | |
|---|---|
| Novel's loss that QBE accepted : | $1,722,029.04 |
| Less deductible: | ($500,000.00) |
| Less "uninsured percentage" (5%): | ($61,101.45) |
| Net payment to Novel: | $ 1,160,927.59 |

This amount of the QBE Admitted Loss is based, in part, on the "invoice value" for transactions for which Novel did not seek indemnification. QBE, however, maintains that Novel applied some proceeds received from Covadonga other than in chronological order and, therefore, incorrectly. Thus, QBE and Novel do not agree as to which specific transactions between Novel and Covadonga remain unpaid. The distinction is irrelevant to Novel: the parties agree on the amount that is in dispute.

**VII.   Novel's Litigation Claim**

In this litigation, Novel seeks judgment for the principal amount of $9,804,810.72, representing the invoice value of the original 32 invoices submitted with the Claim, less: (i) the invoice value of the two invoices issued after the Notifiable Event; (ii) the Policy Deductible ($500,000.00); (iii) the uninsured percentage ($577,144.12); and (iv) the QBE Payment ($1,160,927.59).[4]  Additionally, Novel seeks interest at the rate of 9 percent per annum.

For ease of reference, the chart below sets forth the details of the invoices and associated invoice values for which Novel seeks indemnification, and QBE's different calculation.  *See* Stip. ¶ 58.

---

[4] This amount differs from the amount Novel originally claimed in the Complaint ($10,821,740.43).  The difference is explained.  First, and most significant, Novel only obtained the list of specific invoices included in the QBE Admitted Loss Amount through discovery in this litigation.  As such, at the time it filed the Complaint, Novel did not know what invoice value QBE had accepted for purpose of calculating the QBE Admitted Loss.  Second, Novel incorrectly calculated the Insured Percentage.

8

| | INVOICE NO. | INVOICE DATE | COVADONGA DEBT (QBE'S CALCULATION) | PAYMENT DUE DATE | GROSS INVOICE VALUE | NOVEL CLAIMED LOSS | QBE ADMITTED LOSS |
|---|---|---|---|---|---|---|---|
| 1 | 1910 | 4/19/2010 | 22,091,404.87 | 9/16/2010 | 1,374,647.02 | 1,198,356.39 | 0.00 |
| 2 | 1913 | 4/27/2010 | 18,644,597.04 | 9/24/2010 | 1,329,804.05 | 1,329,804.05 | 0.00 |
| 3 | 1914 | 5/7/2010 | 15,850,669.16 | 10/4/2010 | 1,176,156.70 | 1,176,156.70 | 325,487.54 |
| 4 | 1928-G | 5/28/2010 | 17,031,585.69 | 10/25/2010 | 269,003.60 | 269,003.60 | 0.00 |
| 5 | 1928-H | 6/2/2010 | 17,148,141.99 | 10/30/2010 | 116,556.30 | 116,556.30 | 0.00 |
| 6 | 1928-I | 6/4/2010 | 17,193,274.35 | 11/1/2010 | 45,132.36 | 45,132.36 | 0.00 |
| 7 | 1928-J | 6/8/2010 | 17,249,950.65 | 11/5/2010 | 56,676.30 | 56,676.30 | 0.00 |
| 8 | 1928-K | 6/16/2010 | 17,278,140.85 | 11/13/2010 | 28,190.20 | 28,190.20 | 0.00 |
| 9 | 1928-M | 6/22/2010 | 17,368,592.50 | 11/19/2010 | 90,451.65 | 90,451.65 | 0.00 |
| 10 | 1928-L | 6/25/2010 | 17,550,929.40 | 11/25/2010 | 182,336.90 | 182,336.90 | 0.00 |
| 11 | 1947 | 7/17/2010 | 17,780,830.63 | 12/14/2010 | 229,901.23 | 229,901.23 | 0.00 |
| 12 | 1947-A | 7/19/2010 | 17,802,007.47 | 12/16/2010 | 21,176.84 | 21,176.84 | 0.00 |
| 13 | 1947-B | 7/23/2010 | 18,019,160.27 | 12/19/2010 | 217,152.80 | 217,152.80 | 0.00 |
| 14 | 1947-C | 7/26/2010 | 18,148,939.21 | 12/20/2010 | 129,778.94 | 129,778.94 | 0.00 |
| 15 | 1947-D | 7/27/2010 | 18,394,864.79 | 12/24/2010 | 245,925.58 | 245,925.58 | 0.00 |
| 16 | 1947-E | 7/29/2010 | 18,649,929.89 | 12/26/2010 | 255,065.10 | 255,065.10 | 0.00 |
| 17 | 1947-F | 7/31/2010 | 18,566,609.99 | 12/28/2010 | 264,366.25 | 264,366.25 | 0.00 |
| 18 | 1947-G | 8/3/2010 | 18,835,882.09 | 12/31/2010 | 269,272.10 | 269,272.10 | 0.00 |
| 19 | 1947-H | 8/6/2010 | 18,861,065.92 | 1/3/2011 | 25,183.83 | 25,183.83 | 0.00 |
| 20 | 1955 | 8/11/2010 | 22,746,277.62 | 1/8/2011 | 5,110,644.07 | 5,110,644.07 | 0.00 |
| 21 | 1947-I | 8/12/2010 | 22,898,710.79 | 1/9/2011 | 152,433.17 | 152,433.17 | 0.00 |

**VIII.   Anticipated Testimony**

Novel expects that James Besch and Frank Gouverne, a former Novel employee directly involved with the QBE Policy, will testify to their understanding of its terms and the basis for that understanding. They will explain that the understood that as older invoices were paid by Covadonga, the Policy would "roll over" and cover new transactions. Novel also intends to call QBE's "underwriter," Wayne Bayer, to explain his conduct.

## OVERVIEW OF LEGAL ISSUES

**I.   NOVEL'S CLAIM FOR BREACH OF CONTRACT**

The only issue remaining with respect to Novel's claim is the interpretation of ambiguous Policy language. For this, QBE bears the "heavy burden" of establishing by "clear and unmistakable" Policy language that the Policy excludes the 21 invoices, and that such language

9

is not subject to any other reasonable interpretation. *See, e.g., Parks Real Estate Purchasing Group v. St. Paul Fire and Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006); *Brice,* 761 F. Supp. 2d at 99; *Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304, 311, 476 N.E.2d 272, 275 (1984).

## II.    QBE'S COUNTERCLAIM FOR DECLARATORY JUDGMENT

QBE asserts a counterclaim for declaratory judgment, seeking a declaration that it owes no further contractual obligation to Novel other than the amount already paid in the QBE Payment. As such, QBE's counterclaim is effectively the mirror image of Novel's claim for breach of contract. To prevail on this claim, QBE thus bears the same burden of proving that it has *not* breached its obligations under the Policy—or, in other words, that the Policy clearly and unmistakably excludes the 21 disputed invoices.

## III.   THE EVIDENCE PRESENTED AT TRIAL WILL RESOLVE ANY AMBIGUITY IN NOVEL'S FAVOR

The Court has already determined that the language of the Policy is ambiguous regarding the application of the "Endorsed Credit Limit" provision. *See* SJ Order at 9. The Court has also already determined that, to resolve this ambiguity, extrinsic evidence may be considered to ascertain the meaning intended by the parties during the formation of the Policy. *See id.* at 9 (citing *Morgan Stanley*, 225 F.3d at 275-76; *Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428-29 (2d Cir. 1992)). According to the Court, then, the jury's task is to consider the extrinsic evidence presented by the parties at trial, and determine whether this evidence is sufficient to resolve the ambiguity in the relevant Policy language. *See* SJ Order at 9.

As a matter of logic, after its consideration of the extrinsic evidence, the jury can reach one of only three possible conclusions: (1) the jury finds that a preponderance of the evidence supports Novel's interpretation of the Policy, in which case, Novel prevails; (2) the jury finds that a preponderance of the evidence supports QBE's interpretation of the disputed language for which there is no other reasonable explanation, in which case QBE prevails; or (3) the jury is

10

unable to resolve the ambiguity, in which case Novel must prevail because following application of the doctrine of *contra profenterem* against QBE and in Novel's favor.

Given QBE's inability to identify sufficient evidence at summary judgment, it remains for all to see what new evidence it will proffer at trial.

### IV.    IN THE ALTERNATIVE, THE APPLICATION OF THE ENDORSED CREDIT LIMIT PROVISION IS AN EXCLUSION, WHICH SHOULD BE STRICTLY CONSTRUED AGAINST QBE

Throughout this litigation, Novel has consistently argued that QBE's purported application of the "Endorsed Credit Limit" provision operated as an exclusionary clause, because the provision purports to limit coverage under the Policy, to exclude a subset of invoices that would otherwise—undeniably—be covered.  Under New York law, "it is the insurer which has the burden of proof to establish that claim in encompassed by an exclusion in a policy . . . and any limitation in coverage must be described in clear and explicit language."  *Utica Mut. Ins. Co. v. Prudential Prop. & Cas. Ins Co.*, 103 A.D.2d 60, 63, 477 N.Y.S.2d 657 (2d Dep't 1984), *aff'd*, 64 N.Y.2d 1049, 489 N.Y.S.2d 704, 478 N.E.2d 1305 (1985).  As noted above, this Court is well familiar with the principle that the law concerning the interpretation of exclusionary clauses in insurance policies is highly favorable to insureds: insurers must establish the fact of an exclusion stated in clear and unmistakable policy language that is subject no other reasonable interpretation.  *See Brice,* 761 F. Supp. 2d at 99.

Applying this standard to the application of the "Endorsed Credit Limit" provision, the Court's determination that this provision is "ambiguous" necessarily means that QBE failed to satisfy its burden, and mandates a ruling in Novel's favor.  No further analysis is required.  *See, e.g., VAM Check Cashing Corp. v. Fed. Ins. Co.*, 699 F.3d 727, 732 (2d Cir. 2012) ("Where the plain language of a policy permits more than one reasonable reading, a court must adopt the reading upholding coverage.").

QBE would characterize the dispute as concerning "coverage" rather than a limit or exclusion. The Second Circuit rejected QBE's semantic argument 18 years ago in *Stonewall Ins. Co. v Asbestos Claim Mgmt. Corp.*, 73 F.3d 1178, 1205 (2d Cir. 1995), finding that "the exclusionary effect of policy language, not its placement, controls allocation of the burden of proof."

## V.   THE PARTIES' PROPOSED REQUESTS TO CHARGE

The parties agree on most proposed jury instructions. Those on which the parties agree are submitted as Joint Proposed Requests to Charge. Each party has also submitted proposed additional requests to charge, as to which the other party does not agree. Novel addresses the parties' disagreement with respect to each of the additional requests to charge below.

### A.   # 12: "Burden of Proof"

QBE's suggestion that Novel bears the burden of proof is incorrect. It is beyond reasoned dispute that QBE seeks to exclude a subset of transactions from Policy coverage, namely, those invoices issued when Covadonga owed Novel more than the "Endorsed Credit Limit." *See* SJ Order at 2 ("The Insurer contends that any invoices issued at a time when Covadonga owed Novel $15 million or more are *excluded* from coverage.") (emphasis added). Under these circumstances, QBE bears the burden of proof. *See Brice*, 761 F.Supp.2d at 99 ("[b]efore an insurance company is permitted to avoid policy coverage, it must satisfy the burden which it bears of establishing that the exclusions or exemptions apply in the particular case, and that they are subject to no other reasonable interpretation."). This rule applies to any attempt to limit coverage, not merely one that is labeled an "exclusion." *See Utica,* 103 A.D.2d at 63. Accordingly, it would error to instruct the jury that Novel has the burden of proof.

The third paragraph in QBE's proposed instruction ["If you conclude..."] is also incorrect. The jury faces three choices. It may find that the evidence proves: (a) that the parties

12

intended that the Policy would cover all invoices issued to, but unpaid by, Covadonga at the time of default or claim, up to $15 million; (b) that the parties intended that the Policy would <u>never</u> any invoice that was issued at a time when Covadonga owed more that $15 million to Novel (regardless of the amount Covadonga owed Novel at the time of a default or claim); or (c) that that evidence is inconclusive. But because it is QBE's burden to prove an exclusion, Novel is entitled to judgment unless the jury finds "b;" otherwise, QBE will not have established that the Policy, in "clear and unmistakable language" for which no other reasonable interpretation is offered, that the Policy excluded the challenged transactions.

By contrast, the third paragraph in Novel's proposed request to charge is appropriate. It correctly establishes that if the jury is unable to resolve ambiguities, Novel is entitled to judgment.

### B.     # 13: Preponderance of the Evidence

QBE's first paragraph, which asserts that Novel bears the burden of proving coverage, is incorrect for the reasons set forth the previous section. *See* Section V.A, *supra.*

### C.     # 14: Breach of Contract—Ambiguous Coverage Term

QBE advances the wrong legal standard in paragraph 4 of its proposed request to charge ["In considering the parties' understanding of the Policy..."]. The appropriate standard by which the parties' intention should be determined is that of "the ordinary businessman," not someone who is knowledgeable about trade credit insurance. Indeed, QBE's cited authority, supports this proposition, and not the proposition that QBE advances. *See Ace Wire & Cable., Inc. v. Aetna Causlty & Surety Co.*, 60 N.Y.2d 390, 398 (1983) ("The tests to be applied in construing an insurance policy are common speech . . . and the reasonable expectation and purpose of the ordinary businessman.")

By contrast, the direction Novel sets out in the last paragraph of its propose request to charge ['If, upon review of all of the evidence....''] is correct for the reasons set forth in the Section V.A, *supra*.

### D.   # 15: Coverage or Exclusion?

Novel submits that the Court's SJ Order confirms that QBE seeks to prove an exclusion. As the Court held: "The Insurer contends that any invoices issued at a time when Covadonga owed Novel $15 million or more are excluded from coverage." SJ Order at 2. QBE appears to argue otherwise, and argues further that Novel is required to establish "coverage" in the first instance before QBE is required to prove an exclusion. To the extent this issue is unresolved, Novel submits this proposed request to charge.

### E.   # 16 : Breach of Contract—Ambiguous Contractual Term

The first paragraph of Novel's proposed request to charge accurately reflects the law for the reasons set forth in Section V.A, *supra*.

The second paragraph of the Novel's proposed request to charge also accurately reflects the law. The burden of proof to establish an exclusion or limitation on coverage lies with the insurer. *See* Section IV, *supra*. Cases describe this as a "heavy burden" in which the insurer is required to demonstrate by clear and unmistakable policy text. *See id.* If, after considering the extrinsic evidence, QBE is unable to meet its heavy burden, then the rule of *contra proferentem* must be applied. As the Court has already noted: "[N]one of the Policy terms at issue were negotiated by the parties. They were, instead, drawn from the Insurer's 'Specific Account Policy,' a standard form available on the Insurer's website." SJ Order at 11. Accordingly, Novel will be entitled to judgment.

**VI.   THE PARTIES' PROPOSED VERDICT SHEETS**

Each party has also submitted a proposed verdict sheets as to which the other party does not agree. Novel submits that its proposed verdict sheet is a correct statement of the law, for the reasons set forth in Section V, above.

## CONCLUSION

Novel presently expects to raise the foregoing legal issues at trial. As trial proceeds, however, Novel may seek leave of Court to raise additional legal issues of any kind if and when they arise.

Dated: New York, New York　　　　　　Respectfully submitted,
　　　　April 30, 2013

　　　　　　　　　　　　　　　　　　　SULLIVAN & WORCESTER LLP

　　　　　　　　　　　　　　　　　　　By: /s/ Michael T. Sullivan
　　　　　　　　　　　　　　　　　　　　　Michael T. Sullivan
　　　　　　　　　　　　　　　　　　　　　Andrew T. Solomon
　　　　　　　　　　　　　　　　　　　　　Karen E. Abravanel
　　　　　　　　　　　　　　　　　　　1633 Broadway
　　　　　　　　　　　　　　　　　　　New York, New York 10019
　　　　　　　　　　　　　　　　　　　Telephone: (212) 660-3000
　　　　　　　　　　　　　　　　　　　Facsimile: (212) 660-3001
　　　　　　　　　　　　　　　　　　　msullivan@sandw.com
　　　　　　　　　　　　　　　　　　　asolomon@sandw.com
　　　　　　　　　　　　　　　　　　　kabravanel@sandw.com

　　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff*
　　　　　　　　　　　　　　　　　　　*Novel Commodities S.A.*