UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------- X
                                              :
NOVEL COMMODITIES S.A.,                       :
                                              :                No. 11-cv-6339 (PGG)
            Plaintiff,                        :
                                              :                ECF CASE
      - v -                                   :
                                              :
QBE INSURANCE CORPORATION,                    :
                                              :
            Defendant.                        :
                                              :
-------------------------------------------- X


**NOVEL'S OPPOSITION TO QBE'S MOTION TO EXCLUDE EVIDENCE OF
WITNESSES "WITHOUT FIRST-HAND KNOWLEDGE"**

SULLIVAN & WORCESTER LLP
Michael T. Sullivan
Andrew T. Solomon
Karen E. Abravanel
1633 Broadway, 32nd Floor
New York, New York 10019
Telephone: (212) 660-3000
Facsimile: (212) 660-3001

*Attorneys for Plaintiff
Novel Commodities S.A.*

Plaintiff Novel Commodities S.A. ("Novel") respectfully submits this memorandum of law in opposition to Defendant QBE Insurance Corporation's ("QBE") Motion to Exclude Evidence of Witnesses Without First-Hand Knowledge (dkt. no. 52) (the "Motion").

## PRELIMINARY STATEMENT

In its Order of March 30, 2013, the Court reviewed the extrinsic evidence that QBE proffered in support of its cross-motion for summary judgment. The Court rejected all of that evidence as insufficient, save a single email. That email, the Court held, "tends to suggest that Novel understood that when it extended more than $15 million in credit to Covadonga, it would bear the loss if Covadonga did not pay on that invoice." Novel's Trial Ex. 64 (Order) at 10. Based on that email, the Court concluded that a trial is necessary. Frank Gouverne, the Novel trader responsible for all of Novel's sales to Covadonga, wrote that email. Bizarrely, by the Motion, QBE now seeks to bar Mr. Gouverne from testifying, because it avers that he was not involved in the negotiation of the insurance policy at issue in this litigation (the "Policy"), thus rendering his testimony irrelevant. But having opened the door to Mr. Gouverne's statements about the meaning of the Policy—in the absence of which the Court would have granted summary judgment for Novel—QBE cannot now prevent Novel from presenting additional testimony that is probative of this issue.

In any event, Mr. Gouverne has yet to offer any testimony in this case. There is no basis, at this stage, for this Court to determine that Mr. Gouverne lacks relevant personal knowledge. Moreover, Novel will show that Mr. Gouverne was the Novel trader responsible for all of the transactions covered by the Policy. As such, Mr. Gouverne was intimately involved with the decision to purchase the Policy from QBE, which was necessary to finance the bulk of Novel's sales to Covadonga. Novel has never acknowledged, by stipulation or otherwise, anything to the contrary.

I.  **QBE HAS OPENED THE DOOR TO MR. GOUVERNE'S TESTIMONY BY RELYING ON HIS STATEMENTS AS EVIDENCE OF THE PARTIES' INTENT**

In support of its motion for summary judgment, QBE proffered, and the Court accepted as extrinsic evidence, statements by Mr. Gouverne that were made long after the parties negotiated the Policy.  The Court held that an email from Mr. Gouverne, dated September 2010—nearly a year after the issuance of the Policy—"tends to suggest" Novel's understanding regarding the meaning of the relevant terms of the Policy.  *See* Novel's Trial Ex. 64 (Order) at 9-10.  If Mr. Gouverne's statement in an email was sufficient for QBE to withstand summary judgment, there can be no basis for excluding his live testimony at the trial of this matter.

Further, QBE's position on this Motion directly contradicts its own prior arguments.  QBE argued in its cross-motion for summary judgment that the Court *should* consider the email from Mr. Gouverne as "contemporaneous evidence" of Novel's understanding concerning the meaning of the Policy.  *See* Novel's Trial Ex. 53 (QBE's Memorandum of Law in Support of Cross-Motion for Summary Judgment) at 20-21.  According to QBE, this email is "documentary evidence" which "demonstrates that Novel's understanding during the term of the Policy was that extensions of credit above the ECL were at its own risk."  *See* Novel's Trial Ex. 63 (QBE's Reply Memorandum of Law in Support of Cross-Motion for Summary Judgment) at 7.  As such, QBE now seeks to prevent Novel from using Mr. Gouverne's testimony, while at the same time relying on Mr. Gouverne's statements in its own case.  This effort must be rejected.[1]

---

[1] QBE has also indicated that it intends to present the testimony of Randall West, QBE's claim handler.  *See* Proposed Joint Pretrial Order (dkt. no. 54) at 4.  There has been no stipulation regarding Mr. West's participation in the negotiation of the Policy.  In fact, the record indicates that Mr. West only became involved in the parties' dispute after Novel filed its claim for coverage, in February 2011.  *See, e.g.*, Novel's Trial Exs. 32 (Letter from R. West to J. Besch), 33 (Letter from J. Besch to R. West) and 34 (Letter from R. West to J. Besch).

2

## II. MR. GOUVERNE CAN TESTIFY ABOUT THE PARTIES' INTENT AT THE TIME THE POLICY WAS NEGOTIATED

QBE specifically seeks to preclude Mr. Gouverne from testifying about the intent of the parties when entering into the Policy because he "was not involved in the negotiation of the Policy and can therefore have no personal knowledge regarding the intent of the parties at the time the Policy was entered into." QBE's Br. (dkt. no. 53) at 2-3. This argument fails because it is premature, and because it misstates both the parties' joint submissions and the record in this case.

As a preliminary matter, it is premature for QBE to make any assertions regarding Mr. Gouverne's personal knowledge, because he has never been deposed nor asked to provide any statements regarding his involvement in the negotiation of the Policy. Instead, QBE refers only to a purported "stipulated" fact in the parties' Joint Proposed Pretrial Order, and asserts "that *only* Mr. Besch (on behalf of Novel), Mr. Bayer (on behalf of QBE) and John Hertzer (an employee of Novel's insurance broker AON), were involved in the negotiation of the Policy." QBE's Br. at 2 (emphasis added). QBE's reference is plain wrong; the Joint Pretrial Order contains no such stipulation. Instead, the relevant stipulated fact actually states: "The Policy was negotiated: (a) on behalf of Novel, by James Besch; and (b) on behalf of QBE, by Wayne Bayer." *See* Proposed Joint Pretrial Order at Ex. A (dkt. no. 54-1) at ¶ 24. Novel has never "acknowledged" by "stipulation" or otherwise that Mr. Besch and Mr. Bayer were the only individuals involved in the negotiation of the Policy. *See id.*

Nor has Novel ever stated that Mr. Gouverne was *not* involved in the negotiation of the Policy. In fact, quite to the contrary, Novel has expressly described Mr. Gouverne as "a former Novel employee *directly involved* with the QBE Policy." *See* Novel's Trial Mem. of Law at 9 (dkt. no. 58) (emphasis added). As Novel will show at trial, since he was the trader responsible for Novel's sales to Covadonga, it fell upon Mr. Gouverne to obtain credit insurance that would

3

protect Novel against the risk of Covadonga's non-payment.  Mr. Gouverne therefore worked closely with and through James Besch (the principal of Novel's U.S. agent, Access Global Capital, LLC) to negotiate and obtain several credit insurance policies to cover sales to Covadonga, including the Policy issued by QBE.  *See, e.g.,* Novel's Trial Ex. 43 (Transcript of the Deposition of James Besch) at 15:13-16:3 ("Frank Gouverne from Novel reached out to me . . . Frank requested the services of Access Global Capital to attempt to structure a financing program whereby they could sell on open credit terms to Covadonga in Mexico."); *see also id.* at 33:16-18 ("My primary contact [at Novel] was Frank Gouverne.  He is a partner, and I believe his title was head trader at Novel.").

Mr. Gouverne will also testify about Novel's conduct during the effective period of coverage under the Policy.  The jury may consider the parties' subsequent conduct as extrinsic evidence of their intent concerning the meaning of the Policy.  *See, e.g.,* Restatement (Second), Contracts § 202(4) & cmt. g ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning."); *IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.*, 26 F.3d 370, 374 (2d Cir. 1994) ("There is no surer way to find out what parties meant, than to see what they have done."); *Big Tree Energy Partners v. Bradford*, 219 A.D.2d 27, 640 N.Y.S.2d 270, 273 (3d Dep't 1996) (considering "[t]he course of dealing and the course of performance between the parties to the contract" in determining the meaning of a contract term).

4

## **CONCLUSION**

For the foregoing reasons, the Motion should be denied.

Dated: New York, New York
       May 14, 2013

Respectfully submitted,

SULLIVAN & WORCESTER LLP

By: /s/ Michael T. Sullivan
    Michael T. Sullivan
    Andrew T. Solomon
    Karen E. Abravanel
1633 Broadway
New York, New York 10019
Telephone: (212) 660-3000
Facsimile: (212) 660-3001
msullivan@sandw.com
asolomon@sandw.com
kabravanel@sandw.com

*Attorneys for Plaintiff*
*Novel Commodities S.A.*

5