UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
  NOVEL COMMODITIES S.A.,

                Plaintiff,                No. 11-cv-6339 (PGG)
                                                ECF CASE

       v.

  QBE INSURANCE CORPORATION,

                Defendant.
-----------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF
QBE INSURANCE CORPORATION'S
<u>MOTION FOR JUDGMENT AS A MATTER OF LAW</u>**

CLYDE & CO US LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174

*Attorneys for Defendant
QBE Insurance Corporation*

# TABLE OF CONTENTS

PAGE(S)

TABLE OF AUTHORITIES .................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ......................................................................................................... 1

ARGUMENT ............................................................................................................................. 5

    A.    The Standard for Granting of Judgment as a Matter of Law ....................... 5

    B.    The New York Court of Appeals Has Declared That it is a Cardinal Rule of Construction That Any Interpretation Which Renders a Contract Provision Without Force or Effect Should Not be Adopted ........................ 5

    C.    QBE's Interpretation of the Policy Is the Only Reasonable One, as Novel's Theory Renders the ECL Meaningless ............................................ 7

CONCLUSION ........................................................................................................................ 16

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Chesapeake Energy Corp. v. Bank of N.Y. Mellon,*
   No. 13 Civ. 1582(PAE), 2013 WL 1890278 (S.D.N.Y. May 8, 2013) ..................................... 7

*Corhill Corp. v. S. D. Plants, Inc.,*
   9 N.Y.2d 595 (N.Y. 1961) ............................................................................................ 5

*Golden Gate Yacht Club v. Société Nautique de Genéve,*
   12 N.Y.3d 248 (N.Y. 2009) ........................................................................................... 6

*Meloff v. N.Y. Life Ins. Co.,*
   240 F.3d 138 (2d Cir. 2001) ......................................................................................... 5

*Nautilus Ins. Co. v. Matthew David Events, Ltd.,*
   893 N.Y.S.2d 529 (N.Y. App. Div. 1st Dep't 2010) ..................................................... 6, 15

*Norwest Fin., Inc. v. Fernandez,*
   No. 98 CIV. 6635(SAS), 1999 WL 946786 (S.D.N.Y. Oct. 19, 1999) ............................ 6

*Raymond Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,*
   5 N.Y.3d 157 (N.Y. 2005) ............................................................................................ 5

*Ronnen v. Ajax Elec. Motor Corp.,*
   88 N.Y.2d 582 (N.Y. 1996) ........................................................................................... 5

*This Is Me, Inc. v. Taylor,*
   157 F.3d 139 (2d Cir. 1998) .................................................................................... 5, 15

*U.S. Bank Nat'l Ass'n v. Southwest Airlines Co.,*
   2009 WL 2163594 (S.D.N.Y. July 20, 2009) ............................................................... 6

**OTHER AUTHORITIES**

Rule 50(a) of the Federal Rules of Civil Procedure ........................................................... 4

Rule 50(a)(1) of the Federal Rules of Civil Procedure ...................................................... 5

Rule 50(b) of the Federal Rules of Civil Procedure .......................................................... 1

Rule 50 of the Federal Rules of Civil Procedure .............................................. 1, 4, 5, 15

## PRELIMINARY STATEMENT

Defendant-counterclaimant QBE Insurance Corporation ("QBE") respectfully submits this memorandum in support of its motion for a judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure (the "Rule 50 Motion").

This post-trial motion arises from a trade credit insurance policy (the "Policy") issued by QBE to Plaintiff Novel Commodities S.A. ("Novel"). As set forth below, the interpretation of the Policy offered at trial by Novel rendered a key provision of the Policy, known as the Endorsed Credit Limit (the "ECL"), wholly superfluous and without force or effect. The New York Court of Appeals has declared it a "cardinal rule of construction that a court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect." Therefore, for the reasons more fully set forth below, QBE's Rule 50 Motion should be granted and judgment in favor of QBE should be granted as a matter of law.

## STATEMENT OF FACTS

Prior to the trial in this matter, QBE moved for summary judgment offering an interpretation of the Policy that held that the ECL was to be applied to each invoice at the time it was issued by Novel to CIA. Arrocera Covadonga ("Covadonga"). To the extent any invoice was issued at a time when Covadonga owed Novel amounts in excess of the $15 million ECL, the invoice would not be covered under the Policy and would never become covered. (Dkt. No. 26). This remained QBE's position through trial. Novel has never contended that QBE's interpretation leaves the ECL without force or effect.

Novel also moved for summary judgment, and later, reconsideration of the Court's denial of Novel's motion for summary judgment. As the Court stated, in these motions, Novel did not

1

offer an interpretation that reasonably explained "when the [ECL] analysis is to be conducted: at the end of the Policy term, when an unpaid invoice was issued, when the buyer first defaulted, at the time of each subsequent default, when the claim is made, or at some other point." Order Denying Novel's Motion for Reconsideration (Dkt. No. 59) at 5.

At the subsequent trial, QBE adduced evidence in support of its position that the ECL applied each time an invoice was issued by Novel, and that any invoices issued at a time when Covadonga owed Novel more than the $15 million ECL were not covered under the Policy and could never become covered under the Policy. (Trial Tr. at 290:24-291:25; 331:25-332:15; 352:14-353:6).

Novel contended at trial that the ECL was to be applied at the time of a loss under the Policy. Novel's witness, James Besch of Global Access Capital LLC, testified as follows:

> Q. And part of this case is about Novel trying to ask QBE to pay for those transactions that were over the [ECL], right?
>
> A. At the time of loss they are not over the limit, they are within the coverage of the policy.

(Trial Tr. at 252:4-7). This testimony mirrored a May 16, 2011 letter by Mr. Besch to QBE introduced as Trial Exhibit 33 in which Mr. Besch stated that "QBE's concerns regarding the Policy's $15 million Endorsed Credit Limit appear to be misplaced because the position has to be considered at the time of loss." (Trial Ex. 33 at QBE 012843).

Novel's witnesses at trial testified that the term "rollover" summarized Novel's interpretation of the ECL. Under Novel's rollover theory, invoices issued by Novel to Covadonga at a time when Novel had more credit outstanding than the $15 Million ECL were not covered, but could, in effect, "fall into the limit" – and thereby become subject to coverage –

if Covadonga repaid balances, thereby creating "space" under the ECL. *See* Trial Tr. 110:5-111:5; 104:7-16; 222:17-23.

On cross-examination, however, neither of Novel's witnesses were able to offer testimony of how, under Novel's rollover theory, the ECL would ever have any force or effect. Instead, as was established by the trial testimony, under Novel's theory the ECL was wholly overridden by the Policy Amount, leaving the ECL without force or effect. For example, Mr. Frank Gouverne testified:

> Q: In fact, if you have a $12 million loss, really what you need to know is what the policy amount is, right? Correct?
>
> A: Well, what you need to – yeah, if you would be up to the limit.
>
> Q: Okay. Because the way you're interpreting the endorsed credit limit, it really doesn't even matter when you have a big loss, it doesn't even matter what the endorsed credit limit is; it just matters what the policy amount is, right?
>
> A: I know that, yeah.

(Trial Tr. 170:7-15).

Further, each of Novel's witnesses was shown a demonstrative exhibit (Trial Ex. BBB) that presented a hypothetical policy and loss which was substantially identical to the facts in this case. Concerning this hypothetical, Mr. Gouverne acknowledged that, under Novel's theory, the ECL had no force or effect:

> Q. So I'm asking you, assuming these facts, if there is a loss to Novel of $22 million and all the invoices were during the policy period and Novel had no other insurer, can you tell from these facts how much QBE has to pay Novel?
>
> A. In my view, it would be $13,500,000.
>
> Q. Because all you need to do is look at the policy amount because you know that the loss is over $13,500,000. Right?

3

> A. Yes.
>
> Q. And you don't need to look at the endorsed credit limit at all, do you?
>
> A. No.
>
> Q. In your interpretation of how this works, the endorsed credit limit has no purpose in determining the loss, does it?
>
> A. Because-- well, because we are over the limit--
>
> Q. Right.
>
> A. -- it doesn't matter.

(Trial Tr. at 199:4-19).

Novel's only other witness, Mr. Besch, was likewise wholly unable to articulate any force or effect of the ECL under Novel's theory:

> Q. Sitting here today, you cannot identify any role that the endorsed credit limit would have in determining what QBE pays, given Novel's position in this case; correct?
>
> A. This is a hypothetical, and I don't have a response to your question, sir.

(Trial Tr. at 254:19-23).

Before the case was submitted to the jury, QBE made an oral motion for a judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure, on the basis that Novel did not offer a fair and reasonable interpretation of when the ECL is applied under the Policy. (Trial Tr. at 401:20-407:19). Novel declined to respond, asking instead for an opportunity to do so later. *Id.* at 407:21-24. The Court reserved decision on the Rule 50 Motion. *Id.* at 408:1. On May 23, 2013, the jury returned a verdict in favor of Novel.

4

## ARGUMENT

### A. The Standard for Granting of Judgment as a Matter of Law

Rule 50(a)(1) of the Federal Rules of Civil Procedure states:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
> (b) resolve the issue against the party; and
>
> (c) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Although courts have stated that motions under Rule 50 of the FRCP "should be granted cautiously and sparingly," *see Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001), they have also stated that such motions should be granted if the evidence supports only one conclusion that a reasonable jury could have reached, *see This Is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998) (quoting *Cruz v. Local Union No. 3 Int'l Bhd. Of Elec. Workers*, 34 F.3d 1148, 1154-55 (2d Cir. 1994)).

### B. The New York Court of Appeals Has Declared That it is a Cardinal Rule of Construction That Any Interpretation Which Renders a Contract Provision Without Force or Effect Should Not Be Adopted

The New York Court of Appeals has declared that it has "long and consistently ruled against any construction which would render a contractual provision meaningless or without force or effect." *Ronnen v. Ajax Elec. Motor Corp.*, 88 N.Y.2d 582, 589 (N.Y. 1996); *see also Corhill Corp. v. S. D. Plants, Inc.*, 9 N.Y.2d 595, 599 (N.Y. 1961) (holding that it is a "cardinal rule of construction that a court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect") (internal quotation marks omitted); *Raymond Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 5 N.Y.3d 157, 162 (N.Y. 2005) ("In

5

determining a dispute over insurance coverage, we first look to the language of the policy. We construe the policy in a way that affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect.") (internal quotation marks omitted).

When the parties to a contract present competing interpretations of its language and one party's construction renders a provision meaningless, courts applying New York law routinely reject the interpretation that renders the provision nugatory in favor of the interpretation that gives full force and effect to all contract terms. *See, e.g., Golden Gate Yacht Club v. Société Nautique de Genéve*, 12 N.Y.3d 248, 256 (N.Y. 2009) (reversing Appellate Division's determination that Deed of Gift was ambiguous and awarding summary judgment to Appellant because any alternative construction "would render the annual regatta requirement a nullity"); *Nautilus Ins. Co. v. Matthew David Events, Ltd.*, 893 N.Y.S.2d 529, 532 (N.Y. App. Div. 1st Dep't 2010) (reversing lower court's denial of summary judgment to insurer because policyholder's construction of exclusion at issue rendered language in contract provision defining term "employees" a nullity); *U.S. Bank Nat'l Ass'n v. Southwest Airlines Co.*, 2009 WL 2163594, at *9 (S.D.N.Y. July 20, 2009) (granting partial summary judgment to plaintiff because defendant's favored interpretation rendered certain clauses in lease meaningless) (citing *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005)).

This Court has held that contract interpretations that render provisions meaningless are "not reasonable." *Norwest Fin., Inc. v. Fernandez*, No. 98 CIV. 6635(SAS), 1999 WL 946786, *3 (S.D.N.Y. Oct. 19, 1999) (finding that defendants' proffered interpretation was "not reasonable" "because it render[ed] several parts of the Purchase Agreement meaningless") (citing *Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*, 482 N.Y.S.2d 465, 468 (N.Y.

6

1984)); *Chesapeake Energy Corp. v. Bank of N.Y. Mellon*, No. 13 Civ. 1582(PAE), 2013 WL 1890278, at *16-17 (S.D.N.Y. May 8, 2013) (finding defendant's construction "incoherent and unreasonable" because, in various ways, defendant's construction contravened "basic canons that an interpretation of a provision of an agreement should not make other clauses meaningless, superfluous, unreasonable, or inaccurate").

As set forth below, because Novel's interpretation of the Policy, and most particularly its "rollover" theory, leaves the ECL without force or effect, Novel's interpretation of the Policy must be rejected.

### C. QBE's Interpretation of the Policy Is the Only Reasonable One, as Novel's Theory Renders the ECL Meaningless

The evidence at trial established that neither of Novel's witnesses could offer any example of how, under Novel's interpretation of the Policy, the ECL would apply. As Mr. Gouverne admitted, the ECL would always be disregarded in favor of the $13.5 million Policy Amount, which is less than the ECL and which controls the maximum loss QBE pays Novel under the Policy. (Trial Tr. at 170:2-15; *see also* Trial Tr. at 199:4-19).

QBE acknowledges that Novel's rollover theory at least makes reference to the ECL. However, rollover suffers from the same fatal deficiency as all of Novel's prior arguments: the practical result of rollover (and indeed all of Novel's interpretations) is to deprive the ECL of any force or effect under any and all conceivable circumstances. That is, if one were to apply the ECL in the manner suggested by Novel's rollover theory, the ECL would <u>never</u> have any real effect on the obligations of the parties (i.e., the calculation of the amount of money that QBE owes to Novel). What follows are a series of examples which are illustrative of the fatal deficiency of Novel's rollover theory.

***Scenario 1***

7

Assume that Novel extends $20 million of credit to Covadonga and that Covadonga pays back nothing.[1] Under this scenario, QBE would calculate the loss as follows:

1. Novel extended $20 million in credit to Covadonga;
2. Applying the ECL, only the invoices up to the $15 million ECL are insured and the remaining $5 million is not insured;
3. Against the insured loss amount of $15 million, QBE applies the $500,000 Policy deductible (resulting in a reduced loss amount of $14.5 million) and then multiplies that amount by the 95% insured percentage (resulting in a further reduced loss amount of $13.775 million).[2]
4. However, because QBE's Policy Amount limit is only $13.5 million, QBE would only owe Novel $13.5 million.

Novel, on the other hand, would perform the calculations as follows:

1. Novel extended $20 million in credit to Covadonga;

---

[1] Although this scenario does not involve payments by Covadonga and therefore does not involve Novel's "rollover" theory, it is intended to respond to the Court's remarks at trial, in response to QBE's Oral Motion for Judgment as a Matter of Law under Rule 50(a), in which the Court queried whether the ECL may have a practical function under Novel's interpretation if more than $15 million of debt was issued by Novel to Covadonga, but then never paid down. (Trial Tr. at 405:9-406:18). As will be shown, however, application of Novel's theory of coverage both in this scenario and elsewhere results in QBE paying precisely the same amount of money to Novel as would be owed if the Policy contained only a Policy Amount (i.e., if the ECL did not exist in the Policy at all).

[2] Although Mr. Gouverne appeared somewhat confused as to the order in which the deductible and the insured percentage should be applied at trial, his testimony was clear that both the deductable and the insured percentage must be applied against a loss to determine the amount of money that QBE must pay to Novel under the Policy. (Trial Tr. at 186:18-187:4 ("Q: Right. But Mr. – are you reading – did you understand Mr. Bayer to be saying losses up to $10 million would be covered, or did you understand that he was saying invoices up to $10 million would be covered? A: For me it's the same result. In the end, it's $10 million in invoice values, minus the deductible and minus the insured percentage. So it doesn't make a difference to me.")).

8

2. Because Covadonga does not repay balances under this scenario, Novel's "rollover" theory would not apply;

3. However, whether Novel then calculates its insured claim by applying the $500,000 Policy deductible and 95% co-insurance provision against $15 million (the amount of insured debt if Novel's version of the ECL is applied) or $20 million (the amount of insured debt if no ECL existed in the Policy at all), the result is the same – the total loss in either case is above the $13.5 million Policy Amount (e.g., taking an insured loss amount of $15 million, and then applying the $500,000 Policy deductible and multiplying the result by the 95% insured percentage results in a loss amount of $13.775 million).

4. Because QBE's Policy Amount limit is only $13.5 million, QBE would only owe Novel $13.5 million, regardless of whether Novel's version of the ECL is applied.

Thus, under this scenario, the ECL has no impact upon the calculation of the loss. Further scenarios show that this is always the case under Novel's theory, no matter what size loss or whether repayments are made by Covadonga, whereas QBE's construction of the ECL has a real and demonstrable effect on the obligations of the parties.

### *Scenario 2*

Assume that Novel extends the $20 million of credit to Covadonga, but that, instead of paying back nothing, Covadonga pays back $10 million and defaults on the remainder. Under QBE's interpretation, the loss is calculated as follows:

1. Novel extends $20 million in credit to Covadonga;

9

2. Under QBE's interpretation, only those invoices which, when issued, were within the $15 million ECL are covered;

3. Subtract the $10 million Covadonga payment from the $15 million insured invoice amount, resulting in a potentially insured loss of $5 million;

4. Covadonga defaults, resulting in an insured loss amount of $5 million subject to application of the deductible and the insured percentage;

5. Apply the deductible and the insured percentage, resulting in a proper claim of $4.275 million ($5 million - $500,000 = $4.5 million x 95% = $4.275).

Clearly, under QBE's interpretation, the ECL is given effect.

Under Novel's theory, however, the ECL has no effect under this (or any other) scenario:

1. Novel extends $20 million in credit to Covadonga;

2. [Novel omits QBE's step that applies the ECL and reduces the insured invoice amount to $15 million];

3. Subtract the $10 million Covadonga payment from the $20 million total invoice amount (which $20 million total is determined without application of the ECL);

4. Apply the deductible and the co-insurance provision to the $10 million loss, resulting (under Novel's theory) in a loss of $9.025 million ($10 million - $500,000 =$9.5 million x 95% = $9.025 million).

The Court is respectfully requested to notice that in, considering the calculations of loss required by Novel's rollover theory, the ECL in no way affects the math. This scenario establishes that, even though Novel gamely tries to incorporate the ECL into its "rollover" theory, when it comes time to determine the parties' rights and obligations under the Policy,

10

"rollover" supplies no meaning to the ECL. Fatally to Novel's case, the ECL simply has no force or effect under Novel's rollover theory.

### Scenario 3

Assume that Novel extends $40 million of credit to Covadonga and then pays back $20 million, but defaults on the remainder. Under QBE's theory, the following calculations would be performed:

1. Novel extends $40 million in credit to Covadonga;
2. Due to the application of the ECL, only the invoices up to the $15 million ECL would be insured;
3. Covadonga repays $20 million, so all insured invoices would be repaid and QBE would owe Novel $0.

Thus, under QBE's interpretation of the Policy, the ECL is given effect under this scenario.

However, under Novel's "rollover" theory, the ECL is given no effect:

1. Novel extends $40 million in credit to Covadonga;
2. [QBE's second step concerning the ECL is omitted under Novel's rollover theory];
3. Covadonga repays $20 million, leaving a balance of $20 million;
4. According to Novel, QBE owes the Policy Amount because $15 million of the outstanding $20 million would be insured and $15 million minus the $500,000 deductible, times the 95% insured percentage, is $13.775 million, which is greater than the $13.5 million Policy Amount. Because $13.775 million is greater than the Policy Amount, the Policy Amount would control.

11

If no ECL existed and the Policy contained only a Policy Amount, QBE would also owe Novel $13.5 million. Again, under Novel's theory, the ECL has no force or effect: QBE pays the same amount whether or not the ECL is applied under Novel's theory because, regardless of whether Novel calculates its insured claim by applying the $500,000 Policy deductible and 95% co-insurance provision against $15 million (the amount of insured debt if Novel's version of the ECL is applied) or $20 million (the amount of insured debt if no ECL existed in the Policy at all), the result is always greater than the Policy Amount, so the Policy Amount would always control. Thus, the ECL is rendered superfluous.

*Scenario 4*

Assume that Novel extends $30 million of credit to Covadonga, but this time Covadonga pays back $20 million, leaving the outstanding balance at $10 million. Assume that Novel extends another $5 million of credit to Covadonga, so the total outstanding credit to Covadonga is now $15 million. Under QBE's interpretation, the ECL would have an affect as follows:

1. Novel extends $30 million in invoice credits to Covadonga before any amounts are repaid;
2. Of the $30 million in invoices, only $15 million are within the ECL and are insured. The remaining $15 million is not insured and can never become insured ($30 million - $15 million ECL = $15 million);
3. Covadonga repays $20 million, leaving a nil insured invoice amount under the Policy ($15 million minus $20 million = less than $0);
4. Novel extends $5 million more in credit, which is all within the ECL and is all covered;
5. default occurs;

12

    6. QBE owes Novel $4.275 million ($5 million - $500,000 deductible = $4.5 million x 95% insured percentage = $4.275 million).

Clearly, under QBE's interpretation, the ECL is given force and effect.

Equally clearly, under Novel's rollover theory, the ECL would again have no force or effect:

1. Novel extends $30 million in invoice credits to Covadonga before any amounts are repaid;
2. [Under Novel's theory, QBE's second step concerning the ECL is omitted];
3. Covadonga repays $20 million, leaving a $10 million balance;
4. Novel extends $5 million more in credit for a total outstanding of $15 million;
5. default occurs;
6. According to Novel's theory, QBE would owe the Policy Amount because its $15 million loss, minus the $500,000 deductible, times the 95% insured percentage, is $13.775 million, which is greater than the $13.5 million Policy Amount.

Once again, the result of Novel's rollover theory is the same whether or not the ECL exists. Novel gives no effect to the ECL.

As illustrated by the hypotheticals above, the amount of money that QBE owes to Novel under Novel's interpretation of the Policy is always entirely independent of the ECL. All that is required, under Novel's theory, is to know the amount of Covadonga's default, the deductible amount, the co-insurance amount, and the Policy Amount. Never, under Novel's theory, does the ECL affect the outcome. Rather, in all cases, the amount of money owed to Novel by QBE under Novel's "rollover" theory is always exactly the same as it would be if the ECL did not exist in the Policy at all.

13

A key reason why Novel's theory is flawed derives from the fact that, as Novel argues it, the final ECL calculation can never be done until the time of an insurance loss because, prior to default by Covadonga, a conclusive determination of the effect of the ECL will always be impossible because Covadonga could potentially pay back more debt and thereby free up more space under the ECL. When such calculation is made at the time of a loss, however, its function will always be swallowed – and its effect always rendered entirely meaningless – by virtue (and application) of the Policy Amount.

In contrast to Novel's "rollover" theory, QBE's interpretation of the ECL applies the ECL and the Policy Amount at completely separate times and in doing so gives full meaning and effect to each. Under QBE's interpretation, when an invoice is issued its insured status is determined. If at the time of the issuance of the invoice, Covadonga's outstanding debt to Novel is less than the ECL, the invoice is an "Insured Debt" under the Policy. (Trial Ex. 8 at QBE 006428-29). If, on the other hand, an invoice is issued at a time when Covadonga's outstanding debt to Novel exceeds the ECL, the invoice is not insured and can never become insured; rather, the debt is retained for Novel's own account. (Trial Ex. 8 at QBE 006423-24; Trial Tr. at 291:9-16 and 315:21-316:7.) Thus, under QBE's interpretation, the ECL serves an entirely separate function than does the Policy Amount. In contrast to the ECL, which determines which invoices qualify as insured debts at the time of their issuance, the Policy Amount applies at the time of a loss to determine the maximum amount of money that QBE is liable to pay under the Policy so that QBE cannot be liable for any claims in excess of that amount. (Trial Ex. 8 at QBE 006430; Trial Tr. at 353:17-21).

14

As demonstrated at trial – and by the hypotheticals above – applying the ECL and the Policy Amount in this manner gives full meaning and effect to both the ECL and the Policy Amount. (Trial Tr. at 290:24-291:25; 331:25-332:15; 352:14-353:6).

Because QBE's interpretation of the ECL gives full meaning and effect to both the ECL and the Policy Amount, while Novel's "rollover" theory renders the ECL meaningless, QBE respectfully submits that QBE's interpretation of the ECL is the only reasonable interpretation of the ECL and an order should be issued vacating the judgment and finding for QBE as a matter of law. *See Nautilus Ins. Co. v. Matthew David Events, Ltd.*, 893 N.Y.S.2d 529, 532 (N.Y. App. Div. 1st Dep't 2013.5) (awarding summary judgment to insurer because policyholder's construction of exclusion at issue rendered language in contract provision defining term "employees" a nullity); *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998) (noting that the same standard that applies to a pretrial motion for summary judgment pursuant to Rule 56 also applies to motions for judgment as a matter of law during or after trial pursuant to Rule 50).

## **CONCLUSION**

For the foregoing reasons, QBE respectfully requests that its Rule 50 Motion be granted and judgment be entered by this Court: (1) declaring QBE's obligations under the Policy were met in full by QBE's July 26, 2011 payment to Novel in the amount of $1,160,927.59; (2) dismissing Novel's claims against QBE in their entirety; and (3) awarding such other and further relief as this Court deems appropriate.

Dated: New York, New York
June 24, 2013

CLYDE & CO US LLP

By: _____
Michael A. Knoerzer
Stephen M. Kennedy
Victoria L. Melcher
The Chrysler Building
405 Lexington Avenue,
16th Floor
New York, New York 10174
(212) 710-3900

*Attorneys for Defendant*
*QBE Insurance Corporation*

## CERTIFICATE OF SERVICE

On this date true and correct copies of (a) QBE's Notice of Motion; and (b) QBE's Memorandum of Law in Support of Its Motion for Judgment as a Matter of Law, were served upon the following counsel for Novel by electronic mail:

Michael Sullivan, Esq.
Karen Abravanel, Esq.
Sullivan & Worcester LLP
1290 Avenue of the Americas
New York, NY 10104

_____
Kristen B. Conway

Sworn to before me this
24th day of June, 2013

_____
Notary Public

Maria Orecchio
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02OR6119773
Qualified in Westchester County
Commission Expires March 12, 2017

1