UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
  NOVEL COMMODITIES S.A.,                :

                                Plaintiff,    :      No. 11-cv-6339 (PGG)
                                          :      ECF CASE
          v.                                    :

QBE INSURANCE CORPORATION,      :

                              Defendant.  :
-----------------------------------------------------------X

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
QBE INSURANCE CORPORATION'S
<u>MOTION FOR JUDGMENT AS A MATTER OF LAW</u>**

CLYDE & CO US LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174

*Attorneys for Defendant
QBE Insurance Corporation*

**PRELIMINARY STATEMENT**

Defendant-counterclaimant QBE Insurance Corporation ("QBE") respectfully submits this reply memorandum in further support of its motion for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure (the "Rule 50 Motion").

In its opposition to QBE's Rule 50 Motion ("Novel's Opposition"), Novel spills much ink concerning matters that QBE does not dispute on this motion, including that: (1) the Court found the Policy to be ambiguous; (2) the Court instructed the jury that QBE had the burden of proof at trial; (3) Novel proffered at trial an interpretation of the Endorsed Credit Limit ("ECL") in the Policy; and (4) the jury rendered a verdict in favor of Novel. Tellingly, however, Novel does not squarely address QBE's central argument: that Novel's interpretation of the Policy violates a cardinal rule of New York contract interpretation because it renders the ECL without force or effect in any possible circumstance. Because Novel's interpretation violates New York law, it could not reasonably be accepted by the jury.

On the other hand, QBE's construction of the Policy gives meaning to the ECL under every circumstance. Because QBE's construction of the Policy is the only construction that gives meaning to the ECL, it is as a matter of law the only reasonable interpretation. For these reasons, as more fully set forth below, QBE respectfully submits that judgment as a matter of law should be granted in favor of QBE.

**ARGUMENT**

A.   **Novel's Contentions Concerning the Standard Under Rule 50 Are Incorrect**

Despite Novel's arguments, QBE does not seek to avoid, but instead embraces, the narrow standard for granting judgment as a matter of law under Rule 50. That standard requires QBE to demonstrate that "under the governing law, there can be but one reasonable conclusion

1

as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *see also This Is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998) ("A district court may not grant a motion for a judgment as a matter of law unless the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable persons could have reached.") (internal quotation marks omitted); *Caruso v. Forslund*, 47 F.3d 27, 32 (2d Cir. 1995) (stating that, under Rule 50, a movant must demonstrate "there can be but one conclusion as to the verdict that reasonable persons could have reached") (internal quotation marks omitted).

The authorities cited by Novel are not to the contrary, but indeed support QBE's argument. *See, e.g.*, *Pouncy v. Danka Office Imaging Co.*, 393 Fed. Appx. 770, 772 (2d Cir. 2010) (judgment as a matter of law appropriate where party with burden of proof establishes that the jury could not rationally accept non-moving party's position). As discussed below, because Novel's interpretation of the Policy rendered the ECL without meaning, the jury could not have rationally accepted Novel's interpretation, because to do so would be to accept an interpretation that violates a cardinal rule of New York law concerning contract construction.

**B.      Novel's Interpretation of the Policy Is Unreasonable and Contravenes New York Law**

Tellingly, Novel does not attempt in its opposition papers to rebut or refute any of the hypothetical scenarios set forth in QBE's moving papers which illustrate that, under Novel's interpretation of the Policy, the ECL never has any meaning such that it would affect the parties' rights and obligations under the Policy. *See* QBE's Memorandum of Law in Support of its Rule 50 Motion ("QBE's Memo of Law") at 7-13.

Instead, throughout its opposition papers, Novel broadly argues that merely because Novel had an interpretation of the ECL, the jury was free to accept Novel's interpretation and

2

reject QBE's interpretation. This would only be true if Novel's interpretation of the ECL lent any meaning to the parties' rights and obligations under the Policy.[1] However, the Policy interpretation offered by Novel at trial – which Novel sometimes refers to as "rollover" – gives no meaning to the ECL and in no instance ever affects the parties' rights and obligations under the Policy.

For example, in attempting to lend meaning to its interpretation of the ECL, Novel argues that, under its theory:

> [T]he ECL determined the amount of Covadonga credit exposure that QBE insured (and, less certain deductions, would pay) and, therefore, determined the amount of Covadonga debt which, at any one time, Novel could finance through its banks.

Novel's Opposition at 13. Novel's argument fails in at least three ways.

First, Novel's argument that the ECL "determined the amount of Covadonga debt which, at any one time, Novel could finance through its banks" does not refer to any <u>Policy</u> obligations. Novel's banks were not signatories to the Policy. That Novel may look at its Policy provisions when determining its business or financing strategy does not mean that Novel is giving meaning to those Policy provisions.[2]

Second, the amount of QBE's "policy payout" under Novel's interpretation is always calculated completely independent of – and without reference to – the ECL. Whether

---

[1] Seeking to gloss over the fact that Novel's witnesses could not assign a meaning to the ECL, Novel makes the irrelevant argument that its witnesses did at least testify about the ECL. This testimony, however, lent no meaning to the ECL. That Mr. Gouverne testified that he thought the ECL "important," Tr. 110:10-20, does not (as Novel argues at page 5) give meaning to the ECL as required under New York law. That Mr. Besch had a conversation with Mr. Bayer about "rollover," Tr. 219:17-22, as Novel argues at page 5, also does not mean that Novel's interpretation gives meaning to the ECL as required by New York law.
[2] Novel could just as easily argue that it decided to lend more money to Covadonga because it had a trade credit risk policy. Such an argument would not, by itself, give any meaning to the ECL.

3

Covadonga's unpaid debt is less, equal to, or more than the $15 million ECL, the only provisions of the Policy that have any meaning under Novel's "rollover" theory in determining the "policy payout" are the deductible, the 95% Insured Percentage, and the $13.5 million Policy Amount. Novel's witness Mr. Gouverne testified to this at trial. Trial Tr. 170:7-15; 199:4-19.

Third, Novel's proffered interpretation of the ECL – as a limit of the amount Novel "would pay" (*See* Novel's Opposition at 13) – confuses the Policy Amount and the ECL.[3] The limit on the amount QBE would pay under the policy is the Policy Amount, not the ECL. *See* Trial Tr. 170:2-15. It is for this reason that Novel's related argument – that the "ECL remained in place and effective to determine the maximum amount of outstanding debt against which policy payout would be calculated, *i.e.*, the amount from which the insured percentage and deductible would be subtracted" – is unpersuasive. Under Novel's theory, the ECL could have no function, because it was the function of the Policy Amount to limit "policy payout." If, as Novel now argues, the limit on the amount QBE "would pay" is the ECL, then Novel's interpretation necessarily renders the Policy Amount superfluous. Either way, Novel's interpretation of the ECL violates the cardinal rule of New York law that all provisions be given meaning.

As QBE pointed out in its Memo of Law, the fatal flaw in Novel's interpretation of the ECL is that <u>Novel does not apply the ECL to the parties' mutual rights and obligations under the Policy until there has been a loss</u>.[4] By that time, however, the ECL is no longer needed, as all

---

[3] Novel's argument that the $15 million ECL represented the loss limit (*i.e.*, the amount that QBE "would pay") under the Policy subject to the deductible and the insured percentage (*See* Novel's Opposition at 13) is demonstrably in error. When the $500,000 deductible and the 95% Insured Percentage are applied to the $15 million ECL, the resulting figure is $13.775 million. However, the Policy Amount under the Policy is only $13.5 million. *See* Trial Tr. 195:16-19.

[4] Although Novel now denies what it has said previously in its correspondence to QBE (Trial Ex. 33) and the trial testimony of Mr. Besch (Trial Tr. 252:4-7), the fact is that Novel's position

4

that is needed to determine the parties' rights and obligations under the Policy is the loss amount, the deductible, the insured percentage and Policy Amount.

By contrast to Novel's interpretation, QBE's interpretation gives full meaning and effect to all of the Policy terms and conditions, including the ECL.  Under QBE's interpretation, when an invoice is issued, its insured status is determined.  If at the time of the issuance of the invoice, Covadonga's outstanding debt to Novel is less than the ECL, the invoice is an "Insured Debt" under the Policy.  *See* Trial Ex. 8 at QBE 006428-29.  If, on the other hand, an invoice is issued at a time when Covadonga's outstanding debt to Novel exceeds the ECL, the invoice is not insured, and the debt is retained for Novel's own account.  *See* Trial Ex. 8 at QBE 006423-24; Trial Tr. at 291:9-16 and 315:21-316:7.  Thus, under QBE's interpretation, the Policy Amount and the ECL both have a purpose and function.  While the ECL applies at the time of a transaction to determine whether an invoice is insured, the Policy Amount applies at the time of a loss to determine the maximum amount of money that QBE is liable to pay under the Policy, so that QBE cannot be held liable for any claims in excess of that amount.  *See* Trial Ex. 8 at QBE 006430; Trial Tr. at 353:17-21.

Novel does not deny that QBE's witnesses offered an interpretation that gives meaning to the ECL, but Novel responds to QBE's witnesses by resorting to name calling (Mr. Bayer merely followed the "party line") or spurious attempts at impeachment of QBE witnesses (Mr. West's testimony was "effectively worthless" because he "is a lawyer by training").  *See* Novel's Opposition at 6-7.  QBE will ignore these aspersions and instead rely upon the fact that QBE's

---

before the Rule 50 Motion was that the ECL was judged at the time of the loss.  But even assuming that this was not Novel's position, its "rollover" theory is still unreasonable as a matter of law because the ECL does not have any meaningful effect or function at any point in time during the Policy Period, as there is always coverage, under Novel's theory, up to the Policy Amount.

5

interpretation gives the ECL meaning, whereas Novel's interpretation does not. Thus, the Court can only accept QBE's interpretation.

### C. Novel's Claims that New York's Cardinal Rule Against Reading Terms Out of a Contract Is Inapplicable Here Are Spurious

Although Novel acknowledges that the New York Court of Appeals has declared that it is a cardinal rule of New York law that a contract interpretation is to be avoided if that interpretation renders a clause superfluous, Novel – in apparent recognition of the fact that this cardinal rule is fatal to its interpretation – seeks to recast the rule as a mere "guideline" that does not apply in this instance. *See* Novel's Opposition at 8-10.

#### i. The Cardinal Rule Is Not a Discretionary Guideline

Contrary to Novel's argument, the rule of construction relied upon by QBE is not merely a "guideline" under New York law. As the cases cited by QBE reflect, the New York Court of Appeals has affirmed that it has "long and consistently ruled against any construction which would render a contractual provision meaningless or without force or effect." *Ronnen v. Ajax Elec. Motor Corp.*, 88 N.Y.2d 582, 589 (N.Y. 1996).

Novel's interpretation of the Second Circuit's decision in *LaSalle Bank National Association v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005), is incorrect. Novel contends that the statement by the Second Circuit in *LaSalle* that an interpretation that "render[s] at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible" somehow dilutes the "cardinal rule" under New York law into a "guideline" which gives the court discretion, as a matter of preference, to accept interpretations that read out contract terms. The Second Circuit's decision in *LaSalle,* however, plainly goes on to state that interpretations that render a clause superfluous "will be avoided if possible." These words admit

6

of no ambiguity: if possible, an interpretation that renders the ECL superfluous should be avoided.  Novel's is such an interpretation and it is possible to avoid it.[5]

> ii.     *The Cardinal Rule Is Properly Applied on this Rule 50 Motion*

Novel's other argument against application of New York's "cardinal rule" on this motion is based upon two misconceptions. First, Novel contends that QBE is asking the Court to apply the cardinal rule to resolve an ambiguity. While there is no case law that QBE is aware of that states that the cardinal rule cannot be applied to resolve an ambiguity, the fact is QBE is not asking the Court to resolve an ambiguity. Rather, it is asking the Court to reject Novel's interpretation as a matter of law because it renders the ECL superfluous. This is precisely the function of the cardinal rule under New York law.

Second, Novel contends that the cardinal rule is "generally" not applied at this stage of the litigation. To the contrary, case law shows that the cardinal rule is readily applicable even after a trial. For example, in *Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co.*, which is cited in QBE's moving papers, s*ee* QBE's Memo of Law at 7, Judge Engelmayer of this Court initially found the contract at issue to be ambiguous, but later reversed this finding after a bench trial where it became clear that one party's construction logically accounted for all of the contract's terms, while the other party's interpretation was "at war" with basic canons of construction, including the cardinal rule applicable here that contracts may not be interpreted to render certain terms superfluous.  *See* No. 13 Civ. 1582(PAE), 2013 WL 1890278 at *5, *15-17 (S.D.N.Y. May 8, 2013).  In *Chesapeake*, the Court ruled, based on the competing interpretations presented at trial, that although the contract was "flawed and awkwardly drafted," it was subject

---

[5] Novel also argues that the "cardinal rule" is inapplicable to standard form contracts because they often contain "meaningless boilerplate" provisions.  Novel's Opposition at 11. The ECL, however, is far from "meaningless boilerplate." Instead, as both parties agree, the ECL is a


to only one reasonable interpretation. *Id.* at *11. In making this finding, the Court emphasized that the plaintiff's interpretation was "imperfect but reasonable," while the interpretation offered by the defendant "contravened the basic canons that an interpretation of a provision of an agreement should not make other clauses meaningless, superfluous, unreasonable, or inaccurate." *Id.* at *15-17. As *Chesapeake* demonstrates, this Court may – contrary to Novel's argument – apply the "cardinal rule" even after a trial.

Novel's argument that the "cardinal rule" may not be applied beyond the summary judgment stage should also be rejected because Novel did not until trial proffer any theory as to when the ECL applies. Indeed, in denying Novel's Motion for Reconsideration of the Court's Summary Judgment Order, the Court noted that Novel had completely failed to explain when and how the ECL applies under the Policy:

> Here, as the Court explained in its Order, Novel has not provided a reasonable or coherent reading of the Policy language at issue. It is entirely unclear from Novel's presentation when the "Endorsed Credit Limit" analysis is to be conducted: at the end of the Policy term, when an unpaid invoice was issued, when the buyer first defaulted, at the time of each subsequent default, when the claim is made, or at some other point. (Order at 8-9). Because Novel has not offered a "reasonable reading" of the Policy's relevant terms, it is not entitled to summary judgment.

Dkt. No. 59 at 5. Given that Novel only offered an interpretation of the ECL for the first time at trial, it is to be expected and is not at all unfair for Novel's interpretation of the ECL to be judged on a Rule 50 motion.[6] Indeed, if Novel's argument were accepted, then interpretations of

---

material term of the Policy and it is central to this dispute. *See, e.g.,* Novel's Opposition at 5-6.
[6] Unlike other court decisions, the Court's finding of ambiguity in this case was not based on an express determination that both parties had presented reasonable interpretations of the contract. *Cf. Brad H. v. City of New York*, 17 N.Y.3d 180, 186 (N.Y. 2011) ("Ambiguity is present if language was written so imperfectly that it is susceptible to more than one reasonable interpretation.").

8

ambiguous contracts, no matter how ridiculous, could never be challenged as a matter of law so long as they are ultimately accepted by a jury.

**D.      Contrary to Novel's Contention, QBE's Interpretation Is Consistent with the Purpose of the Policy**

As a last ditch argument, Novel contends that QBE's interpretation of the Policy is at odds with the "cardinal principle" that the Policy "should be interpreted so as to give effect to its general purposes as revealed within the four corners of the policy." *See* Novel's Opposition at 14. As an initial matter, the case on which Novel bases this argument is *Metropolitan Life Ins. Co. v. Noble Lowndes Int'l Inc.*, 84 N.Y.2d 430 (N.Y. 1994). A close reading of that case, however, reveals that the "cardinal principle" expressed in *Metropolitan Life* is not that a policy must be interpreted to give effect to its "general purposes," but rather the well-known rule that "the entire contract must be considered and, as between possible interpretations of an ambiguous term, that will be chosen which best accords with the sense of the remainder of the contract."[7] *Metropolitan Life*, 84 N.Y.2d at 437.

Based upon its misreading of *Metropolitan Life*, Novel argues that QBE's interpretation of the Policy undercuts its general purpose of "provid[ing] Novel with insurance protection for $15 million of Covadonga debt exposure for the entire Policy Period." *See* Novel Opposition at 14. Novel, however, completely fails to identify for the Court (or for QBE) where within the "four corners of the policy" this alleged general "purpose" can be found.

Nevertheless, even assuming Novel's "cardinal principle" is an accurate statement of law, Novel's application of this principle is wrong. Under QBE's interpretation, $15 million in credit

9

was always subject to coverage during the *length of the entire Policy Period* provided that the invoices making up that credit were issued at a time when Covadonga's total debt was less than $15 million. Contrary to its contention, Novel was not required to "wait" for Covadonga's debt to fall below the ECL before it could sell new product to Covadonga. Instead, consistent with the Policy's terms – and as established at trial – Novel was free to extend additional credit beyond the ECL to Covadonga, but any such credit was issued at Novel's own risk and thus was not subject to coverage under the QBE Policy. *See* Trial Tr. 314:21-315:2; Trial Tr. 315:21-317:19.

## CONCLUSION

For the foregoing reasons, QBE respectfully requests that its Rule 50 Motion be granted and judgment be entered by this Court: (1) declaring QBE's obligations under the Policy were met in full by QBE's July 26, 2011 payment to Novel in the amount of $1,160,927.59; (2) dismissing Novel's claims against QBE in their entirety; and (3) awarding such other and further relief as this Court deems appropriate.

---

[7] Because QBE's interpretation of the ECL makes sense of the ECL, the Policy Amount, and the various other provisions within the Policy, such as the Co-Insurance and Insured Debt provisions, while Novel's interpretation renders the ECL entirely superfluous in light of the Policy Amount, it is actually QBE's interpretation which "best accords" with the remainder of the contract under the "cardinal principle" set forth in *Metropolitan Life.*

Dated: New York, New York
August 5, 2013

                                                                  CLYDE & CO US LLP

                                  By:   /s/_____
                                         Michael A. Knoerzer
                                         Stephen M. Kennedy
                                         Victoria L. Melcher
                                         The Chrysler Building
                                         405 Lexington Avenue,
                                         16th Floor
                                         New York, New York 10174
                                         (212) 710-3900

                                         *Attorneys for Defendant*
                                         *QBE Insurance Corporation*