UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------- X
                                            :
NOVEL COMMODITIES S.A.,                     :
                                            :
                Plaintiff,           :          No. 11-cv-6339 (PGG)
                                            :
      - v -                              :                    ECF CASE
                                            :
QBE INSURANCE CORPORATION,                  :
                                            :
                Defendant.           :
                                            :
------------------------------------------- X


# NOVEL'S MEMORANDUM OF LAW IN OPPOSITION TO
# QBE'S MOTION FOR JUDGMENT AS A MATTER OF LAW


SULLIVAN & WORCESTER LLP
Michael T. Sullivan
Karen E. Abravanel
1633 Broadway, 32nd Floor
New York, New York 10019
Telephone: (212) 660-3000
Facsimile: (212) 660-3001

*Attorneys for Plaintiff*
*Novel Commodities S.A.*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT ............................................................................................................................ 2

    I.    STANDARD FOR JUDGMENT AS A MATTER OF LAW ................................ 2

    II.    THE EVIDENCE SUPPORTED THE JURY'S VERDICT THAT QBE DID NOT MEET ITS BURDEN OF PROOF .......................................................... 3

        A.    The Legal Construct ................................................................................... 3

        B.    There Was Ample Evidence To Support The Jury's Rejection Of QBE's Interpretation ................................................................................. 5

            1.    Novel's Evidence .......................................................................... 5

            2.    QBE's Evidence ............................................................................ 6

    III.    QBE RELIES ON A FLAWED APPLICATION OF A MAXIM OF CONTRACT INTERPRETATION ........................................................................ 8

    IV.    NOVEL'S POLICY INTERPRETATION WAS NOT UNREASONABLE ........ 11

        A.    Novel's Position Was Not That The ECL Only Applied At The Time Of Loss, But Rather That The Determination Of Coverage Was Not Static ......................................................................................... 12

        B.    Novel's Interpretation Did Not Render The ECL "Meaningless" ............ 13

    V.    ACCEPTING QBE'S INTERPRETATION WOULD VIOLATE THE "GENERAL PURPOSE" OF THE POLICY ...................................................... 14

CONCLUSION ........................................................................................................................ 16

# **TABLE OF AUTHORITIES**

**Cases**

*Cash v. County of Erie,* 654 F.3d 324 (2d Cir. 2011) ................................................................. 2

*Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., N.A.*,
   No. 13 Civ 1582 (PAE), 2013 WL 1890278 (S.D.N.Y. May 8, 2013) ........................... 1, 8, 10

*Corhill Corp. v. S.D. Plants, Inc.*, 9 N.Y.2d 595 (1961) ............................................................... 9

*Golden Gate Yacht Club v. Société Nautique de Genéve*, 12 NY.3d 248 (2006) .......................... 9

*Hurd v. Am. Hoist & Derrick Co.*, 734 F.2d 495 (10th Cir. 1984) ................................................ 3

*In re Bayou Group, LLC*, No. 09 Civ. 02340 (PGG), 2012 WL 386275
   (S.D.N.Y. Feb. 6, 2012) .............................................................................................................. 2

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195
   (2d Cir. 2005) .............................................................................................................................. 9

*Matter of Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352 (2003) ................................ 14

*Metropolitan Life Ins. Co. v. Noble Lowndes Intern. Inc.*, 84 N.Y.2d 430 (1994) ....................... 14

*Nautilus Ins. Co. v. Matthew David Events, Ltd.*, 69 A.D.3d 457 (1st Dep't 2010) ...................... 9

*North Gate Corp. v. National Food Stores, Inc.,* 140 N.W.2d 744 (Wis. 1966) ......................... 11

*Norwest Fin., Inc. v. Fernandez*, No. 98 Civ. 6635 (SAS), 1999 WL 946786
   (S.D.N.Y. Oct. 19, 1999) ..................................................................................................... 9, 10

*Pouncy v. Danka Office Imaging, Inc.*, 393 Fed. Appx. 770 (2d Cir. 2010) ................................. 2

*Raymond Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 5 N.Y.3d 157 (2005) ................ 9

*RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310 (2d Cir. 2003) ............................................. 8

*Ronnen v. Ajax Elec. Motor Corp.*, 88 N.Y.2d 582 (1996) ........................................................... 9

*Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017 (2d Cir. 1985) .................................... 10

*Schron v. Troutman Saunders LLP*, 97 A.D.3d 87 (1st Dep't. 2012) ......................................... 11

*U.S. Bank Nat'l Ass'n v. Southwest Airlines Co.*, No. 07 Civ. 11131 (DLC),
   2009 WL 2163594 (S.D.N.Y. July 20, 2009) ............................................................................ 9

**Other Authorities**

Restatement (Second) of Contracts § 203 (1981) ........................................................................ 11

**Treatises**

11 Williston on Contracts § 32:5 (4th ed.) ......................................................................................... 9

Case 1:11-cv-06339-PGG   Document 93   Filed 08/05/13   Page 4 of 20

## **PRELIMINARY STATEMENT**

Defendant QBE Insurance Corporation ("QBE") seeks to circumvent a jury verdict because, it claims, Plaintiff Novel Commodities S.A. ("Novel") advanced an "unreasonable" interpretation of QBE's ambiguous insurance policy (the "Policy"). The critical flaw to this argument is that it ignores the burden of proof. Novel was not required to prove anything. Rather, QBE was required to prove all, including most fundamentally that the parties intended to exclude the disputed class of transactions from the Policy. As demonstrated below, ample evidence supports the jury's verdict that QBE failed to meet its burden of proof.

Just as significant, the Policy interpretation that QBE advanced at trial, which the jury rejected, was itself patently unreasonable. Indeed, QBE's interpretation makes sense only in the context of QBE's expectation—unrevealed until trial—that its exposure would "ebb and flow" during the term of the Policy (the "Policy Period"). In other words, even though the Policy provides for uninterrupted protection for the stated Policy limits during the entirety of the Policy Period, QBE expected—and its interpretation well nigh assured—that its financial exposure would necessarily fall below the agreed Policy limits. In the words of a decision on which QBE relies, this interpretation "does violence" to other, undeniably unambiguous aspects of the Policy, to wit, that QBE had agreed to cover agreed amounts of Novel's credit exposure to Cia. Arrocera Covadonga ("Covadonga") for the entirety of the Policy Period, as well as contrary to Novel's express objective. This it may not do. *See Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., N.A.*, No. 13 Civ 1582 (PAE), 2013 WL 1890278, at *16 (S.D.N.Y. May 8, 2013).

As set out below, QBE's motion is without merit.

**ARGUMENT**

I.  **STANDARD FOR JUDGMENT AS A MATTER OF LAW**

To prevail on this motion, QBE bears a "heavy burden." *Cash v. County of Erie,* 654 F.3d 324, 333 (2d Cir. 2011). As this Court has held, the legal standard is "well established":

> Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in [its] favor. In deciding such a motion, the court must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence. Thus, judgment as a matter of law should not be granted unless
>
> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or
>
> (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it].

*In re Bayou Group, LLC*, No. 09 Civ. 02340 (PGG), 2012 WL 386275, at *7 (S.D.N.Y. Feb. 6, 2012) (quoting *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 288 (2d Cir. 1998)).

In this action, QBE's burden is greater still. "[W]here, as here, the moving party bore the burden of proof as to the issue [at trial], judgment as a matter of law is 'rare,' . . . and '[a] verdict should be directed in such instances only if the evidence in favor of the movant is so overwhelming that the jury could rationally reach no other result.'" *Pouncy v. Danka Office Imaging, Inc.*, 393 Fed. Appx. 770, 772 (2d Cir. 2010) (quoting *Broadnax v. City of New Haven*, 415 F.3d 265, 270 (2d Cir. 2005) and *Granite Computer Leasing Corp. v. Travelers Indem. Co.*, 894 F.2d 547, 551 (2d Cir. 1990)). The Tenth Circuit, reviewing decisions by several other Courts of Appeal, has described this heightened standard as follows:

> When the party with the burden of proof moves for a directed verdict the evidence must be viewed from a different perspective. Rather than considering the evidence for its sufficiency to support a finding for the opposing party as is done when the party not having the burden of proof has made such a motion, the evidence is tested for its overwhelming effect. . . . The test is a strict one, and a directed verdict for the party having the burden of proof may be granted only where he has established his case by evidence that the jury would not be at liberty to disbelieve.

*Hurd v. Am. Hoist & Derrick Co.*, 734 F.2d 495, 499 (10th Cir. 1984) (citing *United California Bank v. THC Financial Corp.*, 557 F.2d 1351, 1356 (9th Cir. 1977); *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1177 (3d Cir. 1976), *cert. denied*, 429 U.S. 1053 (1977); *Service Auto Supply Co. v. Harte & Co. Inc.*, 533 F.2d 23, 25 (1st Cir. 1976)).

## II.   THE EVIDENCE SUPPORTED THE JURY'S VERDICT THAT QBE DID NOT MEET ITS BURDEN OF PROOF

Properly framed, the question on this motion is not whether Novel presented a reasonable interpretation of the disputed Policy text (which it did), but whether there was legally sufficient evidence for the jury to conclude rationally that QBE failed to carry its burden. Undeniably, there was.

### A.   The Legal Construct

This is an insurance coverage dispute. On March 30, 2013, the Court denied the parties' cross-motions for summary judgment, finding that key Policy provisions were ambiguous and finding further that the limited extrinsic evidence offered on motion had not resolved those ambiguities. *See* March 30, 2013 Order (dkt. no. 39).

At trial, the Court set out those unresolved ambiguities in its instructions to the jury:

> As you know, the dispute between the parties concerns a trade credit insurance policy—which I will refer to as "the Policy"—issued by QBE Insurance Corporation to Novel Commodities S.A. on October 1st, 2009. . . . The policy provided coverage to Novel in the event that a Mexican company to which it was shipping rice—CIA. Arrocera Covadonga—did not pay Novel

3

> for the rice. The parties disagree about the scope of that coverage, however.
>
> Both sides agree that coverage under the Policy is subject to a $15 million limit—referred to as the "endorsed credit limit"—but they disagree about how this provision of the policy should be applied. The parties also disagree about the proper interpretation of a number of other policy provisions, including the "insured debt" and "co-insurance" provisions.
>
> Novel argues that while an invoice issued when more than $15 million in credit is outstanding to Covadonga is not initially covered, that invoice is covered by the policy once payments from Covadonga bring the outstanding credit balance down to $15 million or less.
>
> QBE contends that application of the $15 million endorsed credit limit provision happens only once: When the invoice is issued. If the amount of credit outstanding when the invoice is issued is more than $15 million, Novel has—according to QBE—no coverage for that invoice.

Trial Tr. 474:6-475:6.

Because the ambiguities concerned the extent of coverage under the Policy, the Court correctly determined that QBE, not Novel, had the burden of proof on all issues. The Court instructed the jury accordingly:

> [T]he preponderance of the evidence standard applies to all disputed issues in this case. QBE bears the burden of proof on these issues. Accordingly, in order for you to rule in favor of QBE, you must find that QBE has proven by a preponderance of the evidence that the policy provides no coverage for invoices issued by Novel when more than $15 million in credit is outstanding to Covadonga. In order for QBE to prevail, it must demonstrate that, one, it would be unreasonable for the average man or woman reading the policy to construe it as Novel does; and, two, QBE's interpretation is the only construction that fairly could be placed on the policy.

Trial Tr. 475:7-18.

The Court also instructed the jury, among other things, to consider the relevant language of the Policy, noting that "[a]n insurance contract should be construed so as to give full meaning and effect to all of its provisions." Trial Tr. 477:1-3. The Court then amplified this instruction:

> An insurance policy must be read as a whole and every part should be read with reference to the whole. If possible, the policy should be interpreted so as to give effect to its general purposes as revealed within the four corners of the policy. An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and should be avoided if possible.

Trial Tr. 478:10-16.

The ultimate question put to the jury was straightforward: "Has QBE Insurance Corporation met its burden of proof as set forth in the Court's jury instructions?" Trial Tr. 486:6-7. The Court instructed the jury "to apply all of the instructions you have been given in answering that question." Trial Tr. 481:3-4.

### B.   There Was Ample Evidence To Support The Jury's Rejection Of QBE's Interpretation

#### 1.   *Novel's Evidence*

Novel's witnesses, Frank Gouverne and James Besch, both contradicted QBE's interpretation of the disputed Policy text. Both testified that they understood that the Policy would "revolve" or "rollover" and cover newer transactions as Covadonga paid off older transactions. *See, e.g.,* Trial Tr. 110:10-20 (Gouverne); 222:17-23 (Besch). Mr. Gouverne testified that this feature of the Policy was "important" to Novel, and that he spoke to Mr. Besch to "make sure" that a predecessor policy issued by QBE in February 2009, which contained the same standard terms as the Policy (including each of the terms in dispute) (the "Predecessor Policy"), had this feature. *See* Trial Tr. 108:5-109:17. Mr. Besch testified that he discussed with Wayne Bayer, QBE's underwriter, Novel's need to "be very productive with" the predecessor policy by "rolling it over," and that Mr. Bayer agreed. Trial Tr. 219:17- 220:2. Mr. Besch

5

testified to a later conversation in which Mr. Bayer confirmed that the Policy would have the same attributes as its predecessor, including the "rollover" feature.  Trial Tr. 224:1-16.

Mr. Gouverne and Mr. Besch also both testified about a critical email exchange in June 2009 (PX 6), in which Mr. Besch confirmed that the Predecessor Policy would "rollover" to cover newer transactions as Covadonga paid old transactions.  Trial Tr. 118:11-122:3; 179:16-183:18; 222:1-223:20; 243:15-248:18.  And Mr. Gouverne testified that Novel conducted itself in full conformity with its understanding that the Policy coverage would "rollover," rather than operate as QBE argued at trial.  Trial Tr. 132:2-151:17.

Further, nothing in the Policy, the starting point for the jury's analysis, contradicts the understanding of Messrs. Gouverne and Besch.

### 2. *QBE's Evidence*

QBE proffered no expert testimony at trial with respect to any issue, including the interpretation of the disputed Policy language.  Instead, QBE relied exclusively on fact witnesses.

First, QBE presented the testimony of Mr. Bayer, the QBE underwriter for the Policy.  Trial Tr. 256:23-24; 294:12-14.  Mr. Bayer maintained QBE's party line: that the Policy did not cover the disputed transactions.  But his evidence was primarily limited to his citation to the same Policy text that the Court already found insufficient to support QBE's motion for summary judgment.  Trial Tr. 290:24-291:16.

Mr. Bayer also offered an unsatisfying rationale for QBE's interpretation of the Policy.  He explained that the "more debt a customer assumes, the riskier it becomes for repayment," implicitly asserting that his interpretation limited QBE's risk by limiting the amount of debt that Novel could "assume."  *See* Trial Tr. 260:3-7.  But elsewhere, he acknowledged just the opposite: he admitted that the Policy placed no restriction on the amount of credit that Novel

6

could extend to Covadonga.  Trial Tr. 262:10-15 and 309:25-310:5.  There was no logical connection between the rationale that Mr. Bayer offered and the Policy interpretation that he advanced.

Mr. Bayer also testified that he provided his explanation to Mr. Besch, who "did not argue with" him on the point.  Trial Tr. 291:19-292:2.  Yet, Mr. Besch contradicted Mr. Bayer's recollection of this conversation.  Trial Tr. 227:14-19.

The jury was entitled to reject Mr. Bayer's testimony in its entirety.  First, this testimony was directly contradicted by Mr. Besch.  *Id*.  Second, Mr. Bayer's testimony also indicated an imperfect memory.  For example, Mr. Bayer denied knowing who Mr. Gouverne was, despite having attended a settlement meeting with him in the summer of 2011.  *See* Trial Tr. 263:5-8 and 228:17-229:24.

The testimony presented by Randall West, another QBE employee who supervised the handling of Novel's claim, was effectively worthless because it was based on Mr. West's own "interpretation" of the Policy text.  Mr. West is a lawyer by training.  Trial Tr. 358:25-359:2.  He supervises the QBE department that "handles claims."  Trial Tr. 338:23-339:11.  He has spent his entire career either employed by insurance companies or providing legal representation to insurance companies.  Trial Tr. 359:1-25.  Mr. West was not an "underwriter" on the Policy.  Trial Tr. 294:15-17.  In fact, he has no "underwriting" experience.  Trial Tr. 363:1-2.  As such, Mr. West offered no relevant evidence about the parties' intent concerning the disputed terms of the Policy.  The jury was entitled to reject his testimony in its entirety.

Finally, QBE presented the testimony of John Hertzer, an employee of Aon Trade Credit, which is identified in the Policy as the "broker."  Mr. Hertzer had little involvement in Mr. Besch's communications with Mr. Bayer.  Trial Tr. 221:15-25.  Fundamentally, Mr. Hertzer testified inaccurately when he incorrectly attributed non-existent language to QBE's policy.

7

Trial Tr. 332:7-9 ("The QBE policy states that any shipment that is made that is in excess of the credit limit is forever uncovered."). Additionally, Mr. Hertzer testified to an incomplete recollection about a conversation that he could only assume he had with Mr. Besch. *See* Trial Tr. 335:18-336:3. He also admitted to an ongoing commercial relationship with QBE and Mr. Bayer, from which he and his employer earn compensation. Trial Tr. 335:2-17. The jury was entitled to reject Mr. Hertzer's testimony, as well.

In sum, the jury was presented with ample evidence in opposition to QBE's interpretation, and thus the jury had ample justification for disbelieving QBE's witnesses and rejecting their evidence concerning the interpretation of the Policy.

### III.   QBE RELIES ON A FLAWED APPLICATION OF A MAXIM OF CONTRACT INTERPRETATION

QBE purports to base the motion on the application of a "cardinal rule of contract construction that a court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect." *See* QBE's Br. at 1. According to QBE, this rule of contract construction means that the Court must reject, as a matter of law, Novel's interpretation of the Policy. Not so.

Courts generally apply the "cardinal rule" on which QBE relies in the context of resolving the threshold question of whether the language of a contract is ambiguous—not, as QBE would argue, for the purpose of resolving that ambiguity. *See, e.g., RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 313 (2d Cir. 2003) ("In assessing ambiguity, we consider the entire contract to 'safeguard against adopting an interpretation that would render any individual provision superfluous.'") (citations omitted). Indeed, all but three of QBE's cited authorities (*see* QBE's Br. at 5-7) involve a court's application of the maxim not to resolve an ambiguity, but rather to reject a party's attempt to introduce ambiguity into a document that was otherwise unambiguous on its face. *See Chesapeake*, 2013 WL 1890278, at *17 ("Under the case law,

8

where one construction is reasonable and affords a clear and definite meaning and all others are not reasonable, a contract is not ambiguous."); *Norwest Fin., Inc. v. Fernandez*, No. 98 Civ. 6635 (SAS), 1999 WL 946786, at *4 (S.D.N.Y. Oct. 19, 1999) ("Because the defendants' interpretation renders various parts of the Purchase Agreement meaningless, there is no ambiguity on the issue of whether Norwest was required to offset credit losses against the contingent price."); *U.S. Bank Nat'l Ass'n v. Southwest Airlines Co.*, No. 07 Civ. 11131 (DLC), 2009 WL 2163594, at *9 (S.D.N.Y. July 20, 2009) ("Each of Southwest's proffered contract constructions fails to suggest an ambiguity that would forestall this finding of breach."); *Nautilus Ins. Co. v. Matthew David Events, Ltd.*, 69 A.D.3d 457, 460 (1st Dep't 2010) (noting that "the plain meaning of the policy's language may not be disregarded to find an ambiguity where none exists"); *Golden Gate Yacht Club v. Société Nautique de Genéve*, 12 N.Y.3d 248, 256 (2006) (reversing lower court's determination that relevant contract language was ambiguous).[1]

But even if it were applicable here, QBE overstates the impact of the maxim. As more commonly stated—and as the Court instructed the jury—the "cardinal rule" is a guideline, not a requirement:

> An interpretation which gives effect to all provisions of the contract is *preferred* to one which renders part of the writing superfluous, useless or inexplicable. A court will interpret a contract in a manner that gives reasonable meaning to all of its provisions, *if possible*.

11 Williston on Contracts § 32:5 (4th ed.) (emphasis added); *see also, e.g., LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("[A]n interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not

---

[1] The three remaining authorities cited by QBE involve the application of the maxim to unambiguous contract language. See *Ronnen v. Ajax Elec. Motor Corp.*, 88 N.Y.2d 582, 588 (1996) (finding that "unambiguous words" of relevant contract provision "presented an issue of pure contract interpretation for the court"); *Corhill Corp. v. S.D. Plants, Inc.*, 9 N.Y.2d 595, 599 (1961) (interpreting "express provision" of contract); *Raymond Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 5 N.Y.3d 157, 162 (2005) (looking only to "the language of the policy").

9

preferred and will be avoided if possible.'") (citations omitted); *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985) ("[A]n interpretation that gives a reasonable and effective meaning to all the terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect.").

In this respect, QBE goes too far when it cites two cases, *Chesapeake and Norwest*, for the proposition that "contract interpretations that render provisions meaningless are 'not reasonable.'" *See* QBE's Br. at 6. Neither authority supports that broad (and incorrect) position.

First and foremost, as noted above, *Chesapeake* concerned a document that the court deemed unambiguous. In doing so, the court rejected an alternative interpretation, finding it "at war with . . . basic canons of construction" because it was "commercially unreasonable," rendered other provisions "incoherent or inaccurate," and "[did] violence" to still other provisions. *See Chesapeake,* 2013 WL 1890278 at **15-17. At most, therefore, *Chesapeake* stands for the unremarkable (and inapplicable) proposition that a court will not rely on an "unreasonable" interpretation to introduce ambiguity to that which is otherwise unambiguous.

Similarly, the court in *Norwest* found that the disputed language of the parties' agreement was not ambiguous. *See Norwest,* 1999 WL 946786 at *4. In so doing, the court also rejected the defendants' alternative interpretation for reasons similar to that used by the *Chesapeake* court, finding that the plaintiff "offered an interpretation of the relevant contractual provisions that gives meaning to each provision while the defendants have offered an interpretation that it is contrary to the plain meaning of the document." *Id.* at *3. The court found that the defendants' interpretation was not reasonable because it was based on "a tortured interpretation of the relevant contract language." *Id*. Thus, *Norwest* stands for the prosaic proposition that a party cannot manufacture an ambiguity in the face of clear contract language.

10

Further still, QBE's "cardinal rule" is inapplicable in disputes concerning standardized form agreements, such as QBE's Policy. As one state appellate court recently explained:

> We recognize that the foregoing analysis appears to render the 'other consideration' phrase in the option agreement meaningless, in violation of a cardinal rule of interpretation. *See Ronnen v. Ajax Elec. Motor Corp.*, 88 N.Y.2d 582, 589, 648 N.Y.S.2d 422, 424–425, 671 N.E.2d 534, 536–537 (1996). However, some documents do use meaningless boilerplate and, in our view, the rule should not be carried to absurd lengths to imbue meaning into every legalistic jotting.

*Schron v. Troutman Saunders LLP*, 97 A.D.3d 87, 95 (1st Dep't. 2012) *aff'd*, 20 N.Y.3d 430 (2013). In fact, this principle is well-established. *See* Restatement (Second) of Contracts § 203 cmt. b (1981) ("[A] standard form may include provisions appropriate only to some of the transactions in which the form is to be used; or the form may be used for an inappropriate transaction. Even agreements tailored to particular transactions sometimes include overlapping or redundant or *meaningless* provisions.") (emphasis added); *North Gate Corp. v. National Food Stores, Inc.,* 140 N.W.2d 744, 748 (Wis. 1966) (rejecting "general rule" as having "much less force where, as here, a standard form, designed for use in varying fact situations, is used, and it is obvious that in each transaction where the form is used, some of its terms will necessarily be surplusage" and instead applying doctrine of contra proferentem to construed contract against draftsman).

Thus, Novel was not required to proffer an interpretation that harmonized all of the terms of QBE's Policy.

### IV. NOVEL'S POLICY INTERPRETATION WAS NOT UNREASONABLE

QBE is also incorrect when it asserts that Novel's interpretation of the Policy rendered the "Endorsed Credit Limit" provision ("ECL") "meaningless" and was, therefore, "unreasonable." *See* QBE's Br. at 15.

11

### A. Novel's Position Was Not That The ECL Only Applied At The Time Of Loss, But Rather That The Determination Of Coverage Was Not Static

As a preliminary matter, QBE's motion misstates Novel's position in this case, asserting that "Novel contended at trial that the ECL was to be applied at the time of a loss under the Policy." *See* QBE's Br. at 2. That is not correct. Novel did not argue or present evidence that it considered whether a transaction was covered only at the time of loss.

Rather, Novel's position was that the status of a particular transaction as covered or uncovered was not static, as QBE argued, but likely to change. An invoice that was initially not covered because Covadonga's unpaid debt exceeded the ECL would become covered as Covadonga paid down older debt. *See, e.g.,* Trial Tr. 110:21-111:3. Throughout the life of the Policy, Novel thus remained vigilant to determine whether particular transactions were covered or not, *i.e.*, whether they were within the ECL. And to this end, throughout the Policy Period, Novel kept track of its aggregate exposure to Covadonga as against the ECL and, as Covadonga paid down older transactions, moved other debt from the "uncovered" to "covered" category. *See, e.g.,* Trial Tr. 132:2-151:17.

But Novel also asserted that, as a practical matter, an insured would have to review the transactions for which it intended to submit a claim and determine whether those transactions were covered. The amount of debt above the agreed limits would not be appropriately included in a claim. As Mr. Gouverne explained:

> THE COURT: Or to put it in concrete terms if there was, say, $16 million outstanding in credit to Covadonga at the time it defaulted, I take it it was your understanding that the amount over $15 million would not be subject to insurance?
>
> THE WITNESS: Would not be covered. Yes, indeed.

Trial Tr. 144:10-14.

Put differently, if at the time of loss, Covadonga's debt exceeded the ECL, then it is indeed likely that anyone preparing a claim would focus on the Policy Amount; but if the amount of the debt was less, then it is likely that one preparing a claim would focus on the "insured percentage" and the deductible. In all scenarios, the ECL remained in place and effective to determine the maximum amount of outstanding debt against which policy payout would be calculated, *i.e.*, the amount from which the uninsured percentage and deductible would be subtracted.

### B. Novel's Interpretation Did Not Render The ECL "Meaningless"

QBE refers to Mr. Gouverne's testimony on cross-examination as an "admission" that, under Novel's interpretation, "the ECL would always be disregarded in favor of the $13.5 Policy Amount." *See* QBE's Br. at 7. That was not Mr. Gouverne's testimony. But QBE's mischaracterization still does not make the required point.

Mr. Gouverne testified about the importance of the ECL provision to Novel: the ECL determined the amount of Covadonga credit exposure that QBE insured (and, less certain deductions, would pay) and, therefore, determined the amount of Covadonga debt which, at any one time, Novel could finance through its banks. Trial Tr. 198:15- 201:21. In the context of a hypothetical scenario presented on cross-examination, concerning a hypothetical loss in which Mr. Gouverne understood that Novel would be entitled to the maximum amount provided by the Policy, Mr. Gouverne testified that he would focus on the Policy Amount, not the ECL, to determine how much QBE would pay. Trial Tr. 170:7-15 and 199:4-19. That made sense: the Policy Amount represented the maximum amount that QBE had agreed to pay in case of a loss.

As such, Mr. Gouverne's testimony hardly advanced an interpretation that rendered the ECL "meaningless." Rather, it simply established the commercial reality that if a loss occurred at a time when Covadonga owed $15 million or more, Novel expected that QBE would pay fully

under the Policy, up to the Policy Amount. Indeed, in any scenario in which Novel had extended credit to Covadonga up to or in excess of $15 million, and in which none of that debt had been repaid at the time of default and claim, the ECL would always be "meaningless," as QBE now uses the term. Novel would expect to receive the maximum benefit under the Policy, *i.e.*, the full Policy Amount. According to the practical perspective from which Mr. Gouverne testified when considering the hypothetical presented, Novel, when preparing a claim, would be justified in focusing on the Policy Amount, rather than the ECL.

### V. ACCEPTING QBE'S INTERPRETATION WOULD VIOLATE THE "GENERAL PURPOSE" OF THE POLICY

Equally problematic for QBE is that the rule of contract construction on which it relies does not stand alone. As set forth in the Court's jury instructions, another rule of contract construction requires that "[i]f possible, the policy should be interpreted so as to give effect to its general purposes as revealed within the four corners of the policy." Trial Tr. 478:11-14; *see also Matter of Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (2003). The New York Court of Appeals has described this rule as a "cardinal principle" of contract construction—just like the rule on which QBE relies. *See Metropolitan Life Ins. Co. v. Noble Lowndes Intern. Inc.*, 84 N.Y.2d 430, 437 (1994) (quoting *Rentways, Inc. v. O'Neill Milk & Cream Co.*, 308 N.Y. 342, 347 (1955)).

Applying QBE's rule in this case, and accepting QBE's forced interpretation of terms already deemed ambiguous, would violate, indeed pervert, a general purpose of the Policy: to provide Novel with insurance protection for $15 million of Covadonga debt exposure for the entire Policy Period. There can be no legitimate debate that this was an agreed and accepted purpose of the Policy. Similarly, QBE has never disputed that Novel was always permitted to extend credit—above and beyond and Policy limits—to Covadonga. *See* Trial Tr. at 310:14-311:3.

But accepting QBE's interpretation of the ambiguous terminology would effectively negate both undisputed facts: the Policy would no longer be available to provide full coverage for the entire Policy Period, and instead, QBE would enjoy moments of respite—periods in which the potential payout was less than was agreed—by reason of the anticipated "ebb" in the debt for which it was at risk.  If QBE's interpretation were correct, then Novel would have been required to wait for the "ebb" of Covadonga's debt before it could commence the process of creating new "flow" of goods to Covadonga.  In other words, Novel would not have been able to utilize the entire $15 million ECL throughout the life of the Policy.  This proffered (but rejected) interpretation is contrary to the terms of the Policy; and it is contrary to Novel's intention, of which QBE was fully aware, to keep the entirety of its insurance limits "at work" in order to maximize Novel's access to bank financing.  *See* Trial Tr. 108:5-109:17 and 219:17- 220:2.

QBE's interpretation, therefore, would effectively negate a core tenet of the Policy, and would fundamentally frustrate Novel's stated objective for obtaining insurance coverage under the Policy.  For these reasons, the jury was entitled to reject QBE's interpretation as unreasonable.

## **CONCLUSION**

For the foregoing reasons, QBE's motion should be denied.

Dated: New York, New York　　　　　　Respectfully submitted,
　　　　July 22, 2013

　　　　　　　　　　　　　　　　　　SULLIVAN & WORCESTER LLP

　　　　　　　　　　　　　　　　　　By: /s/ Michael T. Sullivan
　　　　　　　　　　　　　　　　　　　　Michael T. Sullivan
　　　　　　　　　　　　　　　　　　　　Karen E. Abravanel
　　　　　　　　　　　　　　　　　　1633 Broadway
　　　　　　　　　　　　　　　　　　New York, New York 10019
　　　　　　　　　　　　　　　　　　Telephone: (212) 660-3000
　　　　　　　　　　　　　　　　　　Facsimile: (212) 660-3001
　　　　　　　　　　　　　　　　　　msullivan@sandw.com
　　　　　　　　　　　　　　　　　　kabravanel@sandw.com

　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff*
　　　　　　　　　　　　　　　　　　*Novel Commodities S.A.*