UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NOVEL COMMODITIES S.A.,

        Plaintiff,

v.

QBE INSURANCE CORPORATION,

        Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: October 28, 2013

**ORDER**

11 Civ. 6339 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

      This case concerns an insurance coverage dispute. In 2009 and 2010, Plaintiff Novel Commodities S.A. ("Novel") sold large quantities of rice to CIA. Arrocera Covadonga ("Covadonga"), a large Mexican agribusiness, on credit. Because of the credit risk associated with doing business with Covadonga, Novel obtained a trade credit insurance policy (the "Policy") from Defendant QBE Insurance Corporation ("QBE"). The term of the Policy was from October 1, 2009, to September 30, 2010. The Policy was subject to an "Endorsed Credit Limit" of $15 million. (Trial Transcript ("Tr.") 124, 195, 239, 261, 266, 295, 311; Ex. 8 (Policy)) After the deductible and other limitations on coverage are applied, the Policy provided Novel with coverage up to $13.5 million in the event that Covadonga did not pay invoices for rice Novel had shipped. (Tr. 195-99, 239, 266; Ex. 8 (Policy))[1]

      After Covadonga defaulted on its payment obligations, Novel made a claim under the Policy, seeking coverage for thirty-two invoices Novel issued between April 19, 2010, and September 23, 2010, for rice shipped to Covadonga. (Tr. at 111-18; Ex. 29 (Claim)) Novel sought to recover the invoice value of the rice: $12,285,001.12. (Ex. 29 (Claim) at NOVEL

---

[1] The Policy is subject to a $500,000 deductible and provides for a recovery of only 95% of an "Insured Loss" (the "Insured Percentage"). (Tr. 194-95, 197, 252-53 and Ex. 8 (Policy))

0002) QBE denied coverage for many of the invoices, because they were issued, and rice was shipped, at a time when Covadonga's outstanding debt to Novel was greater than $15 million. QBE argues that these sales and shipments represent extensions of credit that exceed the $15 million Endorsed Credit Limit, and therefore are not covered under the Policy. (Tr. 34-35, 37-38, 40, 46, 290-91, 331-32; 352-53, 442, 444-45, 457-58; Ex. 33)

Novel contends, however, that the Policy provides coverage for all invoices not paid by Covadonga – as long as Novel extended the credit during the Policy period and before Covadonga had committed any default – up to $15 million, minus the deductible and the "Insured Percentage." (Tr. 414, 421, 424-25, 426, 430-31)

The Court denied the parties' cross-motions for summary judgment, finding that the relevant Policy terms are ambiguous, and that the extrinsic evidence offered by the parties was not conclusive. Novel Commodities S.A. v QBE Ins. Corp., 11 Civ. 6339 (PGG), 2013 WL 1294618 (S.D.N.Y. Mar. 30, 2013)

The case proceeded to trial before this Court and a jury on May 20, 2013. On May 23, 2013, the jury returned a verdict in favor of Novel, finding that QBE had not met its burden of demonstrating that the Policy provides no coverage for invoices issued by Novel when more than $15 million in credit is outstanding to Covadonga. (Tr. 486; Verdict Form (Dkt. No. 71); Jury Charge (Tr. 474-76))

On August 5, 2013, QBE moved for judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 50(b). (Dkt. No. 90) QBE has also filed a motion to stay execution of the judgment entered in this case. (Dkt. No. 84) For the reasons stated below, both motions will be denied.

I.  **EVIDENCE AT TRIAL**

   A.  **Relevant Policy Language**

   The "Insuring Clause" of the Policy reads as follows:

   > In consideration of the payment of all **Premium** and other charges when due and subject to the terms and conditions of this **Policy**, we agree to cover you in respect of goods sold and **Dispatched** . . . within the **Policy Period** up to the **Insured Percentage** of the **Insured Loss** in the event of the **Buyer** failing, due to **Insolvency** or **Protracted Default**, to pay you an **Insured Debt** up to the **Policy Amount**. Any **Endorsed Credit Limit, Policy Amount** or other limits of liability under this **Policy** and under any preceding or future **Policy** issued by us to you are non-cumulative.

(Ex. 8 (Policy), Art. II) (emphasis in original).

   An "Insured Debt" is defined in the Policy as the invoice value of goods sold that does not exceed the "Endorsed Credit Limit":

   > **"Insured debt"** means the invoice value of such goods sold and **Dispatched** . . . by you arising out of the trade specified in the **Declaration** that: a. is owed to you by the **Buyer**; and b. does not exceed the **Endorsed Credit Limit** for the **Buyer**; and c. is in respect of the invoice value of goods . . . both sold by you to the **Buyer** and **Dispatched** to the **Buyer** within the **Policy Period** pursuant to a contract of sale providing for repayment of the debt within the terms of payment specified in the **Declaration**. . . .

(Id., Art. V) (emphasis in original).

   The Policy defines "Endorsed Credit Limit" as "the maximum amount of credit that you are covered for under this **Policy** and shall not include any sales tax, value added tax, or any other taxes." (Id.) (emphasis in original). As originally issued, the Policy provided for an "Endorsed Credit Limit" of $10,000,000. (Ex. 8 (Policy Declaration) at QBE 006406) Effective April 1, 2010, the Endorsed Credit Limit was increased to $15,000,000. (Id. at QBE 006434)

   The Policy also contains a "Co-Insurance" clause, which states:

   > You shall retain for your own account: (1) the amount of **Insured Loss** that exceeds the **Insured Percentage**; and (2) any indebtedness of the **Buyer** to you that exceeds the

3

> **Endorsed Credit Limit**; and (3) the **Deductible** amount (if any); and (4) any loss that exceeds the **Policy Amount**.

(Ex. 8, Art. III.6.a) (emphasis in original).

The Policy does not state when the determination is made as to whether "any indebtedness of the Buyer to [Novel] exceeds the Endorsed Credit Limit." (Id.) QBE argues that for each Novel invoice that Covadonga fails to pay, it is necessary to analyze the amount of credit that Novel had outstanding to Covadonga when the invoice was issued. If Novel had more than $15 million in credit outstanding to Covadonga when the invoice was issued, there is – according to QBE – no coverage. As noted above, Novel contends that no such invoice-specific analysis is required under the Policy, and that coverage turns simply on whether the unpaid invoices were issued within the Policy period and amount to less than the $15 million limit.

### B.   Relevant Testimony

At trial, as at summary judgment, the parties offered conflicting interpretations of the Policy. Novel's witnesses testified that their understanding – at the time the Policy was issued – was that it provided coverage for rice sold on credit to Covadonga up to the Endorsed Credit Limit of $15 million (less the deductible and the Insured Percentage). According to Novel, while some or all of an invoiced amount might not initially be covered by the Policy – because at the time the invoice was issued more than $15 million in aggregate credit had been extended to Covadonga – as the Mexican importer paid off earlier invoices and reduced its debt to Novel below the $15 million threshold, coverage would extend to transactions not originally covered. (Tr. 108-11, 222) Moreover, Novel witnesses testified that they had been assured by QBE's underwriter that the Policy had this "rollover" feature. (Tr. 118-122, 179-81, 221-24, 243-48)

4

QBE's witnesses testified that the Endorsed Credit Limit analysis must be conducted each time Novel issues an invoice, and that any invoice issued when Covadonga owes Novel more than the $15 million is not, and could never become, covered under the Policy. (Tr. 290-92, 331-32, 352-53) QBE's underwriter testified that the Policy does not cover the disputed invoices and that any credit issued above the $15 million threshold was at Novel's own risk. (Tr. 256-57, 262)

QBE did not, however, cite to any language in the Policy demonstrating that the Endorsed Credit Limit determination is to be made each time an invoice is issued. Indeed, there is no language in the Policy stating or suggesting that the Endorsed Credit Limit determination is to be made each time Novel issues an invoice to Covadonga, as opposed to cumulatively at the time of default.

## II. JURY INSTRUCTIONS AND VERDICT

Consistent with well settled case law, the Court instructed the jury that QBE, as the insurer, had the burden of demonstrating that its interpretation of the Policy was correct:

> As I stated earlier, the preponderance of the evidence standard applies to all disputed issues in this case. QBE bears the burden of proof on these issues. Accordingly, in order for you to rule in favor of QBE, you must find that QBE has proven, by a preponderance of the evidence, that the policy provides no coverage for invoices issued by Novel when more than $15 million in credit is outstanding to Covadonga. In order for QBE to prevail, it must demonstrate that, one, it would be unreasonable for the average man or woman reading the policy to construe it as Novel does; and, two, QBE's interpretation is the only construction that fairly could be placed on the policy.[2]

---

[2] In instructing the jury that QBE had the burden of proving that the Policy provided no coverage for invoices issued when more than $15 million was then outstanding to Covadonga, the Court relied on Vargas v. Insurance Co. of North America, 651 F.2d 838, 840 (2d Cir. 1981); Kenevan v. Empire Blue Cross and Blue Shield, 791 F.Supp. 75, 79 (S.D.N.Y. 1992); Sincoff v. Liberty Mut. Fire Ins. Co., 11 N.Y.2d 386, 390 (1962); New York v. Evanston Ins. Co., 39 A.D.3d 153, 156 (2d Dept. 2007); and Boggs v. Comm. Mut. Ins. Co., 220 A.D. 2d 973, 974 (3d Dept. 1995). (Dkt. No. 69 at 10 n.2)

In instructing the jury that QBE was required to demonstrate that Novel's interpretation was unreasonable, and that QBE's interpretation was the "only construction that fairly could be place

5

(Tr. 475)

The Court also instructed the jury that the Policy should be considered as a whole, and interpreted – as much as possible – to give meaning to all of its provisions:

> An insurance policy must be read as a whole and every part should be read with reference to the whole. If possible, the policy should be interpreted so as to give effect to its general purposes as revealed within the four corners of the policy. An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and should be avoided if possible.

(Tr. 478)

In the event that the Policy and the extrinsic evidence did not permit the jury to determine the parties' intent, the jury was instructed – without objection – to apply the rule of contra proferentem:

> If, after considering the relevant policy language and the extrinsic evidence, you are still unable to determine the parties' intent, then you may, as a last resort, consider the fact that QBE drafted the relevant portions of the policy, and that, as a result, any ambiguities in the language of the policy must be construed against QBE. Accordingly, where efforts to determine the parties' intent from the policy itself and from extrinsic evidence prove fruitless, you should then construe the relevant policy language adversely to QBE, as the party that drafted that language.

(Tr. 478-79)[3]

---

on the Policy," the Court relied on Morgan Stanley Group Inc. v. New England Ins. Co., 225 F.3d 270, 276 (2d Cir. 2000); General Accident Ins. Co. of Am. v. Manchester, 116 A.D. 2d 790, 792 (3d Dept. 1986); Kronfeld v. Fidelity & Cas. Co. of N.Y., 53 A.D. 2d 190 (1st Dept. 1976); and Mobil Oil Corp. v. Reliance Ins. Co., 69 Misc.2d 876, 879 (Sup. Ct. N.Y. Cty. 1971), aff'd, 39 A.D.2d 839 (1st Dept. 1972). (Dkt. No. 69 at 10 n.1)

[3] In giving this instruction, the court relied on the following authorities: Union Ins. Soc'y v. William Gluckin & Co., 353 F.2d 946, 951-52 (2d Cir. 1965) ("The terms of an insurance policy are usually what the insurance company chooses to make them. That is the rationale of the general rule that any ambiguity is to be resolved liberally in favor of the insured. . . . However, this rule of construction 'is applicable only where the ambiguity persists after all other aids to construction are used. It certainly does not foreclose the use of parol evidence initially to resolve such ambiguity.'"); Atl. Cas. Ins. Co. v. Value Waterproofing, Inc., No. 11 Civ. 7565 (DLC), 2013 WL 152854, at *6 (S.D.N.Y. Jan. 15, 2013) ("Ambiguity in the language of the insurance contract that is not resolved by consideration of available extrinsic evidence is construed against the insurer and in favor of the insured."); Actors Fed. Credit Union, 2013 WL 754713, at *4 ("the doctrine of contra proferentem only applies if the ambiguity cannot be resolved by

On May 23, 2013, the jury returned a verdict finding that QBE had not met its burden of demonstrating that the Policy provides no coverage for invoices issued by Novel when more than $15 million in credit is outstanding to Covadonga. (Tr. at 486; Verdict Form (Dkt. No. 71))

## DISCUSSION

QBE has moved for judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 50(b). (Dkt. No. 90) QBE contends that it is entitled to judgment as a matter of law because Novel's interpretation of the Policy renders the Policy's Endorsed Credit Limit provision meaningless. (QBE Br. 7)

## I. LEGAL STANDARD

The standard for granting judgment as a matter of law under Rule 50 is "well established":

> Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in [the opposing party's] favor. In deciding

---

examining extrinsic evidence of the parties' intentions, either as a matter of law or as a matter of fact") (quotation omitted); Sarinsky's Garage Inc. v. Erie Ins. Co., 691 F. Supp. 2d 483, 486 (S.D.N.Y. 2010) ("Where the ambiguity cannot be resolved by examining extrinsic evidence of the parties' intentions – either as a matter of law or as a matter of fact – the court should construe the ambiguous language in accordance with the rule of contra proferentem, a rule of contract construction which requires the court to construe the contract against the insurer."); Alfin, Inc. v. Pacific Ins. Co., 735 F. Supp. 115, 121 n.5 (S.D.N.Y. 1990) ("Furthermore, perhaps the fact finder, after hearing all the evidence, will be able to resolve the dispute without the need to employ this doctrine of construction, which is only to be used as a last resort."); Charge of Judge Sand in Fogarty v. Near North Insurance Brokerage Co., Inc., No. 96 Civ. 1637 (Nov. 5, 1997) (Tr. 408); State Farm Mut. Auto. Ins. Co. v Philly Family Practice, Inc., 525 F. Supp. 2d 718, 726 (E.D. Pa. 2007) ("[C]ourts have commonly employed jury instructions to suggest the use of the contra proferentem rule to juries.") (citing Fogarty v. Near N. Ins. Brokerage, 162 F.3d 74, 78 (2d Cir. 1998)); Webb v GAF Corp., 936 F Supp 1109, 1119 (N.D.N.Y. 1996); Porous Media Corp. v. Midland Brake, Inc., 220 F.3d 954, 960 n. 8 (8th Cir. 2000) ("A contra proferentem instruction is appropriate where one party drafts and controls the contractual terms of a contract; in such situation, a contra proferentem instruction tells the jury to construe any ambiguity in such contract against the drafter."). (Dkt. No. 69 at 13 n.10)

such a motion, the court must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence. . . . Thus, judgment as a matter of law should not be granted unless

"(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or

(2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [the movant]."

Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir. 1998) (internal citations omitted) (quoting Cruz v. Local Union No. 3, 34 F.3d 1148, 1154 (2d Cir. 1994)); see also Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 133-34 (2d Cir. 2008) (same). The Second Circuit has noted that "[j]udgment as a matter of law on an issue as to which the movant bears the burden of proof is 'rare.'" Broadnax v. City of New Haven, 415 F.3d 265, 270 (2d Cir. 2010) (quoting Granite Computer Leasing Corp. v. Travelers Indem. Co., 894 F.2d 547, 551 (2d Cir. 1990)). "'A verdict should be directed in such instances only if the evidence in favor of the movant is so overwhelming that the jury could rationally reach no other result.'" Id. (citing Fairbrother v. Morrison, 412 F.3d 39, 53 (2d Cir. 2005); Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 109 (2d Cir. 2001).

## II. ANALYSIS

QBE contends that the jury's verdict must be overturned because Novel's interpretation of the Endorsed Credit Limit provision renders that term meaningless, and it is a "'cardinal rule of construction that a court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect.'" (QBE Br. 5-7 (quoting Corhill Corp. v. S.D. Plants, Inc., 9 N.Y.2d 595, 599 (1961)). This argument fails for several reasons.

As an initial matter, the rule cited by QBE is applied at an earlier stage of litigation, when a court is making a determination of whether a contract is ambiguous or

8

unambiguous as a matter of law.[4] The cases QBE relies on (QBE Br. 6-7) arise in this context. See, e.g., Golden Gate Yacht Club v. Societe Nautique de Geneve, 12 N.Y.3d 248, 256 (2009) (summary judgment); Nautilus Ins. Co. Matthew David Events, Ltd., 893 N.Y.S.2d 529, 532 (1st Dept. 2010) (summary judgment); U.S. Bank Nat'l Ass'n v. Southwest Airlines Co., No. 07 Civ. 11131(DLC), 2009 WL 2163594, at * 9 (S.D.N.Y. July 20, 2009) (summary judgment); Northwest Fin., Fernandez, No, 98 Civ. 6635(SAS), 1999 WL 946786, at *3 (S.D.N.Y. Oct. 19, 1999) (motion in limine to preclude the introduction of parol evidence with respect to the interpretation and meaning of a stock purchase agreement); Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs., 63 N.Y.2d. 396, 402-403 (1984) (declaratory judgment action); Chesapeake Energy Corp. v. Bank of N.Y Mellon, No. 13 Civ. 1582(PAE), 2013 WL 1890278, at *16-17 (S.D.N.Y. May 8, 2013) (bench trial).

Here, the Court determined at summary judgment that the Policy provisions addressing application of the Endorsed Credit Limit provision are ambiguous, and that accordingly neither side was entitled to judgment as a matter of law. QBE has cited no case in which a jury verdict has been overturned because the losing party's interpretation of a contract at trial better accounts for all provisions in an ambiguous contract. That is not the standard that applies to a motion for judgment as a matter of law challenging a jury verdict. See Galdieri-Ambrosini, 136 F.3d 276.

Moreover, QBE ignores the fact that it had the burden of proof on this issue at trial. In attempting to demonstrate that, under the Policy, the Endorsed Credit Limit analysis is applied each time an invoice is issued, and is not affected by payments

---

[4] QBE's current argument was not made at summary judgment.

9

that bring the cumulative credit balance below $15 million, QBE faced significant obstacles.

The Policy does not state the point in time at which the Endorsed Credit Limit analysis is conducted. The Policy that QBE drafted could have stated, but does not state, that this determination is made at the time that each invoice is issued. The Policy that QBE drafted likewise could have stated, but does not state, that no coverage will ever exist for invoices issued at a time when Novel has more than $15 million in credit outstanding to Covadonga. In sum, nothing in the Policy directly contradicts Novel's interpretation of "rollover" or "rolling" coverage, in which new invoices above the limit take the place of older invoices as they are paid off by Covadonga.

Given that the Policy contemplates, and the parties were aware, that Novel would be shipping rice to Covadonga on credit throughout the Policy's one-year term, it is not an unreasonable interpretation of the Policy that the Endorsed Credit Limit determination would be performed on a rolling basis and cumulatively, as old invoices were paid by Covadonga and new invoices were issued. It is likewise not an unreasonable interpretation of the Policy that the Endorsed Credit Limit determination would be made in the event of, and at the time of, Covadonga's default, and not when each invoice is issued. Given (1) the ambiguity in the Policy; (2) the fact that QBE had the burden of proof on this issue; (3) the conflicting extrinsic evidence; and (4) the contra proferentem instruction, the jury's verdict was entirely rational. QBE's arguments do not even begin to demonstrate "such an overwhelming amount of evidence in [QBE's] favor . . . that reasonable and fair minded [persons] could not [have] arrive[d] at a verdict against [it]." Galdieri-Ambrosini, 136 F.3d at 289.

## CONCLUSION

For the reasons stated above, QBE's motion for judgment as a matter of law, and motion for a stay of execution, are denied. The Clerk of Court is directed to terminate the motions (Dkt. Nos. 90, 84).

Dated: New York, New York
October 28, 2013

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge