

Sullivan & Worcester LLP
1633 Broadway
New York, NY 10019

T  212 660 3000
F  212 660 3001
www.sandw.com

Direct Line:  212 660 3024
msullivan@sandw.com

November 20, 2013

**BY ECF AND FACSIMILE**

Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

      Re:    <u>Novel Commodities S.A. v. QBE Insurance Corporation, 11 Civ. 6339 (PGG)</u>

Dear Judge Gardephe:

      We represent the judgment creditor, Novel Commodities S.A. ("Novel").  Further to the Court's order announced at the conference on November 15, 2013, we write in response to the request of judgment debtor QBE Insurance Corporation ("QBE"), submitted on November 18, 2013 (dkt. no. 104), for leave to pursue an interpleader action against Novel and a non-party, Access Global Capital, LLC ("Access").

      The Court should reject QBE's request for several reasons.  First, Access has not asserted an "adverse" claim to the judgment amount.  Rather, it is undeniable that Access's putative claim is as "the insured" under the insurance policy issued by QBE (the "Policy"). But under QBE's own policy language, Access is named as "the insured" only "for the account of Novel Commodities S.A."  Second, even if Access could assert its claim in a different capacity, such would be patently frivolous and should not be recognized by the Court.  Third, even if Access had asserted a cognizable claim, QBE's application comes too late—seven months after Access first asserted the claim, and five months after this Court entered judgment against QBE and in favor of Novel—and is therefore barred by the equitable defense of laches.  Fourth, QBE's request is also barred by the equitable defense of unclean hands, because QBE made a deliberate decision not to involve Access in this case.  Finally, denying the request for interpleader will not result in any harm to QBE.

## I.      Access's Putative Claim Is Not "Adverse"

      Interpleader is allowed only if "[t]wo or more adverse claimants . . . are claiming or may claim to be entitled to" property in the stakeholder's possession.  *See* 28 U.S.C. 1335; *see also Pine Run Props., Inc. v. Pine Run Ltd.*, No. 90 Civ. 6289 (PKL), 1991 WL 280719, at *8 (S.D.N.Y. Dec. 26, 1991) (citing cases).  This requirement applies equally to interpleader actions brought under Rule 22 of the Federal Rules of Civil Procedure: "even without express language, adversity on the part of the claimants would be required by the nature of

The Honorable Paul G. Gardephe
Page 2
November 20, 2013

the interpleader remedy because otherwise there would not be any need to protect either the stakeholder or the claimants."  7 Wright & Miller § 1705 at 549 n.1 (2d ed. 2001); *see also id.* at 549 ("A prerequisite for permitting interpleader is that two or more claimants must be 'adverse' to each other.").

Requiring that claims be "adverse" is another way of saying that the claims must be "mutually exclusive."  *See, e.g., Trowbridge v. Prudential Ins. Co. of Am.*, 322 F. Supp. 190, 192 (S.D.N.Y. 1971) ("interpleader is a procedural device which enables a person holding money or property conceded to belong to another to join two or more parties asserting mutually exclusive claims to the fund in a single suit"); 7 Wright & Miller § 1705 at 552 ("The simplest illustration of adversity is when each claimant asserts an exclusive right to the fund.").  Here, the claims of Access and Novel are not adverse; they are redundant.

Contrary to QBE's November 18 paraphrase, Access does not purport to claim as "an additional insured under the Policy."  *See* QBE's Letter Br. at 2.  Rather, Access claims as "the insured."  *See* Letter from Access's counsel, Richard Yeskoo to QBE's counsel, dated November 14, 2013 (attached hereto as Exhibit A) (same).   Indeed, Access has <u>never</u> identified itself as "an additional insured."  *See* Letter from Mr. Yeskoo to QBE's counsel, dated April 11, 2013 (attached hereto as Exhibit B) ("Access is the insured of your client, QBE Insurance Corporation, under policy number DC/8800281/AE").[1]

But by the very text of QBE's policy, Access is named as an insured only for "for the account of Novel Commodities S.A."  *See* Policy, Declarations Page (Plaintiff's Trial Exhibit 8) (attached hereto as Exhibit C).  So, Access's claim as "the insured" must be as agent for Novel.

Indeed, at trial, James Besch testified to Access's role as Novel's "agent":

> Q.     Going back to the same page, item 2, the named insured and mailing address, it identifies "Access Global Capital, LLC for the account of Novel Commodities S.A."  Why was Access Global identified in the box for named insured?
>
> A.     We were the agent for Novel in the United States.  Mr. Bayer [QBE's underwriter] was aware of that and this is the language he suggested.

Trial Tr. at 220:17-24 (attached hereto as Exhibit D).

By definition, therefore, Access is not adverse to Novel, at least vis-à-vis the Policy.  Accordingly, to the extent Access would assert a claim against the Policy, it may—and does—do so only in a representative capacity, <u>on behalf of</u> Novel.  Put another way, there is no legal basis for Access to assert any claim under the Policy on its own behalf.  Thus, as a matter of fact and law, any claim by Access as "the insured" is redundant it not adverse to

---

[1] Were Access claiming as an "*additional* insured", and were other circumstances different, QBE might conceivably fashion an argument that it is confronting claims of multiple insureds.  But that is not the case.

The Honorable Paul G. Gardephe
Page 3
November 20, 2013

the claim of Access's principal, Novel.[2]  Since there is no adversity, there can be no interpleader.

## II.   Access's Claim Is Not Sufficient To Justify Interpleader

Even if Access's claim could be considered as advanced on Access's own behalf and in competition with Novel, the claim would remain insufficient to support interpleader.  Such a claim would be "clearly devoid of substance."  *See* 7 Wright & Miller § 1705 at 550.  As this Court has found, "interpleader is inappropriate when the claims . . . actually fall below any meaningful threshold level of susbstantiality."  *Pine Run,* 1991 WL 280719, at *10 (internal citation omitted).  In other words, "a naked claim without any color of support does not justify interpleader."  *Stuyvesant Ins. Co. v. Dean Constr. Co.*, 254 F. Supp. 102, 108 (S.D.N.Y. 1966); *see also Viewhaven, Inc. v. Danon*, No. 85 Civ. 9603 (LLS), 1986 WL 6779, at *3 (S.D.N.Y. June 12, 1986) ("There is no doubt but that an asserted adverse claim may be so wanting in substance that interpleader . . . may not be justified.") (internal citation omitted).

Access's claim fails to meet the minimum threshold for interpleader.  As a preliminary matter, Access's claim is comprised of two bare-bones lawyer's letters, utterly devoid of facts, theory, or calculation.  The initial April 2013 letter from Access's lawyer failed to identify the elements of Access's claim, and did not even state a specific dollar amount.  The November 2013 letter from Access's lawyer, which was sent following an inquiry by QBE's counsel, added only that "the amount that Access is entitled to now exceeds $900,000."  Access has never explained its calculation of this dollar amount, nor has it submitted a single document as foundation for its claim under the Policy.

The only explanation offered has been the trial testimony of James Besch, Access's principal.  But Mr. Besch explained the claim asserted in his lawyer's April 2013 letter as follows:  Covadonga, not Novel, breached a promise to reimburse Access for the premium associated with QBE's policy.  Trial Transcript at 234:19-236:10.[3]  Such an explanation does not provide a basis for claim against the Policy.  Importantly for QBE, such an agreement could not provide a basis for Access to claim against QBE, either in connection with the policy or in connection with QBE's satisfaction of the judgment.

## III.   QBE's Request Is Barred By The Defense Of Laches

Even if Access had asserted a colorable claim, which is clearly not the case, QBE's request would be barred by its inexcusable delay in bringing this application for interpleader.

---

[2] Since Access is only entitled to assert a claim under the Policy on behalf of Novel, there is some logic to Access's original demand to QBE for "all proceeds of the policy."  *See* Exhibit B.  There is no logic, however, for Access's recent demand for an unspecified amount "in excess of $900,000."  *See* Exhibit B.  The arbitrary nature of the demand is apparent.

[3] QBE refers to Plaintiff's Trial Exhibit 14 in an effort to demonstrate the bona fides of Access's claim.  *See* QBE's Letter Br. at 2.  Exhibit 14 purports to be an agency agreement between Access and Novel.  Two facts undermine QBE's effort.  First, Exhibit 14 was never introduced into evidence.  Second, Exhibit 14 was "made as of June 8, 2010," over eight months after QBE sold Novel the Policy.  *See id.* at "Trial Exhibit 14".

The Honorable Paul G. Gardephe
Page 4
November 20, 2013

Interpleader is an equitable proceeding, and is thus subject to dismissal based on equitable defenses.  *See Truck-A-Tune, Inc. v. Re.*, 23 F.3d 60, 63 (2d Cir. 1994).  In particular, courts have found the equitable doctrine of laches applicable to interpleader actions brought by insurance companies under both Rule 22 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1335.  *See generally* David B. Levendusky, Annotation, *Availability of interpleader to insurance company for resolving dispute as to insurance policy under Federal Interpleader Acts (presently 28 U.S.C.A. §§ 1335, 1397, 2361) and Rule 22 of Federal Rules of Civil Procedure*, 19 A.L.R. Fed. 166 §§ 10 and 30 (citing cases).  A party asserting laches as a defensive bar to interpleader must establish two elements: (1) a lack of diligence by the party against whom the defense is asserted; and (2) prejudice to the party asserting the defense.  *See, e.g., Thom v. Ashcroft*, 369 F.3d 158, 166 (2d Cir. 2004) (elements of laches); *U.S. Fire Ins. Co. v. Asbestospray, Inc.*, 182 F.3d 201, 208 (3d Cir. 1999) (considering laches in interpleader action).  "To establish prejudice, the party raising laches must demonstrate that the delay caused a disadvantage in asserting and establishing a claimed right or defense." *Asbestospray,* 182 F.3d at 208; *see also Coleco Indus. Inc. v. Univ. City Studios, Inc.*, 637 F. Supp. 148, 150 (S.D.N.Y. 1986).  Both of these elements are present here.

QBE has known about Access's claim for more than seven months, since April 11, 2013, when Access's lawyer sent a letter to QBE's trial counsel asserting a claim.  Despite that knowledge, QBE made no attempt to interplead Access, and chose not even to allege the absence of an indispensable or necessary party.  It is now too late for QBE to bring Access into this case.[4]  As held long ago in a similar case involving an interpleader action asserted by an insurance company, QBE had a duty to act promptly in response to Access's claim:

> It is true that the Company had a right to pursue the equitable remedy in interpleader to rid itself of the vexation and expense of resisting adverse claims even if it believed that only one of them is meritorious. . . . but in such a situation, if the Company sought to take advantage of this equitable relief, it should have acted with a reasonable degree of promptness and with reasonable diligence.  Certainly, within one month after receiving the claim and realizing its predicament, it should have decided on a course of action.

*John Hancock Mut. Life Ins. Co. v. Doran*, 138 F. Supp. 47, 49 (S.D.N.Y. 1956).  More recently, the Second Circuit found that an interpleader action was "too late" when commenced four or five months after the stakeholder learned of the competing claim.  *See Mendez v. Teachers Ins. and Annuity Ass'n and College Retirement Equities Fund*, 982 F.2d 783 (2d Cir. 1992).  QBE's lengthier delay, of more than seven months, is clearly unreasonable.

---

[4] Of note, Rule 22 of the Federal Rules of Civil Procedure does not contemplate the assertion of a post-judgment claim for interpleader.  The language of Rule 22 expressly applies only to "a *defendant* exposed to similar liability." Fed. R. Civ. P. 22(a)(2) (emphasis added).  Here, since the judgment has been entered and QBE has announced that it will not appeal, QBE is no longer the "defendant" in this case, but only the "judgment debtor."

The Honorable Paul G. Gardephe
Page 5
November 20, 2013

Moreover, QBE received the letter from Access's lawyer more than a month before the first day of trial in this action.  Had QBE actually feared that Access's claim would lead to multiple litigation, QBE could have—and should have—refused to proceed to trial without Access as a party.  Instead, however, QBE made a deliberate decision to proceed with a trial involving only Novel's claims.  Now, that trial is complete, a verdict has been issued, and a final judgment has been entered in favor of Novel.

As for the second element of laches, there can be no question that QBE's delay is prejudicial to Novel.  Having taken no action on Access's claim prior to this point, QBE has improperly resurrected that claim at the eleventh hour, as a barrier to full satisfaction of the judgment.  Further, in parallel correspondence submitted on November 18, 2013 (dkt. no. 107), QBE has invoked Access's claim as an obstacle to this Court's entry of a global stipulation among Novel and certain garnishors regarding the distribution of the judgment proceeds.

QBE's ongoing refusal to pay Novel the amounts it is owed under the Policy, and the associated costs of litigation, have already caused grievous injury to Novel.  Further delay will likely exacerbate this injury.  Indeed, Novel's financial position has been so compromised by QBE's delay that it may be unable to underwrite further legal proceedings to address the issue that QBE could have raised earlier.

Novel is entitled to immediate payment of the judgment, and the Court should not sanction QBE's ongoing attempts to delay fulfillment of its obligations.

## IV.    QBE's Request Is Barred By The Defense of Unclean Hands

QBE's request is further barred by the equitable defense of unclean hands.  *See, e.g., Royal School Laboratories, Inc. v. Town of Watertown*, 358 F.2d 813, 817 n.3 (2d Cir. 1966) ("interpleader may not be invoked by a plaintiff with unclean hands").  A party asserting a defense of unclean hands as a bar to interpleader must establish that the present controversy would not exist absent the conduct of the party seeking interpleader. *See William Penn Life Ins. Co. of N.Y. v. Viscuso*, 569 F. Supp. 2d 355, 362 (S.D.N.Y. 2008). Here, the dilemma of which QBE complains—the prospect of facing multiple claims to the judgment amount—is a dilemma of QBE's own creation.  At every stage of this proceeding, QBE willfully chose not to involve Access in this case, even after receiving Access's claim. Simply put, this an egregious example of a judgment debtor seeking to shift responsibility for the consequences of its decision to proceed to trial in the face of a competing claim to the res in dispute.

None of the cases cited by QBE is factually apposite on this point.  *See* QBE's Letter Br. at 3.  None concerns a judgment debtor who chose to *ignore* competing claims by an alleged beneficiary until after the entry of a final and non-appealable judgment.  Rather, two of the three cases on which QBE relies to support the propriety of interpleader after judgment concern a routine fact pattern: in the post-judgment setting, claimants who are lienors or creditors of the judgment creditor assert competing claims to the judgment proceeds.  *See Spielvogel v. Harkins & Maeger Ltd.*, 639 F. Supp. 1397 (S.D.N.Y. 1986) (judgment debtor commenced interpleader action to resolve competing claims asserted by other creditors of judgment creditor); *Compass Transp. Corp. v. Stangl*, No. 96-CV-0095E(H), 1996 WL 483495 (W.D.N.Y. 1996) (same).  The third case cited by QBE, *Viewhaven*, addresses a unique situation in which two parties asserted claims to the same royalties, with one party claiming entitlement to the royalties pursuant to a state court

The Honorable Paul G. Gardephe
Page 6
November 20, 2013

judgment affirming an arbitration that awarded the royalties to him, and the other claiming entitlement pursuant to unrelated contracts and intellectual property rights.

Put another way, QBE cites no case, and Novel is aware of none, in which a Court has allowed a judgment debtor to interplead judgment proceeds in response to a putative competing claim asserted well before trial, verdict and judgment.

## V.    QBE Will Suffer No Prejudice If The Court Denies The Application For Interpleader

To the extent Access purports to assert rights as "the insured" under the Policy, QBE's exposure to any additional claim was fixed earlier this year when it proceeded to trial without then seeking to interplead.  Denying QBE's current application will not alter that fact.

Moreover, whether Access's putative claim is based on its alleged status as "the insured" or something else, such claim undeniably does not create a lien against the judgment proceeds or any other property.  Thus, QBE faces no increase in liability if it satisfies the Judgment.

* * *

For the foregoing reasons, we respectfully urge the Court to:

(1)    Reject QBE's application;

(2)    Enter the proposed order Novel submitted on Friday, November 15, 2013, which provides for QBE's payment of the Judgment Amount, less $900,000; and

(3)    Further order QBE's immediate payment to Novel of the remaining Judgment Amount, i.e., the withheld $900,000.


Respectfully submitted,

/s/

Michael T. Sullivan


Enclosures

cc:   Stephen Kennedy, Esq. and Victoria Melcher, Esq. (by ECF, w/enc.)
         Counsel for Defendant QBE Insurance Corporation

      Richard C. Yeskoo, Esq. (by e-mail, w/enc.)
         Counsel for Access Global Capital, LLC

# Exhibit A

# YESKOO  HOGAN & TAMLYN, LLP

### A NEW YORK LIMITED LIABILITY PARTNERSHIP
### ATTORNEYS AT LAW

RICHARD C. YESKOO[1]
STEPHEN HOGAN[2]
THOMAS T. TAMLYN[2]
———
[1]MEMBER N.J. & N.Y. BAR
[2]MEMBER N.Y. BAR

139 SOUTH STREET
NEW PROVIDENCE, NEW JERSEY 07974
TEL: (908) 464-8300
FAX: (908) 464-2828

NEW YORK OFFICE
909 THIRD AVENUE, 28TH FLOOR
NEW YORK, NY 10022
(212) 983-0900

November 14, 2013

By Mail and E-mail

Stephen M. Kennedy
Clyde & Co. US LLP
405 Lexington Avenue
New York, NY 10174

Re:     Access Global Capital, LLC/QBE Insurance

Dear Mr. Kennedy:

Our firm represents Access Global Capital, LLC ("Access").  Access is the insured of your client, QBE Insurance Corporation ("QBE"), under policy number DC/8800281/AE.

I had previously written on April 11, 2013 to your partner Michael A. Knoerzer to inform you that Access is entitled to certain proceeds of such policy.  The amount that Access is entitled to now exceeds $900,000.  We demand that if this matter is not resolved amicably that you interplead the policy premiums in the United States District Court for the Southern District of New York.

Yours truly,

Richard C. Yeskoo

cc:     Michael Sullivan

# Exhibit B

# YESKOO  HOGAN  &  TAMLYN, LLP

### A NEW YORK LIMITED LIABILITY PARTNERSHIP
### ATTORNEYS AT LAW
### 139 SOUTH STREET
### NEW PROVIDENCE, NEW JERSEY 07974
### TEL: (908) 464-6300
### FAX: (908) 464-2828

RICHARD C. YESKOO[1]
STEPHEN HOGAN[2]
THOMAS T. TAMLYN[2]

[1]MEMBER N.J. & N.Y. BAR
[2]MEMBER N.Y. BAR

NEW YORK OFFICE
909 THIRD AVENUE, 28TH FLOOR
NEW YORK, NY 10022
(212) 983-0800

April 11, 2013

By Certified Mail, Return Receipt Requested

Michael A. Knoerzer
Clyde & Co. US LLP
405 Lexington Avenue
New York, NY 10174

Re:    Access Global Capital, LLC/QBE Insurance

Dear Mr. Knoerzer:

Our firm represents Access Global Capital, LLC ("Access").  Access is the insured of your client, QBE Insurance Corporation ("QBE"), under policy number DC/8800281/AE.  We understand that this policy is currently subject to litigation in the United States District Court for the Southern District of New York in case number 1:11-cv-6339 (PGG).

Please be advised that Access is entitled to certain proceeds of such policy, specifically including the premium, which it advanced.  Access demands that all proceeds of the policy, whether paid by settlement or final judgment, be paid to it as the insured.

Yours truly,

Richard C. Yeskoo

cc:    Karen Abravanel


EXHIBIT
DD

# Exhibit C



# Notice to Policyholders
# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")

**NO COVERAGE IS PROVIDED BY THIS POLICYHOLDER NOTICE NOR CAN IT BE CONSTRUED TO REPLACE ANY PROVISIONS OF YOUR POLICY. YOU SHOULD READ YOUR POLICY AND REVIEW YOUR DECLARATIONS PAGE FOR COMPLETE INFORMATION ON THE COVERAGES YOU ARE PROVIDED.**

**THIS NOTICE PROVIDES INFORMATION CONCERNING POSSIBLE IMPACT ON YOUR INSURANCE COVERAGE DUE TO DIRECTIVES ISSUED BY OFAC.**

**PLEASE READ THIS NOTICE CAREFULLY**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

➢ Foreign agents;
➢ Front organizations;
➢ Terrorists;
➢ Terrorist organizations; and
➢ Narcotics traffickers;

As "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site - http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

Includes copyrighted material of Insurance Services Office, Inc., with its permission

QBGS-103 (07-04)                                                                                   Page 1 of 1



# Trade Credit Insurance Policy

## Policy Declaration

## Specific Account

Attaching to and Forming Part of Policy Number   DC/8800281/AE

| | | |
|---|---|---|
| Item 1. | Insurer | QBE Insurance Corporation<br>A Stock Company<br>88 Pine Street 16th Floor<br>New York, NY 10005<br><br>Home Office: c/o CT Corporation System<br>1515 Market Street, Suite 1210<br>Philadelphia, PA 19102 |
| Item 2. | Named Insured<br>and Mailing Address | Access Global Capital LLC *for the account*<br>*of Novel Commodities S.A.*<br>8 Old Clinton Road<br>Lebanon, NJ 08833 |
| Item 3. | Broker of Record | Aon Trade Credit<br>Dominion Tower<br>625 Liberty Avenue — 10th Floor<br>Pittsburgh, PA 15222 |
| Item 4. | Policy Period | October 01, 2009 to September 30, 2010<br>At 12:01 a.m. Standard Time<br>(At the Insured's Address Stated Above) |
| Item 5. | Buyer | CIA. Arrocera Covadonga<br>Av. Industria No 5<br>Colonia Santa Clara<br>55540 Ecatepec Estado de México<br>Mexico |
| Item 6. | Policy Currency | USD |
| Item 7. | Policy Amount | $9,000,000 |
| Item 8. | Premium | $300,000 |
| Item 9. | Endorsed Credit Limit | $10,000,000 |
| Item 10. | Deductible | $500,000 |

QBE 006406



# Trade Credit Insurance Policy

## Policy Declaration

| Item 11. | Insured Percentage | 95% |
|---|---|---|
| Item 12. | Approved Country | Mexico |
| Item 13. | Maximum Terms of Payment (Standard) | 150 Days |
| Item 14. | Maximum Terms of Payment (Special) | 150 Days |
| Item 15. | Maximum Extension Period | 10 Days |
| Item 16. | Description of Trade | Rice, beans, and food products |
| Item 17. | Approved Claims Currency | USD |
| Item 18. | Endorsements attaching to Specific Account Policy Form QBTC-0003 (10-05) as follows: Approved Country Risk Schedule: Form QBTC-0300 (10-05) Endorsement 1: Form QBTC-0132 (10-05) Endorsement 2: Form QBTC-0215 (10-05) Endorsement 3: Form QBTC-0224 (10-05) Endorsement 4: Form QBTC-0303 (10-05) | |

In consideration of the Premium paid by you, and subject to all the terms and conditions of the Policy, we agree to provide you with the insurance stated in this Policy.

In witness whereof, we have caused this policy to be executed and attested by our authorized officers, but this policy shall not be valid unless also signed by a duly authorized representative of our company.

Peter T. Maloney – Secretary

Susan Rivera - President

Issued and accepted by QBE Insurance Corporation

Authorized Representative

October 16, 2009

QBE 006407

# Exhibit D

# In The Matter Of:

*NOVEL COMMODITIES S.A., v*
*QBE INSURANCE CORPORATION,*

*May 21, 2013*

*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK, NY 10007*
*212 805-0330*

Original File D5LBNOVF.txt
**Min-U-Script® with Word Index**

| D5LBNOV5 | Besch - direct | Page 220 |
|---|---|---|

1 Q. What do you remember Mr. Bayer saying to you?
2 A. He agreed.
3     THE COURT: When did this conversation take place?
4     THE WITNESS: I honestly-- it would be after we
5 received the indicative quote from him, but I can't remember
6 the date.
7 Q. Mr. Besch, would you turn to Plaintiff's Exhibit 5,
8 please?
9 A. Okay.
10 Q. And the second page, if you would. This is a policy
11 declaration for-- a QBE policy covering the period February 1,
12 2009 through June 30, 2009.
13     Does this policy relate to the conversations with
14 Mr. Bayer about which you've just spoken?
15 A. It does. I believe this is the first policy where QBE came
16 in as primary insurance carrier for Novel.
17 Q. Going back to the same page, item 2, the named insured and
18 mailing address, it identifies "Access Global Capital, LLC for
19 the account of Novel Commodities S.A."
20     Why was Access Global identified in the box for named
21 insured?
22 A. We were the agent for Novel in the United States.
23 Mr. Bayer was aware of that and this is the language he
24 suggested.
25 Q. Now, item 3 identifies AON Trade Credit as the broker of

| D5LBNOV5 | Besch - direct | Page 221 |
|---|---|---|

1 record.
2     How did AON Trade Credit come to be involved in the
3 QBE policy?
4 A. Way back in 2006 or '7, when we had the Euler policy, and
5 the first time QBE came on board, just about the time of
6 executing the first QBE excess policy, I got a call from Wayne
7 Bayer. And he indicated that for QBE to do business with us,
8 that we, Access Global Capital, and Novel needed to work with a
9 licensed insurance broker. He suggested John Hertzer at AON.
10 Q. Had you had any previous relationship with John Hertzer?
11 A. No.
12 Q. Is that why AON Trade Credit is listed as broker of record
13 for this policy?
14 A. It is.
15 Q. Did Mr. Hertzer-- was Mr. Hertzer involved in your
16 discussions with Mr. Bayer?
17 A. With the QBE policies, very little.
18 Q. Did you communicate directly with Mr. Bayer?
19 A. I did.
20 Q. What form did those communications take?
21 A. In?
22 Q. What form? On the phone? E-mails?
23 A. Oh, mostly by the phone. I'm a phone guy. I'll pick up
24 the phone more than send an e-mail. But mostly by phone and
25 occasionally by e-mail.

| D5LBNOV5 | Besch - direct | Page 222 |
|---|---|---|

1 Q. Mr. Besch, would you look at Plaintiff's Exhibit 6,
2 please?
3 A. Okay.
4 Q. Could you identify Plaintiff's Exhibit 6, please?
5 A. This is an e-mail correspondence between myself and
6 Mr. Bayer.
7 Q. First of all, can you tell me what prompted you to initiate
8 an e-mail exchange with Mr. Bayer?
9 A. Well, I was contacted by Mr. Gouverne in Geneva that they
10 had a new bank employee at BNP Paribas, I believe, that was
11 reviewing the QBE policy and they needed confirmation on this
12 specific information.
13 Q. What specific information is that?
14 A. Well, they wanted to know that the policy could roll over;
15 that old invoices-- new invoices would be allowed in the policy
16 as old invoices were paid down.
17 Q. You used the word "roll over," and I think you explained
18 what it meant. But just to be clear, what do you mean by the
19 phrase "roll over" in this context?
20 A. So when you have a limited capacity of an insurance policy,
21 once you reach that capacity, as old invoices are paid, that
22 allows capacity for new invoices to come in under the policy to
23 be covered.
24 Q. What did you understand-- how did you understand-- how did
25 you interpret Mr. Bayer's response to your e-mail?

| D5LBNOV5 | Besch - direct | Page 223 |
|---|---|---|

1 A. Well, it's funny about this e-mail because I remember when
2 I got it, it was to me an e-mail that would be a very easy
3 confirmation from Wayne. I thought this would be something
4 that he could respond to very quickly and affirmatively. So I
5 drafted this e-mail, sent it off to him. He came back with his
6 response.
7 Q. Would you tell me how you interpreted Mr. Bayer's
8 response?
9 A. He was confirming that we, indeed, have a policy that does
10 roll over. He was acknowledging to me, the way I interpreted
11 it, that we had informed him that we were over the policy limit
12 by a little less than $1.2 million. That was not an issue. He
13 didn't raise any red flags about it. We were informing him,
14 getting clarification, because that's what the bank wanted.
15 And he basically came back with the confirmation that I
16 expected.
17 Q. Which was what?
18 A. Which was the policy does roll over and you are allowed to
19 be over the credit limit, pay down old invoices and allow new
20 invoices to come in under the policy.
21 Q. Would you turn to Plaintiff's Exhibit 8, please?
22 A. Okay.
23 Q. Would you identify Plaintiff's 8, please?
24 A. This is a QBE primary policy from October 1st, 2009 through
25 September 30th, 2010.

NOVEL COMMODITIES S.A., v
QBE INSURANCE CORPORATION,

May 21, 2013

---

D5LVNOV6          Besch - direct          Page 232

1    (At the side bar)
2    THE COURT: If this meeting was conducted as a
3  settlement conference and it was agreed at the outset that it
4  would be covered by the rules that generally apply to
5  settlement discussions, then it's inadmissible.  And there was
6  a representation made that the meeting was a settlement
7  discussion, and it was all agreed ahead of time it was going to
8  be confidential.  And you seem to accept that.  And now you
9  want to go into what was said at the meeting.
10    MR. SULLIVAN: Slightly different, your Honor.
11    I understand that views exchanged in a settlement
12  conference may not be offered to indicate or try to demonstrate
13  liability or concession or anything at all like that, and I
14  have no intent to offer or try to suggest that any such
15  concession was made.
16    I'm simply trying to establish that at this meeting,
17  the position announced several weeks earlier was reaffirmed.
18  And I am not trying to get into any aspect of settlement
19  discussions or discussions of compromise or anything at all
20  like that.  And my understanding is that type of evidence is
21  not appropriate, nor is any attempt to show a concession of
22  liability appropriate.  And I'm not attempting to do that at
23  all.
24    THE COURT: Do you object to him eliciting that at the
25  meeting QBE denied coverage for the same reasons it had

---

D5LVNOV6          Besch - direct          Page 233

1  previously stated?
2    MR. KNOERZER: Is that as far as it goes?
3    MR. SULLIVAN: Yes.
4    THE COURT: And I want you to ask the question in that
5  fashion.
6    MR. SULLIVAN: Yes.
7    THE COURT: Okay.  Any objection?
8    MR. KNOERZER: Not if that's as far as it goes.  If
9  we're leaving that meeting after that, okay.
10    MR. SULLIVAN: We're leaving that meeting.
11    THE COURT: Okay.
12    (Continued on next page)

---

D5LVNOV6          Besch - direct          Page 234

1    (In open court)
2  BY MR. SULLIVAN:
3  Q.  Mr. Besch, returning to the meeting you had in the summer
4  of 2011.  At the conclusion of the meeting, did you understand
5  that QBE was reaffirming its position that extensions of credit
6  by Novel to Covadonga at a time when Covadonga owed Novel more
7  than $15 million were not and never would be covered by the
8  policy?
9  A.  Yes.
10  Q.  After the meeting, did you have a private -- withdrawn.
11    MR. SULLIVAN: I have no questions for Mr. Besch at
12  this time.
13    THE COURT: All right.
14    Cross-examination.
15    MR. SULLIVAN: I'm sorry, your Honor.
16    I do have another question.  May I continue?
17    THE COURT: Sure.
18  BY MR. SULLIVAN:
19  Q.  Mr. Besch, would you turn to Exhibit Defendant's DX DD.
20  A.  I'm sorry, which one?
21  Q.  DD.  And it's preceded by the letters "DX."
22  A.  Okay.
23    MR. SULLIVAN: Your Honor, this is a letter, the
24  admissibility of which, has been agreed.  And I offer it into
25  evidence.

---

D5LVNOV6          Besch - direct          Page 235

1    THE COURT: Any objection?
2    MR. KNOERZER: No objection.
3    THE COURT: Defendant's Exhibit DD is received.
4    (Defendant's Exhibit DD received in evidence)
5  Q.  Mr. Besch, would you identify Exhibit DD?
6  A.  Sure.  This is a letter from my attorney, Richard Yeskoo,
7  sending it to QBE -- actually, the attorney for QBE,
8  Mr. Kosner -- indicating that he had learned that there was a
9  litigation with Novel in New York; and that the other litigant
10  may be making an attack on any proceeds paid out of this claim.
11  And he suggested that I -- or he forward a letter to QBE
12  indicating that I was the insured under the policy and have
13  rights under the policy for payment.
14  Q.  In the letter, your attorney -- well, first of all, you
15  authorized your attorney to send this letter?
16  A.  I did.
17  Q.  In the letter, your attorney writes in the second
18  paragraph: Please be advised that Access is entitled to
19  certain proceeds of such policy, specifically including the
20  premium, which it advanced.
21    Is it true that you advanced the premium on Novel's
22  behalf?
23  A.  I did.  And I paid for most premiums throughout the history
24  of this.
25  Q.  Did you have an arrangement with Covadonga respecting the

---

NOVEL COMMODITIES S.A., v
QBE INSURANCE CORPORATION,

May 21, 2013

1  premium for this policy?
2  A. I did.
3  Q. What was that arrangement?
4  A. I was going to advance the premium, and Covadonga was going
5  to reimburse me for it.
6  Q. Did Covadonga fulfill that part of --
7  A. No.
8  Q. -- this agreement with you?
9        And Covadonga is now in bankruptcy, is that --
10  A. They are.
11        MR. SULLIVAN: Pass the witness, your Honor.
12  CROSS-EXAMINATION
13  BY MR. KNOERZER:
14  Q. Good afternoon, Mr. Besch. My name is Mike Knoerzer.
15        We've not met, right?
16  A. We haven't.
17  Q. Let's go right back to this document that we've just looked
18  at, Exhibit DD.
19  A. Okay.
20  Q. It's a letter from your attorney to me.
21        Is this letter saying that any money -- withdrawn.
22        Am I to understand you believe Covadonga owes you the
23  premium?
24  A. Yes. Originally, I advanced it on behalf Covadonga. They
25  did not repay me. I have an agency agreement with Novel in

1  which they indemnify me against any loss, so that's the reason.
2  Q. Do you believe Covadonga is the insured under the policy?
3  A. No.
4  Q. Is Novel the insured under the policy?
5  A. Yes.
6  Q. So --
7  A. And I am, as well. I believe I'm named as insured, as
8  well.
9  Q. But you paid the premium?
10  A. I did.
11  Q. So we're in agreement Covadonga is not the insured under
12  the policy.
13  A. Right.
14  Q. Your contention is that Covadonga owes the premium to
15  you?
16  A. That's correct.
17  Q. Do you have any documents to back that up?
18  A. I -- we have an invoice that we sent to them. I don't have
19  it with me.
20  Q. Is it in the record that you're aware of?
21  A. I don't know. I don't believe -- I don't know.
22  Q. Setting aside whether Covadonga owes you the premium or
23  not, this letter says that if Novel gets any money in this
24  case, it should be turned over to you or your lawyer, right?
25  A. That's correct.

1  Q. So would you agree with me that you have a financial
2  interest in the outcome of this case?
3  A. I absolutely do.
4  Q. And Novel doesn't have the money to pay you, is that the
5  case?
6  A. They do not.
7  Q. Is Novel completely out of business?
8  A. I don't know. They are in trouble.
9  Q. Are you still working with them?
10  A. Yes, I am.
11  Q. Are you being compensated for your time here today?
12  A. I am not.
13  Q. Do we -- do you agree -- let me back up.
14        Mr. Besch, you've been sitting here through the entire
15  proceeding, haven't you?
16  A. I have.
17  Q. Do you agree that invoices over the endorsed credit limit
18  are not covered under the policy that is at issue in this case?
19  A. I do, until such time when older invoices are paid and then
20  they would become insured.
21  Q. Let us turn to Exhibit 8. Do you have the binder?
22  A. I do.
23  Q. And I'll just show you the front page of the policy.
24        Do you recognize Exhibit 8 to be the policy that's at
25  issue in this case?

1  A. I do.
2  Q. And did you see me take Mr. Gouverne through the
3  endorsements that show that the policy amount was increased to
4  13,500,000?
5  A. Yes.
6  Q. And you understand that that's what happened, the policy
7  amount was ultimately increased to 13,500,000?
8  A. Yes.
9  Q. And you also saw the endorsement to this policy, Exhibit 8,
10  where the credit limit or the endorsed credit limit was
11  increased to 15 million. Do you see that?
12  A. Yes.
13  Q. And you have no doubt that this is the policy that's at
14  issue in this case?
15  A. No.
16  Q. And you agree that invoices over the $15 million endorsed
17  credit limit of this policy are not covered?
18  A. Until such time as older invoices are paid, and then they
19  would be covered.
20  Q. When you make the trans -- when Novel makes that
21  transaction, do they know that older invoices will be repaid?
22        Is there any certainty to that?
23  A. No.
24  Q. So at the time that they make the transaction above the
25  endorsed credit limit, all they know is that they are making a